1          IN THE UNITED STATES DISTRICT COURT OF

2            THE NORTHERN DISTRICT OF MISSISSIPPI

3                  NORTHWESTERN DIVISION

4

5    CONSTANCE MCMILLEN,        )

6             Plaintiff,        )

7                               )

8    VS.                        )    NO. 1:10CV61-D-D

9                               )

10   ITAWAMBA COUNTY SCHOOL     )

11   DISTRICT, ET AL.,          )

12             Defendants.      )

13

14            BE IT REMEMBERED, that the

15   above-captioned cause came to be heard on this, the 22nd

16   day of March, 2010, before the Honorable GLEN DAVIDSON,

17   Judge presiding, when and where the following

18   proceedings were had to wit:

19

20            ALPHA REPORTING CORPORATION

21               Heather L. Deloach

22               236 Adams Avenue

23            Memphis, Tennessee 38103

24               (901) 523-8974

```
 1                  A P P E A R A N C E S

 2

 3

 4   ON BEHALF OF THE PLAINTIFF:

 5

 6              MS. CHRISTINE P. SUN

 7              New York, New York

 8

 9              MS. KRISTY BENNETT

10              ACLU of Mississippi

11              Jackson, Mississippi

12

13              MS. ALYSSON LEIGH MILLS

14              Fishman Haygood

15              New Orleans, Louisiana

16

17   ON BEHALF OF THE DEFENDANT:

18

19              MR. BENJAMIN E. GRIFFITH

20              Griffith & Griffith

21              Cleveland, Mississippi

22

23              MS. MICHELE HORN FLOYD

24              Fulton, Mississippi
```

1    COURT REPORTING FIRM:

2

3              ALPHA REPORTING CORPORATION

4              Heather L. Deloach

5              236 Adams Avenue

6              Memphis, Tennessee 38103

7              Phone: (901) 523-8974

8

9                        I N D E X

10

11   WITNESS:                                      PAGE

12   CONSTANCE MCMILLEN

13        Direct Examination

14             By Ms. Bennett                       19

15        Cross Examination

16             By Mr. Griffith                      33

17

18   TERESA MCNEESE

19        Direct Examination

20             By Mr. Griffith                      35

21        Cross Examination

22             By Ms. Sun                           41

23        Re-Direct Examination

24             By Mr. Griffith                      56

1    TRAE WIYGUL

2        Direct Examination

3            By Mr. Griffith                        57

4        Cross Examination

5            By Ms. Bennett                         64

6    EDDIE HOOD

7        Direct Examination

8            By Ms. Floyd                           68

9        Cross Examination

10            By Ms. Sun                            75

11        Re-Direct Examination

12            By Ms. Floyd                          78

13    JIM KEITH

14        Direct Examination

15            By Mr. Griffith                       80

16        Cross Examination

17            By Ms. Sun                            90

18                    E X H I B I T S

19    NO.                  DESCRIPTION           PAGE

20    EXHIBIT NO. P-1                               28

21    EXHIBIT NO. P-2                               45

22    EXHIBIT NO. P-3                               47

23    EXHIBIT NO. P-4                               49

24    EXHIBIT NO. D-1                               62

```
 1               P R O C E E D I N G S

 2            THE COURT:  Okay.  You needed a conference

 3    with the Court.

 4            MS. BENNETT:  Yes, Your Honor.  Constance's

 5    girlfriend obviously, you know, may be mentioned and

 6    she's a minor.  We want to just make sure that it's

 7    understood that her name wouldn't be mentioned.

 8            MR. GRIFFITH:  Absolutely, we understand

 9    that, Your Honor.  That will be off limits for any

10    questions from us and that will remain confidential from

11    our standpoint.

12            THE COURT:  Okay.  I just wonder do you

13    think we ought to -- it might be good to establish a

14    ground rule and refer to her as Jane Doe or something.

15    I don't know.

16            MS. BENNETT:  I've instructed Constance not

17    to refer to her by name.  She can call her her

18    girlfriend.

19            THE COURT:  Okay.

20            MS. BENNETT:  It would be hard for her to

21    call her like Jane Doe.

22            THE COURT:  Okay.

23            MS. BENNETT:  I told her to be sure not to

24    use her name.  That I would make sure that -- do you
```

1    want to establish something?

2              MS. SUN:  I don't think her identity has

3    anything to do with any of the issues so I can't imagine

4    that her name is going to come up.

5              THE COURT:  All right.  Do we have any other

6    ground rules we need to post at this time?

7              MS. BENNETT:  Are there witnesses expected

8    to testify?

9              MR. GRIFFITH:  Excuse me?

10             MS. BENNETT:  Are y'all calling any

11   witnesses?

12             MR. GRIFFITH:  Yes.

13             THE COURT:  Yeah, you need to establish a

14   record.

15             MR. GRIFFITH:  We have all of the members of

16   the school board who has been served or processed.  The

17   superintendent of education, the principal and assistant

18   principal and I believe one expert witness Jim Keith.

19   He's the general counsel for the Mississippi School

20   Board Association.

21             MS. SUN:  Your Honor, we have an objection

22   to Mr. Keith's testimony.  I don't believe that he's

23   offering anything but hearsay and he's also offering

24   expert opinions on things that are inappropriate.

1    Specifically the ultimate legal conclusion as to whether

2    there was a material disruption sufficient to justify

3    the censorship in this case.  So we have an objection to

4    his testimony.  I mean, he's clearly testifying about

5    matters that are not within his personal knowledge and

6    also offering opinions that are inappropriate for an

7    expert.

8                    MR. GRIFFITH:  May I respond?

9                    THE COURT:  Yes, sir.

10                    MR. GRIFFITH:  Your Honor, he is a qualified

11   witness and will be able to testify as an expert based

12   on his training, experience, specialized knowledge and

13   his education.  He'll be confining himself to testimony

14   relating to the governance of school boards, the policy

15   and the decision-making process of school boards.  He

16   will not be expressing any opinions that are legal

17   conclusions or legal opinions.  He will not be

18   addressing the ultimate issue before this Court.  But it

19   is an essential matter because the Plaintiffs are taking

20   issue with the action of the school board and

21   withdrawing its sponsorship of the prom.

22                    They are challenging that as a sham decision

23   or a decision that's not honestly made.  Because of that

24   it is essential for us to establish a record as to not

1  only the normality and the propriety of that decision

2  but how it reflects the policy judgments that must be

3  made by school board members.  Particularly in light of

4  matters that they find as a fact are disruptive to the

5  educational process and the core mission of the public

6  school system which is to educate students.

7            MS. SUN:  May I respond?  With all respect

8  those opinions that he is offering are purely legal

9  opinions.  There is no allegation that board procedures

10  weren't followed.  I think the issue is whether that

11  decision was lawful or not and that is purely a legal

12  conclusion.  We're not challenging the board's internal

13  policies or procedures.  And as I've read his

14  declaration, he states that he has spoken to school

15  board members and, you know, purports to identify some

16  disruption that would occur.  All of that is hearsay.

17  You know, if there are witnesses that can testify

18  personally to that, you know, those are -- that would be

19  appropriate.

20            MR. GRIFFITH:  Your Honor, we will ask that

21  Mr. Keith as an expert be allowed to sit in the

22  courtroom to hear all of the testimony as well.  We'll

23  lay a proper predicate for that testimony as the Court

24  knows under rule 702 and 703.  The expert is permitted

1    to testify even on the basis of hearsay if it is data of

2    a type that's reasonably relied upon by experts in his

3    field.

4              THE COURT:  Okay.

5              MR. GRIFFITH:  Which we'll establish the

6    predicate for, Your Honor.

7              THE COURT:  This Court has always ruled that

8    opinions of law are not admissible.  Now, the only

9    exception is in a patent case.  I've permitted lawyers

10   to testify that a patent is valid.  Other than that I've

11   not permitted expert testimony as to questions of law.

12   Now, if he testifies to something else, then perhaps I

13   will.  I don't want to rule in limine here on matters

14   that may or may not be relevant later on in the case.

15             MR. GRIFFITH:  Your Honor, I really believe

16   that once we have a record more fully developed with the

17   lay witnesses and the board members that will testify

18   that it will be not only a matter that we can probably

19   all tractate and shorten the proceedings but it will

20   inform the expert's opinion and provide a real clear

21   basis for what he's opining.  And that will not be legal

22   opinions.  It will only relate to matters of governance

23   and the decision-making process.  He's addressing the

24   process of school board members.  Many of whom he's

1    actually been involved in the training of.

2              THE COURT:  We'll reach that when we get to

3    it in the case.  As far as him being in the courtroom,

4    he's an officer of the Court and he is an attorney, he

5    will be permitted to remain in the courtroom.

6              MR. GRIFFITH:  Yes, sir.

7              THE COURT:  Anything else?

8              MR. GRIFFITH:  We do have members of the

9    school board and the superintendent as a party --

10             THE COURT:  I think they can remain in the

11   courtroom.

12             MR. GRIFFITH:  That's all that we have from

13   our standpoint.

14             MS. BENNETT:  We don't have anything else,

15   Your Honor.

16             THE COURT:  Off the record.

17             (WHEREUPON, A BRIEF RECESS WAS HELD.)

18             THE COURT:  You may be seated.  The Court

19   calls cause number 1:10CV61, Constance McMillen versus

20   Itawamba County School District, et al.  The purpose of

21   this hearing today is a -- comes before the Court on the

22   Plaintiff's motion for a preliminary injunction pursuant

23   to Rule 65 of the Federal Rules of Civil Procedure.  Are

24   the Plaintiffs ready to proceed?

```
 1              MS. BENNETT:  Yes, Your Honor.

 2              THE COURT:  Very well.  I show appearing for

 3    the Plaintiff Kristy Bennett, Christine P. Sun and

 4    Alysson Leigh Mills; is that correct?

 5              MS. SUN:  Yes, Your Honor.

 6              THE COURT:  And I believe you also have

 7    present with you in the courtroom paralegals Nikita

 8    Thomas and --

 9              MS. BENNETT:  That's it, Your Honor.

10              THE COURT:  Very well.  And the Plaintiff,

11    of course, will remain at counsel table.  For the

12    Defendant Mr. Benjamin E. Griffith from Cleveland,

13    Mississippi and Michele Horn Floyd.

14              MR. GRIFFITH:  The Defendants are ready,

15    Your Honor.

16              THE COURT:  Very well.  We will address this

17    matter pursuant to authority that all of you agree with

18    in your submissions.  That it's incumbent upon the

19    Plaintiff to establish by a preponderance of the

20    evidence, one, is a substantial likelihood that

21    Plaintiff will prevail on the merits.  Two, a

22    substantial threat that Plaintiff will suffer

23    irreparable harm if the injunction is not granted.

24    Three, that the threatening injury to the Plaintiff if
```

```
 1    the injunction is denied outweighs the threatened harm
 2    to the Defendant if the injunction is granted and that
 3    granting the preliminary injunction will not disturb the
 4    the public interest.  Do we all agree on those four
 5    perquisites?
 6                 MS. BENNETT:  Yes, Your Honor.
 7                 MR. GRIFFITH:  Yes, Your Honor.
 8                 THE COURT:  I take it you do because you
 9    said so in your submissions to the Court.  Now, I did
10    not ask you, do you wish to make a brief opening
11    statement?
12                 MS. BENNETT:  Yes, Your Honor.  Just
13    briefly.
14                 THE COURT:  Can we limit that to 15 minutes
15    per side?
16                 MS. BENNETT:  Yes, Your Honor.
17                 MR. GRIFFITH:  Yes, Your Honor.
18                 THE COURT:  Very well.  I'll hear from the
19    Plaintiff.
20                 THE COURT:  Move that podium to any position
21    you're comfortable with, Ms. Bennett.
22                 MS. BENNETT:  Thank you.  This is fine, Your
23    Honor.  May it please the Court, Your Honor, we are here
24    on this matter brought by Constance McMillen against the
```

1   Itawamba County School District regarding a violation of

2   her first amendment rights.  Ms. McMillen has attended

3   Itawamba County schools her entire life and has been in

4   Itawamba Agricultural High School since 9th grade.

5           She was aware of a policy prohibiting her

6   from bringing her girlfriend to the prom and approached

7   school officials about clarifying that and asking

8   whether she would be allowed to bring her girlfriend to

9   the prom.  She was told by school officials that she

10  could not bring her girlfriend to the prom.  That her

11  date must be of the opposite sex.  Constance then

12  contacted counsel and asked if we could help her in

13  attending the prom with her girlfriend.

14          On March 2, 2010, I sent a demand letter

15  along with Christine Sun and the Mississippi Safe

16  Schools Coalition asking that the school district revise

17  their policy prohibiting same sex couples from attending

18  prom and also asking that they allow Constance to wear a

19  tuxedo to prom if she so chose because she had also been

20  told that she would not be -- her girlfriend would not

21  be allowed to wear a tuxedo.

22          We gave the school district until March 10

23  to respond to our request.  We did not receive a

24  response about Constance's request to attend the prom

1   with her girlfriend and wear a tuxedo except we received

2   a letter on March 9 indicating that the school board

3   needed more time to bring up the issue at the next

4   school board meeting which would have been March 22.

5             Then the following day or two days later,

6   the Itawamba County School District issued a statement

7   to the press that due to the alleged controversy raised

8   by Constance's demand letter that they were actually

9   going to cancel the prom.  They cited a distraction to

10  the learning environment.  Subsequently there the next

11  day we filed this instant action and the following week

12  we filed the current motion for preliminary injunction

13  seeking to stop Itawamba County School District from

14  canceling the prom and allow Constance to attend the

15  prom with her girlfriend and to wear a tuxedo.

16            In the Defendant's opposition to our motion,

17  they do not seem to be challenging the first amendment

18  protective speech issue.  Rather they focus on the fact

19  that it was within their purview under the standard set

20  forth in Tinker v Des Moines that there was a material

21  disruption of the learning environment and that as such

22  they were within their rights to cancel the prom.

23            We will offer testimony that shows there

24  wasn't a disruption caused by Constance which is

1    required in order for them to be able to do that but

2    rather any disruption that came of this result came

3    after the actual cancellation of the prom.  And we ask

4    that you'll find in favor of Constance and issue an

5    injunction against canceling the prom.  Thank you, Your

6    Honor.

7            THE COURT:  Very well.  Mr. Griffith.

8            MR. GRIFFITH:  Your Honor, the case before

9    this Court is really governed by the Canal Authority

10   Factors and that is what the proof I believe will be

11   directed to this morning.  We believe the evidence will

12   show on behalf of the Defendants that there was not just

13   a distraction, there was a major disruption of the

14   educational process.  The core educational admission of

15   the school was at risk.

16           There were not just perceptions but there

17   were obvious occurrences that were taking place with

18   students being completely distracted during classroom.

19   Teachers having to respond to questions.  The entire

20   idea that a lesson plan being marginalized as this

21   reached a crescendo.  This school board did what it was

22   responsibly mandated to do.  And that is to adhere to

23   its core mission which is acting as fiduciaries for the

24   students to put the educational system at the forth

1  front and it did so.

2          It's decision was not to cancel a prom.  The

3  decision was to stop sponsoring the prom at the school.

4  That had actually been under discussion, Your Honor, for

5  well over four years out of concerns primarily of

6  liability arising from the holding of school dances on

7  school property.  Concerns over young students drinking

8  and driving and a multiple other concerns that reflected

9  very negatively on the continuation of holding a school

10  dance in this manner.

11          The Court is going to have before it

12  testimony from the Superintendent of Education who will

13  relate to the Court the incidents, the matters that were

14  observed by school board and school administration that

15  justified its decision.  We have with us the board

16  attorney for the board of education who will actually

17  present the balance of the opening statement.  I would

18  like for the Court to have her at this point come to the

19  podium and complete this very briefly.

20          THE COURT:  Very well.

21          MR. GRIFFITH:  Michelle.

22          MS. FLOYD:  If it pleases the Court, Your

23  Honor, the American Civil Liberties Union will have you

24  believe that this is a lawsuit that has as its

1  foundation a violation of the constitutional rights of

2  one of our students due to bigotry and homophobia.  That

3  is simply not the case.  This is, in fact, a lawsuit

4  involving the Itawamba County Board of Education's

5  ability and duty to effectively educate its students and

6  to provide them with a safe learning environment.  The

7  facts are straight forward.

8            The board was faced with a difficult

9  decision.  It had a growing situation that was

10  escalating and jeopardizing the education of the

11  students of Itawamba County.  They were presented with

12  facts that evidenced that classes were being disruptive

13  to the extent that teachers could not actually perform

14  their duties in their classroom.  They were also

15  presented with issues of growing concerns of dressing

16  protest at the prom.

17            These new facts were coupled with the fact

18  that the board of education had been considering for

19  years the fact of not sponsoring the prom.  Those facts

20  it had already contemplated were concerns over

21  liability.  Teachers were taking away their time from

22  their classroom to actually prepare and decorate for the

23  prom.  There were concerns over drinking and drug use,

24  and there were also the fact that other schools had

1    stopped sponsoring their proms.  Many schools have

2    stopped sponsoring their proms and has allowed the

3    parents to do that.

4            Upon being presented with all of these

5    facts, the board did what it thought was best for the

6    Itawamba County School District.  It made a difficult

7    decision to not host a prom but to, in fact, allow

8    parents to sponsor that prom.  There's been a

9    misconception that it's been cancelled.  That's not

10   true.  They simply withdrew their sponsorship.  This is

11   simply a case about the authority of the Itawamba County

12   School District to withdraw sponsorship of a social

13   event that it has absolutely no duty to host.  Because

14   doing so is in the best interest of the educational

15   process of the Itawamba Agricultural High School.

16           It's my contention, Your Honor, that at the

17   end of the day after we have given all the testimony and

18   we've gone through the Canal Authority factors that the

19   Plaintiffs will be unable to prove those four factors

20   that are mandated in order for this Court to order a

21   temporary injunction.  And we ask that that be denied.

22           THE COURT:  Very well.  Plaintiff will call

23   the first witness.

24           MS. BENNETT:  Your Honor, the Plaintiff

1    calls Constance McMillen.

2                   THE COURT:  Very well.  Ms. McMillen if

3    you'll come around and be sworn, please, ma'am.

4                      CONSTANCE MCMILLEN,

5    having been first duly sworn, was examined and testified

6    as follows:

7                   THE CLERK:  Please take a seat in the

8    witness stand and state your name and address for the

9    record.

10                   THE WITNESS:  My name is Constance McMillen

11   and I live in Fulton.

12                   THE CLERK:  May we have your entire address?

13                   THE WITNESS:  Oh, 204 West Gray Street,

14   Fulton, Mississippi.

15                   MS. BENNETT:  You can lower that mic a

16   little so you don't have to talk up to it.

17                     DIRECT EXAMINATION

18   BY MS. BENNETT:

19        Q    Constance, we've established that you live

20   in Fulton.  How long have you lived there?

21        A    My entire life.

22        Q    And is your family from there?

23        A    Uh-huh (affirmative response).

24        Q    You have to say yes.

1          A      Yes.

2          Q      You have to give a verbal response because

3   the court reporter is taking it down.  Are you

4   nervous?

5          A      Yes.

6          Q      Have you attended school with the same kids

7   your entire life?

8          A      Yes.

9          Q      What are the kids at school that you go to

10  school with know about your sexual orientation?

11         A      I mean, they know I've liked girls since the

12  8th grade.

13         Q      Has there ever been any -- anything said to

14  you about liking girls?

15         A      Not that I remember.  I don't remember

16  anybody saying anything or being mean about it.

17         Q      Okay.  What --

18                THE COURT:  Excuse me just one second.  You

19  said no one has been mean to you about it.

20                THE WITNESS:  No one has ever like said

21  anything but people have asked me if I like girls but --

22                THE COURT:  Very well.

23  BY MS BENNETT:

24         Q      What happened earlier this year that

1    prompted you to seek out the school officials about

2    attending prom with your girlfriend?

3        A    I mean, I knew that there was a policy from

4    last year so I went to them.

5        Q    What policy are you talking about?

6        A    The policy for no same sex dates.

7        Q    Okay.

8        A    And so I went to them hoping that I could

9    talk to them and -- you know, because I thought maybe

10   they had the policy in place for a different reason and

11   maybe I could talk to them and them understand how it

12   made me feel and maybe change it.

13       Q    How did it make you feel?

14       A    I mean, it upset me because I felt like I

15   wasn't getting to go to prom because if I can't share

16   prom with my girlfriend who is special to me then I

17   didn't want to go to the prom anyway.

18       Q    And what were you told about bringing your

19   girlfriend to prom?

20       A    That it wouldn't be allowed.

21       Q    And what did you do once you were informed

22   that it wasn't allowed?

23       A    You know, I was upset, you know, but I had

24   been told that there was ways around it.  That I could

1    get a boy to bring me and a boy bring my date.  And, you

2    know, I was just going to let it go because I didn't

3    know what to do.  I was very upset.

4          Q     So what did you do about not knowing what to

5    do?

6          A     I mean, I didn't do anything after the tux,

7    when I talked to them about the tux.  That's when I

8    decided to call the ACLU.

9          Q     What was the conversation about the tux?

10         A     I was just told that it wasn't formal for a

11   girl to wear a tux.  That boys wear tuxedos and girls

12   wear dresses.

13               THE COURT:  Now, who told you this, please,

14   ma'am?

15               THE WITNESS:  The vice principal.

16               THE COURT:  The vice principal?

17               THE WITNESS:  Uh-huh (affirmative

18   response).

19   BY MS BENNETT:

20         Q     And what's his name?

21         A     Coach Mitchell.

22         Q     And did you hear that from anybody else

23   about the tuxedos?

24         A     Well, after that I went to the principal

1  because he told me, Coach Mitchell, told me he didn't

2  know for sure but I could go he thought -- I could go to

3  the principal.  So I went to the principal and he told

4  me basically the same thing.  And I mean, I was

5  explaining to him how it made me feel, and he was like,

6  well, I mean, if you want to, you can go over my head to

7  the superintendent because if she says you can then I'll

8  let you.

9       Q    Was this in relation to wearing a tux?

10      A    Yes.  And so I went to her, but I mean I

11  told him I didn't want to do that.

12      Q    How did you reach out to the

13  superintendent?

14      A    I called her.

15      Q    And what did you tell her you wanted to talk

16  about?

17      A    Well, actually first I talked to an attorney

18  and then the superintendent.

19      Q    Which attorney?

20      A    Ms. Michelle Floyd.

21           THE COURT:  Just I'm having trouble

22  understanding you.  What was the attorney's name?

23           THE WITNESS:  Ms. Michelle Floyd.

24           THE COURT:  Very well.

1   BY MS BENNETT:

2       Q       And she directed you to talk to the

3   superintendent?

4       A       She said that she would talk to the

5   superintendent and get back with me but the

6   superintendent called me that day.

7       Q       What did you tell Michelle Floyd that you

8   wanted to talk about?

9       A       About the tux situation and about the same

10  sex date.

11      Q       The superintendent what's her name?

12      A       Ms. McNeese.

13      Q       Teresa McNeese?

14      A       Uh-huh (affirmative response).

15      Q       So she called you back?

16      A       Right.  And she told me that she would talk

17  to the school board about it.

18      Q       And did she get back with you?

19      A       She did.

20      Q       And what did she convey to you at that

21  point?

22      A       She told me that the girls had to wear

23  dresses or that -- she told me that the girls had to --

24  they could wear pants when I was talking to her.  And

1    then later that day Mr. Wiygul told me that she just

2    said that girls had to wear dresses because she had

3    talked to the school board.  And so I was like -- I

4    asked her about the same sex date thing and she said

5    because it was policy, I mean.

6         Q    And what did you do at that point?

7         A    I was in school.  I was upset.

8         Q    And after that what did you do?

9         A    I called my mom and she knew someone that

10   could get me in touch with Sarah Young with the ACLU.

11   So I got in touch with her and I was very upset and I

12   just asked her if there was anything that could be

13   done.

14        Q    And subsequently that resulted in us writing

15   the demand letter?

16        A    Right.

17        Q    After we sent the demand letter to the

18   school district on March 2, describe how the school was,

19   how it was when you went to school.

20        A    I mean, no one like really said anything to

21   me.  I mean, I wasn't -- it wasn't a big deal.  Like a

22   lot of people didn't really even know about it, you

23   know.  I mean, I'm sure like in a day or two it got

24   around, but I mean, no one really -- no one really knew

1    about it.  No one asked me about it or anything.

2         Q    And did that continue for the next week and

3    a half before the prom was cancelled?

4         A    It did.

5         Q    Was there any -- in the classes that you

6    attended was anything out of the ordinary?

7         A    No.  I mean, I had a teacher ask me about it

8    like the day before the 10th or whatever so I mean that

9    was really the only thing that was said about it at

10   school so --

11        Q    Were students at school surprised about your

12   request?

13        A    I mean, no.  I mean, they -- I had told them

14   that I was talking to the principal.  I mean, my friends

15   I had told them that I was talking to the principal and

16   them about bringing the same sex date and wearing a tux.

17   And they had -- you know, I told them what they said and

18   most of the kids thought it was ridiculous that the --

19   that they weren't going to let it happen, you know.  But

20   I never -- at that point when I told them, I never knew

21   I was going to call the ACLU.  I was just upset about

22   it.

23        Q    How did you find out that prom was

24   cancelled?

1        A        A reporter.

2        Q        A reporter contacted you?

3        A        Right.

4        Q        And how -- did you go to school after you

5    found out that prom was cancelled?

6        A        I did.

7        Q        And how was school at that point?

8        A        It was hostile.  I actually wound up leaving

9    that day because there was so many people -- so many

10   like dirty looks and people whispering when I walked by

11   and stuff like that because most people felt like I had

12   caused the prom to get cancelled.  You know, a lot of

13   people didn't like me very much.

14       Q        What did you think would happen when the

15   demand letter was sent on your behalf?

16       A        Well, I thought that -- I thought maybe the

17   school like maybe they didn't know that they weren't

18   supposed to do that.  Maybe they thought that they could

19   or something.  And I thought that maybe whenever the

20   demand letter was sent they would realize.  It had like

21   court cases in it.  I thought maybe they would realize

22   and then change it because it was the right thing to do

23   and that's what I thought.

24       Q        Did you see a copy of the demand letter?

```
1         A     I did.

2               MS. BENNETT:  Your Honor, may I show the

3    demand letter to her to have her verify it?

4               THE COURT:  Yes, ma'am, yes.

5    BY MS BENNETT:

6         Q     Does that appear to be the letter that was

7    sent on your behalf?

8         A     Yes.

9         Q     And I'll show you it's actually a two-page

10   letter.  Does that appear to be the letter that was

11   sent?

12        A     It is.

13              MS. BENNETT:  Your Honor, may we have the

14   demand letter entered as Exhibit 1 to this hearing?

15              THE COURT:  Any objection?

16              MR. GRIFFITH:  No objection, Your Honor.

17              THE COURT:  It will be admitted as P-1, as

18   Plaintiff's Exhibit No. 1.

19              (WHEREUPON, THE ABOVE-MENTIONED

20              DOCUMENT WAS MARKED AS PLAINTIFF'S

21              EXHIBIT NO. 1 TO THE TESTIMONY OF THE

22              WITNESS AND IS ATTACHED HERETO.)

23              THE CLERK:  Just put it on the table.  Thank

24   you.
```

```
 1   BY MS BENNETT:

 2        Q     How many days did you attend school after

 3   the prom was cancelled?

 4        A     I went for half a day Thursday, but I didn't

 5   go for a full day.

 6        Q     Was there school Friday?

 7        A     Uh-huh (affirmative response).

 8        Q     And then this past week y'all were on spring

 9   break?

10        A     Right.  We were on spring break.

11        Q     Are you aware of there being another prom

12   planned?

13        A     Yes.

14        Q     What do you know about that?

15        A     I know that it's supposed to be at the

16   furniture market and that's all I know.

17        Q     Have you received an invitation to that

18   prom?

19        A     No.

20        Q     Do you know when it is?

21        A     No.

22        Q     Do you know who is putting it on?

23        A     I think it's -- I think someone kin to Alex

24   Miller maybe, but I'm not positive on that.
```

```
 1                  THE COURT:  You say you have not received an
 2     invitation?
 3                  THE WITNESS:  No.
 4                  THE COURT:  Very well.
 5     BY MS BENNETT:
 6          Q     Why have you pursued this matter,
 7     Constance?
 8          A     Because I feel like I have the right to go
 9     to the prom just the same as someone who's straight and
10     I feel like -- I mean, I don't feel like I should have
11     to not go to prom just because I'm gay, you know, or
12     like go with someone else and not be able to enjoy being
13     there with a person that's special to me just because
14     I'm gay.
15                  MS. BENNETT:  Okay.  May I have a moment,
16     Your Honor?
17                  THE COURT:  Yes, ma'am.
18     BY MS BENNETT:
19          Q     Constance, what do you believe you would be
20     expressing if you got to go to the prom with your
21     girlfriend?
22          A     That, you know, that's who I am.
23          Q     And what do you mean by that?
24          A     Like I don't understand what you're
```

1   asking.

2        Q    Well, who are you?  I mean, what is the

3   statement, this is who I am mean?

4        A    Well, that I'm a lesbian and I mean, I have

5   a girlfriend.  And that I'm equal to everyone.  I mean,

6   I'm equal to people that are straight.

7        Q    Okay.  And by wearing a tuxedo, what would

8   that have to do --

9        A    I mean, like I'm -- you know, I can wear

10  whatever but I felt comfortable wearing the tuxedo

11  because I didn't want anything fall out like in the

12  middle of the night and have to worry about all of that.

13  So, you know -- but I think that just because you're a

14  girl doesn't mean you have to dress feminine, and I

15  don't think you should -- I don't think they should put

16  gender laws on that.

17            MS. BENNETT:  Okay.  We tender the witness.

18            THE COURT:  Let me ask just a few.  I am

19  having trouble hearing her.  You said at one point -- I

20  thought I heard you say I was told I could come with a

21  boy and my girlfriend could come with a boy.  Now, did

22  somebody tell you that?

23            THE WITNESS:  Yes.

24            THE COURT:  Who told you that?

```
 1              THE WITNESS:  The vice-principal.

 2              THE COURT:  The vice-principal told you

 3   that?

 4              THE WITNESS:  Uh-huh (affirmative

 5   response).

 6              THE COURT:  Very well.

 7              MS. BENNETT:  Your Honor, may I ask a

 8   follow-up question in relation to that?

 9              THE COURT:  Yes.

10   BY MS. BENNETT:

11        Q     When you asked the superintendent about

12   whether that would be acceptable, what did she tell

13   you?

14        A     She -- I mean, about the --

15        Q     Attending with opposite sex dates and once

16   you got there --

17        A     Yeah.  Well, I asked -- I mean, she said

18   that it was okay and then I asked about dancing.

19   Because I mean, I didn't want to go and then have to

20   pretend like I wasn't with that person all night.

21        Q     And what did she say about the dancing?

22        A     She asked me not to push buttons, and I

23   mean, basically like if we slow dance together and

24   someone is uncomfortable about that, someone gets
```

 1    uncomfortable and complains, we could get kicked out for

 2    that.

 3              MS. BENNETT:  We tender the witness, Your

 4    Honor.

 5              THE COURT:  Very well.

 6              MR. GRIFFITH:  May I proceed, Your Honor?

 7              THE COURT:  Yes, sir.

 8                    CROSS EXAMINATION

 9    BY MR. GRIFFITH:

10         Q    Good morning, Ms. McMillen.

11         A    Good morning.

12         Q    Did you, in fact, buy a ticket to the

13    prom?

14         A    I did.

15         Q    I want to show you what you just referred to

16    earlier, and that was the decision I believe you put it

17    to cancel the prom?

18         A    Uh-huh (affirmative response).

19              MR. GRIFFITH:  I'm not able to get it to

20    zoom.

21    BY MR. GRIFFITH:

22         Q    Ms. McMillen, I'm trying to get this up to a

23    level that it can be read.  Do you see that?

24         A    Uh-huh (affirmative response).

1    Q    Do you see where this is the Exhibit that
2    accompanied the response to the board of education?
3    A    Yes.
4    Q    Can you read that first full paragraph where
5    it cites the board has adopted the following statement.
6    A    Due to the distraction to the educational
7    process caused by recent events, the Itawamba County
8    School District has decided to not host a prom at
9    Itawamba Agricultural High School this year.  It is our
10   hope that private citizens will organize an event for
11   the juniors and seniors; however, at this time we feel
12   it is in the best interest of the Itawamba County School
13   District after taking into consideration the education,
14   safety and wellbeing of our students that the Itawamba
15   County School District not host a junior, senior prom at
16   Itawamba Agricultural High School.  We sincerely
17   apologize for any inconvenience this causes anyone.
18   Q    Thank you.  In that was there any reference
19   in canceling the prom or was it simply no longer
20   sponsoring it?
21   A    They cancelled the prom that the school was
22   hosting.
23   Q    And you got that information from a
24   reporter?

```
 1        A      Right.

 2               MR. GRIFFITH:  No further questions, Your

 3   Honor.

 4               THE COURT:  Any redirect?

 5               MS. BENNETT:  No redirect, Your Honor.

 6               THE COURT:  Ms. McMillen, you may stand

 7   down.  You may return to the table.

 8               MS. BENNETT:  Your Honor, the Plaintiff rest

 9   at this point in time.

10               THE COURT:  Very well.  The Plaintiff rest.

11   Will the Defendant have any witnesses?

12               MR. GRIFFITH:  Yes, Your Honor.  The

13   Defendant will call Ms. Teresa McNeese, the

14   superintendent of education.

15               THE COURT:  Very well.

16                    TERESA MCNEESE,

17   having first been duly sworn, was examined and testified

18   as follows:

19               THE CLERK:  Please take a seat in the

20   witness stand and state your name and address for the

21   record.

22               THE WITNESS:  My name is Teresa McNeese and

23   my address is 605 South Cumming Street, Fulton,

24   Mississippi.
```

1          MR. GRIFFITH:  May I proceed, Your Honor?

2          THE COURT:  Yes, sir.

3                    DIRECT EXAMINATION

4    BY MR. GRIFFITH:

5          Q     Ms. McNeese, very briefly will you give the

6    Court the benefit of your educational background and

7    your training and your current position?

8          A     Yes, sir.  I'm a 1977 graduate of Itawamba

9    High School and a 1979 graduate of Itawamba Community

10   College and then in 1981 University of Mississippi with

11   a bachelor's degree.  And then in 1984 an Ole Miss

12   graduate with a master's degree in education.  I've been

13   in education and served as a teacher and a coach and an

14   administrator in Pasadena, Texas; Senatobia,

15   Mississippi; Mooreville, Mississippi.  Been a principal

16   at Fairview.  That is in the Itawamba County School

17   District.  And then in the fall of 2007, I was elected

18   Superintendent of Education, and I took office in

19   January of 2008.

20         Q     What is your relationship, Ms. McNeese, to

21   the Board of Education of Itawamba County?

22         A     My job is to be their advisor in matters, to

23   make recommendations to them and then, of course, on

24   their vote and recommendation, then I implement those

1    policies or rules within our schools.

2        Q    The issue that I'm asking you about relates

3    to the disposition or how the school prom was to be

4    handled this year.  What was the decision of the board

5    of education regarding the prom and why was it made?

6        A    Yes, sir.  After a period of time which

7    Mr. Wiygul and I, Mr. Trae Wiygul, the high school

8    principal at Itawamba High School, we had been

9    discussing this matter for a couple of years, just about

10   liability issues that -- that seem to come about from

11   schools hosting proms and the time taken out of class

12   for students to decorate and teachers and so forth.

13   That it was becoming such a distraction and becoming

14   such a liability that we had been discussing the fact of

15   no longer hosting the prom.  But with the events of the

16   media and the press, you know, just we were being

17   hounded every day.  Our students being hounded every

18   day.  That we just felt like the best thing for us to do

19   was to withdraw our sponsorship.

20       Q    Could you specifically tell Judge Davidson

21   what actions took place that constituted hounding or

22   disruption or distraction of the educational process

23   that you observed?

24       A    Yes, sir.  I've had -- I had parents call me

1  that said, you know, news media had contacted their

2  children via their cell phone asking for statements.

3  This is before we had made any decisions.  You know,

4  children talking about it in the classrooms, things that

5  were being done that was just causing our teachers not

6  to have school, which our motto in our school is bell to

7  bell instruction.  And we were having a hard time of

8  having bell to bell instruction.

9          We have state test right around the corner

10  that our high school students are required to pass to be

11  able to graduate.  And we were not able to have school.

12  And it is my duty as the superintendent obviously to

13  provide a safe and orderly environment at our schools

14  that is conducive to learning and we felt like we were

15  losing that.

16      Q    What is and what was at that time the core

17  mission of Itawamba County with regard to education?

18      A    It is to provide a quality education for

19  every student.

20      Q    What effect, if any, was there upon that

21  core mission by the distractions and the disruption that

22  you've described?

23      A    We just felt like that we were not able to

24  instruct our students as they were needing, you know,

1    the full bell to bell instruction of our -- of our

2    instructors.

3         Q    In making the decision that the board of

4    education made, first of all were you present during

5    that board meeting --

6         A    Yes, sir.

7         Q    -- on March 10?

8         A    Yes, sir.

9         Q    In making that decision, what alternatives

10   were open to the board of education?  What could they

11   have decided?

12        A    I don't know if I understand your

13   question.

14        Q    In terms of cancellation altogether or

15   simply withdrawal of sponsorship or any other type of

16   decisions, what alternatives were open to them?

17        A    Well, obviously, it was almost a no-win

18   situation either way.  We knew that if we continued on

19   the course that we were in it was just going to be, you

20   know, just a snow ball rolling down hill.  That we were

21   losing control of our education process at the school,

22   so we knew that we had to make a decision.  It had come

23   to that point where we knew it was no longer something

24   that we could not address.

1      Q    What precedent did the board of education

2  have from other schools nearby regarding the holding of

3  proms and how they were sponsored?

4      A    Yes.  We had spoken, you know, through my

5  affiliation with other superintendents and advice from

6  other school districts that they no longer hosted a prom

7  through their school district.  They allowed the private

8  citizens, parents to do that, and there are several who

9  do not host the prom.

10     Q    Specifically can you give us an example?

11     A    I know Lee County doesn't.  I probably know

12  more than that.  I think some of our schools may just

13  host a sit-down dinner for those students who are in

14  that particular grade and don't have a dance per se.

15     Q    In withdrawing its sponsorship of the prom,

16  what direction or detail directives, if any, did the

17  school board give to parents or any parents' group or

18  were there any specific directions on how to do it,

19  where to do and when to do it?

20     A    No, sir.  We asked -- you know, I had a few

21  parents who had told me that they would be interested in

22  helping with a prom if the school district chose to

23  withdraw their sponsorship.  But we told them, you know,

24  we would not want to be a guiding light in that.  We

1    wanted that to be totally parent directed.

2         Q     As of this date, what is the status of the

3    plans that are underway for the prom?

4         A     My last contact that someone actually talked

5    to me said that it was going to be at the Tupelo

6    Furniture Market and that it would be open to all

7    students.  You know, they're not sending out

8    invitations.  I think they basically just say, we're

9    having a dance and, you know, it's available to all

10   students.  So I don't think there was an invitation per

11   se being sent out.

12              MR. GRIFFITH:  Your Honor, may I confer with

13   counsel briefly?

14              THE COURT:  Yes, sir.

15   BY MR. GRIFFITH:

16        Q     One final question, Ms. McNeese.  Do you

17   know where the Mantachie school is and whether it is

18   within Itawamba County and was one of the schools at

19   which proms were to be handled in a different way?

20        A     Yes, sir.  It is one of the schools that's

21   in the Itawamba County School District, and they no

22   longer host their prom.  The parents host it.

23              MR. GRIFFITH:  No further questions, Your

24   Honor.

```
 1              THE COURT:  Cross examination.

 2                    CROSS EXAMINATION

 3  BY MS. SUN:

 4       Q    Good morning, Ms. McNeese.

 5       A    Good morning.

 6       Q    I just have a few questions for you.  Let me

 7  show you the February 5 e-mail.  Do you recognize this

 8  document?

 9       A    Yes, ma'am.

10       Q    What is it?

11       A    It's the Itawamba High School's regulations

12  for their prom.

13       Q    Do you see where it says that the 2010

14  Itawamba High School junior, senior prom will be held

15  Friday April 2 in the IAHS commons?

16       A    Yes, ma'am.

17       Q    Where is the IAHS commons?

18       A    It is the cafeteria area at the high

19  school.

20       Q    Do you see below where there's some

21  paragraphs about the payments and what dates they're

22  due?

23       A    Uh-huh, uh-huh, Yes.

24       Q    And it says that payments must be made by
```

1    February 5 or at the absolutely latest March 5?

2         A     Yes.

3         Q     To your knowledge was the school collecting

4    money from students to attend the prom during that

5    time?

6         A     Yes, ma'am.

7         Q     And do you see that below there's some

8    criteria about the dates that students may bring?

9         A     That's correct.

10        Q     And so it is the policy of Itawamba County

11   High School District that prom dates must be of the

12   opposite sex?

13        A     It is not a county policy.

14        Q     Okay.

15        A     That is not a policy for the county school

16   district.  That is the rules of that particular high

17   school.

18        Q     Do you believe that that policy is

19   appropriate?

20        A     Those rules?

21        Q     Yes.

22        A     Yes.

23        Q     Specifically the policy that the date must

24   be of the opposite sex?

1      A      If you're referring to the rules, yes.

2  Because that -- that rule has been in effect 20 years,

3  and it has nothing to do with same sex.  It is to do

4  with control of the prom situation.

5      Q      So to the best of your knowledge up until

6  March 10 when the school board made that announcement --

7      A      Uh-huh.

8      Q      -- was the high school fully intending to

9  hold a prom at the IAHS commons?

10     A      Yes, ma'am.

11            MS. SUN:  Your Honor, may I have this e-mail

12  entered into evidence?

13            THE COURT:  Pardon?

14            MS. SUN:  May I have this e-mail entered

15  into evidence, this flyer that I just showed the

16  witness?

17            THE COURT:  Any objection?

18            MR. GRIFFITH:  No objection, Your Honor

19            THE COURT:  There's no objection.  It will

20  be admitted as P-2.

21            (WHEREUPON, THE ABOVE-MENTIONED

22            DOCUMENT WAS MARKED AS PLAINTIFF'S

23            EXHIBIT NO. 2 TO THE TESTIMONY OF THE

24            WITNESS AND IS ATTACHED HERETO.)

```
 1   BY MS. SUN:

 2        Q     Let me show you what's been marked as

 3   Exhibit A to this hearing.  Do you recognize Exhibit

 4   A?

 5        A     Yes, ma'am.

 6        Q     I'm sorry.  It's Exhibit P-1.

 7        A     I recognize it.

 8              THE COURT:  Right.  It's into evidence as

 9   P-1.

10   BY MS. SUN:

11        Q     I'm sorry.  Do you recall receiving this

12   letter?

13        A     Yes.

14        Q     Let me show you the second page.  Do you see

15   the last sentence where it states that we would

16   appreciate a response by March 10, 2010, so that we may

17   determine whether we will have to pursue our legal

18   options?

19        A     Yes, ma'am.

20        Q     So is it your understanding that by this

21   letter that the ACLU on behalf of the Plaintiff was

22   giving the school board until March 10 to respond to

23   this letter?

24        A     Yes, ma'am.
```

1      Q      And on March 10 that's the same day that the

2   school board decided to in your words withdraw

3   sponsorship of the prom?

4      A      Yes.

5      Q      Let me show you what was attached to

6   Defendant's opposition papers.  Do you recognize this

7   document?

8      A      Yes, I do.

9      Q      And what is this?

10     A      This is a notice of our special board

11   meeting that we were having that morning or afternoon.

12   I'm sorry.

13     Q      And this was held on March 10, 2010?

14     A      That's correct.

15     Q      The same date that a response was called for

16   in the March 2 letter?

17     A      Yes.

18     Q      Do you see where it says that there will be

19   a meeting to discuss matters involving perspective

20   litigation?

21     A      Yes.

22     Q      Am I correct in understanding that the

23   perspective litigation was the litigation threatened by

24   the ACLU in this March 2 letter?

1      A     Yes.

2            MS. SUN:  Your Honor, may I introduce this

3  as an Exhibit to this hearing?

4            THE COURT:  Yes, you may.  Well, I ask is

5  there any objection?

6            MR. GRIFFITH:  No, objection, Your Honor.

7            THE COURT:  There's no objections.  It will

8  be admitted.

9            THE CLERK:  Plaintiff's Exhibit 3.

10           THE COURT:  It will be P-3.

11           (WHEREUPON, THE ABOVE-MENTIONED

12           DOCUMENT WAS MARKED AS PLAINTIFF'S

13           EXHIBIT NO. 3 TO THE TESTIMONY OF THE

14           WITNESS AND IS ATTACHED HERETO.)

15  BY MS. SUN:

16     Q     I'm going to show you another document.  Do

17  you recognize this document?

18     A     Yes, I do.

19     Q     What is this document?

20     A     This is the statement that the school board

21  voted on as a response to the distractions we were

22  having.

23     Q     I see.  Was this document provided to the

24  media?

1      A    Yes.

2      Q    In fact, it was publicized directly by the

3  school board to the media?

4      A    Yes.

5           THE COURT:  Let's see for the record what's

6  that number, Ms. Long, the Exhibit.

7           THE CLERK:  I can't see it.

8           THE COURT:  I think it's P-2.

9           THE CLERK:  Oh, I see it.  Yes, sir, it is

10  P-2.

11          THE COURT:  P-2.

12          MR. GRIFFITH:  That's not in evidence.  I

13  believe --

14          THE COURT:  Okay.  I'm sorry.  You want to

15  offer it into evidence?

16          MS. SUN:  Yes.

17          THE COURT:  I thought it was received.

18          MS. SUN:  No.  I believe that it was shown

19  to Ms. McNeese.

20          MS. BENNETT:  No.  Constance.

21          MS. SUN:  Oh, I'm sorry.  To the Plaintiff

22  by Defense Counsel.

23          THE COURT:  If it's not in evidence, it's

24  admitted as P-4.

```
1              MR. GRIFFITH:  No objection, Your Honor.

2              THE CLERK:  P-4.

3              (WHEREUPON, THE ABOVE-MENTIONED

4              DOCUMENT WAS MARKED AS PLAINTIFF'S

5              EXHIBIT NO. 4 TO THE TESTIMONY OF THE

6              WITNESS AND IS ATTACHED HERETO.)

7    BY MS. SUN:

8        Q     I'm sorry.  Just one last question about

9    this document.  Do you see in the second paragraph the

10   sentence starting, it is our hope --

11       A     Uh-huh (affirmative response).

12       Q     It is our hope that private citizens will

13   organize an event for the juniors and seniors?

14       A     Yes.

15       Q     Was it your intent to encourage private

16   citizens to organize a private prom?

17       A     We would hope they would.  Our parents

18   usually are very good at sponsoring things.

19       Q     So it's correct that the school board was

20   encouraging private citizens to host a prom for the

21   juniors and seniors?

22       A     Yes.

23       Q     You mentioned in your testimony that there

24   was some disruptions that purportedly occurred, and I
```

1    want to ask you some questions about those disruptions.

2    You mentioned that there were some students who were

3    contacted by the media about the story.  Did those phone

4    calls occur before or after March 10?

5         A    Before.

6         Q    Did any occur after March 10?

7         A    Yes.

8         Q    So the cancellation of the prom didn't stop

9    that alleged disruption from occurring?

10             MR. GRIFFITH:  Object to the form of the

11   question as it refers to cancellation of the prom and

12   that did not occur, Your Honor.

13             THE COURT:  Well --

14             MS. SUN:  I will try to rephrase.

15             THE COURT:  Try to rephrase, yes.

16   BY MS. SUN:

17        Q    The school board's withdrawal of its

18   sponsorship in your words, that did not stop the

19   disruption you claim that occurred through media

20   contacting students; isn't that correct?

21        A    No, it did not stop it.

22        Q    In fact, weren't there -- wasn't there more

23   media interest after the school board's March 10

24   announcement?

1      A     Yes.

2      Q     You mentioned that some students were

3  talking in class and that was disruptive to the

4  educational environment.  Do you remember that

5  testimony?

6      A     Yes.

7      Q     Isn't it fair to say that students talk in

8  class all of the time about issues not related to

9  school?

10     A     Yes.

11     Q     They talk about dating, sports, all sorts of

12 things?

13     A     Yes.

14     Q     And aren't there rules at school that allow

15 teachers to reprimand students for talking in class?

16     A     Yes.

17     Q     And there's certainly nothing about the

18 Plaintiff's request that prevented teachers or the

19 school from reprimanding or punishing students who were

20 being disruptive in class?

21     A     No.

22     Q     Thank you.

23     A     I know the principal had had several

24 conversations with his faculty, you know, to let's stay

1    on the object of having school.  And I know he had that

2    conversation several times.  Now, as far as the day to

3    day, I'm not at the school every day.

4         Q     Right.  So you don't actually have any

5    personal knowledge of the alleged disruption that

6    happened at school?

7         A     Not besides secondhand information.

8         Q     Thank you.  Do you recall receiving the

9    March 2 letter from Plaintiff?

10        A     Yes.

11        Q     Between the time of that March 2 letter and

12   the March 10 announcement to the media about its

13   withdrawal of the sponsorship of the prom, did school

14   get cancelled, did school go on?  I'm sorry.  Did school

15   occur between March 2 and March 10 except for the

16   weekends?

17        A     Yes.

18        Q     There was no cancellation of any classes as

19   far as you know?

20        A     No.

21        Q     How about after March 10, has there been any

22   cancellation of classes or school days?

23        A     No.

24        Q     You mentioned that there had been growing

1     concerns about the prom in general and whether the

2     school should continue to host the prom.  Do you

3     remember that testimony?

4          A     Yes.

5          Q     What exactly were those concerns again?

6          A     As far as -- ask that question.

7          Q     I'm sorry.  I want to get a sense of what --

8     what exactly were the ongoing concerns about the school

9     organizing the prom?

10          A     You know, number one, you have a liability

11     issue.  Students, you know, underage drinking and

12     unfortunately drug use.  So you have those issues that

13     are liability issues.  And then you have the issue of

14     students who are coming out of classes to decorate for

15     the prom, who, you know, you're not having good quality

16     classroom time because you're using all of that time to

17     do preparations for the prom.  And like I said, we've

18     got state wide test coming up.  This is probably the

19     more critical time to be having classroom instruction

20     than any time.

21          Q     Sure.  But up until March 10, the school to

22     your knowledge was fully intending on hosting the prom

23     at IAHS commons?

24          A     Yes.

1     Q     I just want to make sure I have your

2     testimony clear.  The disruptions that you mentioned

3     were telephone calls to students, some talking in class.

4     That's it as far as you know?

5     A     E-mails, phone calls, yes.

6     Q     Those were e-mails to you and other school

7     board members?

8     A     And students.  And I mean, just -- just

9     about everyone involved in the day-to-day operation,

10    yes.

11    Q     Well, let me ask you about the e-mails to

12    you and to other administrators.  Is it your testimony

13    that it's inappropriate for concerned citizens and

14    parents to contact you by telephone and e-mail?

15    A     I am -- I'm very open to people contacting

16    me.  In fact, that's why I sat down with Constance for

17    an hour and talked to her about this situation that was

18    at hand, but, you know, some of the e-mails and phone

19    calls were very polite and very professional and others

20    were pretty abusive.

21    Q     Sure.

22    A     And I know as a public official, I have to

23    accept some of that, but I think there's a line that has

24    been crossed.

1     Q     Constance was not the author of any of the,

2   quote, unquote, abusive e-mails?

3     A     Absolutely not.  Constance has been very

4   respectful and very well spoken in any of our

5   conversations.

6     Q     And those e-mails is it fair to say that

7   there have been e-mails before and after the March 10

8   decision by the school board to withdraw hosting the

9   prom?

10    A     Yes.

11    Q     And, in fact, haven't there been more

12  e-mails since the school board announced to the media

13  that it was withdrawing its hosting of the prom?

14    A     Yes.

15    Q     And so that decision to not host the prom

16  hasn't ceased that -- those alleged disruptive

17  activities?

18    A     No.

19    Q     And despite those e-mails, the school board

20  presumably is continuing to operate normally as a school

21  board would?

22    A     We feel like we had to make the best

23  decision for our students.  And, you know, sometimes you

24  make decisions that are not popular, but you still have

1    to make the ones that you feel are best for the -- just

2    not the students of Itawamba High School, but the

3    students of our whole county school district.

4         Q    Sure.  And you're continuing -- the school

5    board along with yourself are continuing to operate on a

6    normal basis?

7         A    We're trying.

8         Q    I'm sorry.  Is that a yes?

9         A    That is a yes.

10        Q    Thank you.  Are there any other

11   disruption -- I'm sorry.  Are there any other disruptive

12   activities that you can recall?

13        A    No.

14             MS. SUN:  I have nothing further, Your

15   Honor.

16             THE COURT:  Very well.  Any redirect?

17             MR. GRIFFITH:  Briefly, Your Honor.  May I

18   proceed?

19             THE COURT:  Yes, sir.

20                  RE-DIRECT EXAMINATION

21   BY MR. GRIFFITH:

22        Q    Ms. McNeese, the decision of the board of

23   education was made on March 10, 2010, not to host the

24   prom?

1      A      Yes, sir.

2      Q      Is that correct?

3      A      Yes, sir.

4      Q      The day of the week was Wednesday, was it

5   not?

6      A      Yes, sir.

7      Q      What additional days was school held after

8   the 10th of March up until day?

9      A      The 11th and 12th which is Thursday and

10   Friday.

11      Q      And what happened the following week, this

12   entire past week, Monday through Friday March 15 through

13   19?

14      A      The school was on spring break.

15      Q      Closed?

16      A      Yes.

17              MR. GRIFFITH:  No further questions, Your

18   Honor.

19              THE COURT:  Very well.  You may stand down,

20   please, ma'am.  You can return to Counsel table.  The

21   Defendant may call your next witness.

22              MR. GRIFFITH:  Yes, Your Honor.  Defendant

23   calls as its next witness Mr. Trae Wiygul, principal of

24   the high school.

1          THE COURT:  Mr. Wiygul, if you'll come up

2     and be sworn, please, sir.

3                    TRAE WIYGUL,

4     having first been duly sworn, was examined and testified

5     as follows:

6          THE CLERK:  Please take a seat in the

7     witness stand and state your name and address for the

8     record.

9          THE WITNESS:  My name is Trae Wiygul.  I'm a

10    principal at Itawamba Agricultural High School.  My

11    address is 100 Hope Drive, Mantachie, Mississippi

12    38855.

13                   DIRECT EXAMINATION

14    BY MR. GRIFFITH:

15    Q     Mr. Wiygul, would you please give us the

16    benefit briefly of your educational background and your

17    training?

18    A     Yes, sir.  I'm a 1991 graduate of Itawamba

19    Agricultural High School.  I got my bachelor's degree at

20    Mississippi State University in 1996.  Master's from Ole

21    Miss in education and leadership.  Started my teaching

22    career at Mooreville High School, and I spent four years

23    there before taking a job at Dorsey Attendance Center

24    which is in the Itawamba County School District in 2000.

1    I served as assistant principal and coach and teacher

2    there for two years.  In 2002, I took over the

3    principal.  I served as principal for Dorsey Attendance

4    Center for four years before moving to Itawamba

5    Agricultural High School for the last four years.  The

6    first two years served as assistant principal and

7    athletic director, and I've been principal for the last

8    year and a half.

9         Q    Mr. Wiygul, what discussions have taken

10   place in which you've participated during the last

11   several years over continuation of the school's

12   sponsorship of the annual prom?

13        A    For the last -- you know, I've been four

14   years.  Before that I was at a Dorsey which is a K-H.

15   We have no issues with the prom.  We had several

16   discussions on how easy it would be to, you know, pass

17   that burden on to our parents.  And we knew of several

18   schools in the surrounding area, Lee County Schools,

19   Mantachie had passed on the sponsorship of the prom to

20   the parents.  It would just relieve a burden off of us

21   as administrators and the school, the school district

22   simply because, you know, we're talking about drinking,

23   drugs, issues like that.

24              Major issue we have at school is the time

1    spent out of the classroom which I think I had four

2    junior sponsors and four senior sponsors that are all

3    teachers.  Their job is decorating.  That's taking two

4    or three days to work on getting the prom ready.  Those

5    students that are helping with the prom, they're out of

6    the classroom.  That's a major issue.

7              Who's being brought to the prom by

8    perspective students.  We have almost close to -- a

9    little over 200 that would be attending the prom.  You

10   know, they're bringing 200 dates.  We don't know the

11   background of some of those dates and that concerned us

12   very much as well.

13        Q    As of March 10, the date of the decision of

14   the Board of Education to no longer sponsor the prom,

15   what direct contact did you receive by way of e-mail

16   from individuals relating to the board of education and

17   the issues that were before the board regarding the

18   upcoming prom?

19        A    After March 10?

20        Q    Yeah, before the decision was actually made.

21        A    Before the decision was actually made --

22        Q    On March 10 to no longer sponsor the prom.

23        A    Yes, sir.

24        Q    Did you receive any e-mails from other

1    individuals, persons in the community regarding the

2    school board or you?

3         A    Not before that I recall.  I'd have to go

4    back and look and see.

5         Q    As of March 11, can you state whether or not

6    you have received a significant number of e-mails at

7    that point?

8         A    Yes, sir.  I'm getting bombarded by e-mails

9    that are 90 percent negative, 10 percent positive.  Just

10   a rough estimate.

11        Q    Would you characterize what the negative

12   e-mails --

13        A    I've been called every name known to man,

14   negative names.  I've been called a bigot, a homophobic,

15   several curse words.  I've printed some of those off and

16   gave to our school board attorney.  It's been pretty

17   rough.

18             MR. GRIFFITH:  Your Honor, I have before me

19   a collection of just a sampling of those e-mails.  I'm

20   going to hand them to opposing counsel.  I'd like to

21   have these marked as Exhibit 1 for the Defendants a

22   collective Exhibit consisting of exemplary e-mails from

23   and after March 10.

24             THE COURT:  Well, hand them to Counsel.

1          MS. BENNETT:  Your Honor, we object to the

2    introduction of these e-mails as not being relevant

3    unless any of them are actually from Constance.  But

4    otherwise this doesn't go to show that Ms. McMillen's

5    actions caused a disruption in the school.  They all

6    occurred after the board ceased to sponsor the prom.

7    And so, you know, these would be relevant to whether the

8    school board actions caused a disruption but not whether

9    or not Ms. McMillen's action caused the disruption.

10          MR. GRIFFITH:  May it please the Court,

11    these are actually dated on the date of the decision

12    which was that night and these are earlier than that.

13    Some are on that or after and they all refer to the

14    disruption and the distractions of the educational

15    process at school.

16          THE COURT:  Let's mark them for

17    identification.

18          MR. GRIFFITH:  Yes, Your Honor.

19          (WHEREUPON, THE ABOVE-MENTIONED

20          DOCUMENT WAS MARKED AS DEFENDANT'S

21          EXHIBIT NO. 1 TO THE TESTIMONY OF THE

22          WITNESS AND IS ATTACHED HERETO.)

23          THE COURT:  And let the Court review and see

24    what they are.  Marked for identification.

1          MR. GRIFFITH:  Thank you, Your Honor.  May I

2    approach the witness, Your Honor?

3          THE COURT:  Yes, sir.

4    BY MR. GRIFFITH:

5     Q     I'm handing you what's been marked for

6    identification as Exhibit D-1.  Can you identify those

7    documents, sir?

8     A     Yes, sir.

9     Q     And what are those?

10    A     Those are e-mails that I received from

11   people outside of the school district.

12    Q     As you summarized it and described it to the

13   Court?

14    A     Yes, sir.

15    Q     Do you continue to receive those

16   communications?

17    A     Every day.

18    Q     Approximately how many all total have you

19   received as of today?

20    A     I think over 4,000.

21          THE COURT:  Well, let me ask, the prom,

22   sponsorship of the prom, has been withdrawn?

23          MR. GRIFFITH:  Yes, sir.

24          THE COURT:  Now, of course, I've not seen

1    these e-mails, but now, Mr. Wiygul are these people

2    complaining about the current status of the prom?

3            THE WITNESS:  Most of them talk about

4    canceling the prom.  A lot of them I do not read because

5    it's just like a form -- it looks like a form letter to

6    me.  So I just kind of read the first one and delete the

7    majority of them.  And a lot of them is in support of

8    Constance and allowing her to bring her girlfriend to

9    the prom.  A lot of them, you know, just talks about how

10   stupid of a decision we made as far as the school

11   district.

12           THE COURT:  Okay.  Let's mark it for

13   identification.

14           MR. GRIFFITH:  May I confer with Counsel,

15   Your Honor?

16           THE COURT:  Yes, sir.

17           MR. GRIFFITH:  Your Honor, no further

18   questions of this witness.

19           THE COURT:  Okay.  Plaintiff may cross

20   examine Mr. Wiygul.

21           MS. BENNETT:  May I proceed, Your Honor?

22           THE COURT:  Yes, you may.

23               CROSS EXAMINATION

24   BY MS BENNETT:

1       Q      Mr. Wiygul, are you aware of who is

2    collecting the proceeds for the prom that was planned on

3    April 2?

4       A      Yes, ma'am.

5       Q      Do you know what happened to those proceeds

6    for tickets after the decision was made for the school

7    to not host the prom?

8       A      We refunded those back to the students.

9       Q      You talked about receiving these some 4,000

10   e-mails, correct, since the school board issued its

11   statement about not hosting the prom?  Did any of

12   that -- how did those e-mails impact the educational

13   process?

14      A      How they impacted my educational process, I

15   have to go through every one of them to find out if any

16   of them is school related.  I get several e-mails from

17   our curriculum coordinator, our Title 1 federal program

18   coordinator, all different schools.  And, you know, when

19   you've got 125 every hour, you've got to go through

20   every single one of them to find out which one is

21   relevant to your job or which one is relevant to the

22   situation that's going on.

23      Q      So that makes your job more difficult.  Do

24   you know how they've impacted the actual classroom

1    lessons?

2         A    No, ma'am.

3         Q    Do you know if they've impacted the actual

4    classroom lessons at all?

5         A    These e-mails should not impact the

6    classroom.  Those are to me.

7         Q    And you're actually in the high school,

8    right, every day?

9         A    Every day.

10        Q    And after the demand letter was sent by

11   someone on March 2, did you receive a copy of that

12   demand letter?

13        A    Yes.

14        Q    Are you aware of any classes not being held

15   or lessons not being conveyed?

16        A    All classes were held.  That afternoon we

17   met with the teachers.  I had a faculty meeting.  I told

18   them that basically we were -- a letter was sent.  I

19   said we are not to talk about this potential litigation

20   in our classrooms.  We're not to allow our students to

21   talk about this.  And several of my teachers told me at

22   that time, you know, we have to -- it's hard to start a

23   class for having to get them back in the fold of

24   learning.

1    Q    Were your teachers able to do that?

2    A    They were able to address it but, you know,

3    it was common thing.

4    Q    So the school administrator, you and

5    teachers were able to work out any students talking in

6    class about the issues?

7    A    Yes.

8    Q    And you mentioned the fact that there had

9    been discussions about the distraction that the prom

10   caused overall about decorating, taking teachers away

11   from the class or students away from the class.  Are

12   there other events that take teachers or students away

13   from class for decorating at times?

14   A    For decorating?

15   Q    Yeah, like pep rallies or --

16   A    Teachers don't decorate for pep rallies.

17   Q    But students do miss class to decorate for

18   pep rallies?

19   A    Sometimes.

20   Q    Were you at the school board on March 10?

21   A    Yes, ma'am.

22   Q    Did these issues about decorations come

23   up?

24   A    The issue of what we're talking about here

1    today is the main issue.

2        Q    So at the board meeting y'all actually

3    talked about the demand letter that had been received

4    and how the board wanted to respond to it?

5        A    Yes, ma'am.

6             MS. BENNETT:  May I have a moment, Your

7    Honor?

8             THE COURT:  Yes.  Let me ask one question

9    here, and this may prompt further question from you and

10   Mr. Griffin.  Mr. Wiygul, the memo dated February the

11   5th, 2010, which is in evidence as --

12            MS. BENNETT:  P-1, Your Honor.

13            THE COURT:  -- P-1 apparently initiated by

14   Sandy Prestage and Sundra Sabine.  Now, who are these

15   people?

16            THE WITNESS:  Those are junior and senior

17   sponsors.

18            THE COURT:  They're teachers with the

19   school?

20            THE WITNESS:  Yes, sir.

21            THE COURT:  Very well.

22            MS. BENNETT:  May I have a moment, Your

23   Honor?

24            THE COURT:  Yes.

1          MS. BENNETT:  Your Honor, we tender the

2    witness.

3          THE COURT:  Very well.  Any redirect?

4          MR. GRIFFITH:  No redirect, Your Honor.  We

5    call our next witness Mr. Eddie Hood.

6          THE COURT:  Okay.  Just a moment.

7    Mr. Wiygul, you may take a seat and Mr. Hood.

8                    EDDIE HOOD,

9    having first been duly sworn, was examined and testified

10   as follows:

11         THE CLERK:  Just take a seat in the witness

12   stand and state your name and address for the record.

13         THE WITNESS:  Okay.  Eddie Hood, 2115 Walker

14   Levy Road, Fulton, Mississippi.

15         MS. FLOYD:  May I proceed?

16         THE COURT:  Yes, ma'am.

17                 DIRECT EXAMINATION

18   BY MS. FLOYD:

19         Q    Mr. Hood, can you please state your

20   relationship with the Itawamba County School District?

21         A    I've been a school board member for the

22   first district for -- this will be the 18th year.

23         Q    And as a school board member, do you hold

24   any offices?

1      A      I'm chairman of the board.

2      Q      How many of those years have you been

3   chairman?

4      A      Probably half.

5      Q      What is your current employment?

6      A      With AllState Insurance.

7      Q      And what is your educational background?

8      A      Graduate of IHS in 1969 and several

9   insurance courses since then.

10     Q      Mr. Hood, did you help participate in the

11  board's decision to stop hosting the prom?

12     A      Sure did.

13     Q      Prior to that decision being made, had you

14  received any statements from anyone that were negative

15  about the situation that was going on?

16     A      I had received several statements.  I sure

17  had.

18     Q      Can you surmise any of those?

19     A      The statements were of the concern of what

20  were we going to do to make it a safe environment at the

21  school and continue it to host the prom, you know and

22  not let that interfere with what we were doing in the

23  every day education process.  That was the concern on

24  the parents that were calling me and talking to me.

1      Q      As your tenure on the board, has this been

2  the first year that it's actually been discussed that

3  the Itawamba County School District might stop hosting

4  the high school prom?

5      A      It had discussed it before.  We just didn't

6  follow through like we should have.

7      Q      How many years do you think it's been being

8  discussed?

9      A      I know over the last four or five years it's

10  been discussed.

11      Q      And you've participated in those

12  discussions?  You had personal knowledge of that?

13      A      Yes, I did.

14      Q      And what are your concerns of the school

15  district and it hosting the prom?

16      A      My concern is, you know, we want to have

17  school.  We are in the business of school, you know and

18  educating our children.  We should have got out of the

19  prom business several years ago.  We did not.  We run

20  into a situation now where we see it is causing

21  disruption.  And we want to move on and we want our

22  children to go to school, get an education, let our

23  teachers teach and do the things that we should do in a

24  school district.

1      Q      Do you know of other schools that no longer

2   host their prom?

3      A      I do.  According to the local media, there

4   was a article in the Tupelo Journal and probably about

5   75 percent of schools according to them do not host a

6   prom.  Some do have dinners, some have recognition

7   ceremonies but most of the ones that I know don't.

8   That's the way I understand it now.

9      Q      So it's your understanding that the majority

10  of the schools in Mississippi do not host the prom?

11     A      According to the article in the Tupelo Daily

12  Journal some couple of weeks ago, yes.

13     Q      Are there any other high schools in Itawamba

14  County?

15     A      There are.  There are two more.

16     Q      And do either of those host their prom?

17     A      No.

18     Q      Have you been contacted by Mr. Wiygul, Trae

19  Wiygul, or spoke to him at any time about disruptions in

20  the classroom?

21     A      I sure have.

22     Q      Were any of those prior to March the 10th?

23     A      Yes, they were.

24     Q      Since March the 10th, have you also received

1    communications through media and people of interest?

2         A    I sure have.

3         Q    And what have those been like?

4         A    Been just bombarded with e-mails.  You know,

5    the situation.  Why are we doing it.  Just bombarded

6    like Mr. Wiygul said.

7         Q    And is it your opinion that those people

8    think that this prom was cancelled because Constance is

9    a lesbian?

10        A    Correct.

11        Q    And is that the reason the prom was not

12   hosted?

13        A    No, it's not.

14        Q    And would you reiterate why it is that we

15   chose not to host the prom?

16        A    We chose not to host the prom and get to the

17   business of the school.  Most of those e-mails let me

18   say have come around the world not knowing the whole

19   situation.  You know, that's been most of the e-mails.

20        Q    People that you would characterize as

21   knowing the whole situation, how have those responses

22   been?

23        A    Very positive.

24        Q    Mr. Hood, to your knowledge is there

1    actually a prom?

2         A      As far as I know, yes, there are.

3         Q      And that's been the word in the community?

4         A      Yes, it is.

5         Q      Do you know where?

6         A      Tupelo Furniture Market is my

7    understanding.

8         Q      And do you have a relative who would

9    actually attend that prom?

10        A      I do.

11        Q      And she is?  I'm not asking for any names.

12        A      Granddaughter.

13        Q      Granddaughter.  And it's her understanding

14   there's a prom?

15        A      Yes, it is.

16        Q      How did she get word of that?  Do you know

17   if it was the media?

18        A      The media first of all said that the prom

19   was cancelled which, of course, was wrong.  Then they

20   got word at school I think maybe through the other

21   students talking that there is a prom, you know.  It's

22   just not sponsored by the school district anymore.

23        Q      Has she received an invitation to that

24   prom?

1      A      No invitation.  It's all just strictly --

2   the tickets are available.

3              MS. FLOYD:  May I speak with Counsel,

4   please?

5              THE COURT:  Yes, ma'am.

6   BY MS. FLOYD:

7      Q      Mr. Hood, has this in any way affected your

8   place of employment?

9      A      It has.  Because of e-mails that we receive.

10  First of all I've got an old e-mail address on the

11  district web site.  It was an AllState e-mail address

12  which now is a different e-mail address.  And so they

13  picked up that I worked for AllState so they called the

14  corporate office and several threats about me and then

15  it got down to threats to our local offices and my local

16  staff.

17     Q      What type of threats?

18     A      According to the -- our attorneys and our HR

19  director I spoke with --

20             THE COURT:  Just a moment.

21             MS. BENNETT:  Your Honor, we object.  The

22  issue of whether or not Mr. Hood received threats to his

23  work e-mail is not relevant to whether there was a

24  disruption in the school.

1           THE COURT:  Objection sustained.  We're

2   concerned about disruption at school.

3   BY MS. FLOYD:

4       Q    Were you afraid that those type of

5   disruptions and type of e-mails that you were getting

6   would carry over into the school setting?

7       A    I was afraid of that.

8           MS. FLOYD:  No further questions, Your

9   Honor.

10          THE COURT:  Very well.  You may cross

11  examine.

12               CROSS EXAMINATION

13  BY MS. SUN:

14      Q    Good morning, Mr. Hood.

15      A    Good morning.

16      Q    I just have a couple of questions about your

17  testimony.

18      A    Yes, ma'am.

19      Q    You mentioned that you've received e-mails

20  and other types of communications to you as a school

21  board member?

22      A    Right.

23      Q    Is it your testimony that as a public school

24  official that it's inappropriate for citizens to e-mail

1    you about decisions that the school board makes?

2         A    Did you say is it inappropriate?

3         Q    Right.

4         A    No, it's not inappropriate at all.

5         Q    And, in fact, I presume this is not the

6    first e-mail that you've received --

7         A    Sure.

8         Q    -- as a school board member?

9         A    That's correct.

10        Q    And I know you're a school board member, but

11   do you have any role in terms of directly educating

12   students at Itawamba High School?

13        A    Just as a school board member.

14        Q    Between March 2 and March 10, have you

15   visited school grounds?

16        A    Yes.  I was at school a couple of times.  I

17   was trying to think, you know, because we do visit

18   periodically.  I was at school some during those times.

19   Not for a long period of time, but I did visit the

20   school, yes.

21        Q    Was the school operating normally?

22        A    It was operating normally but it was --

23   yes.

24        Q    Okay.  At any time did the school board

1  consider allowing Constance to bring her girlfriend to

2  the prom?

3      A    We agreed to follow the rules that were set

4  out for the prom and that we would stick strictly to the

5  rules.

6      Q    At no point did the school board consider

7  actually allowing Constance to bring her girlfriend to

8  the prom?

9      A    Not to my knowledge.  Strictly by the rules.

10      Q    What about her request to wear a tuxedo to

11  the prom, was there at any time consideration by the

12  school board to allow her to wear a tuxedo to the prom?

13      A    Not by the board, no, ma'am.

14      Q    Was it the school board's decision that

15  female students could not wear tuxedos to the prom?

16      A    Yes.  We did decide that according to the

17  rules of the prom.

18      Q    And it's also school board policy that

19  students cannot bring opposite sex dates to the prom?

20      A    No.  It's not a school board policy.  That's

21  a policy -- it's a rule for the prom at IHS.  It's not a

22  school board policy.

23      Q    But the school board agreed with that

24  policy -- I'm sorry, agreed with that rule?

1      A     We did.

2            MS. SUN:  May I have a moment, Your Honor?

3            THE COURT:  Yes, ma'am.

4            MS. SUN:  Your Honor, I have no further

5      questions.  Thank you.

6            THE COURT:  Very well.

7            MS. FLOYD:  May I proceed?

8            THE COURT:  Yes, you may.

9                    RE-DIRECT EXAMINATION

10     BY MS. FLOYD:

11     Q     Mr. Hood, you were asked about the rule of

12     the high school about all dates had to be of the

13     opposite sex.  Do you know how long that's been a rule

14     at Itawamba Agricultural High School?

15     A     As far as I know for years.  I've talked to

16     teachers that sponsored the prom years ago, and it was

17     in place then so it's been in place for years.

18     Q     Do you know the history behind that?

19     A     It is trying to keep actually a bunch of

20     boys or a bunch of girls getting together and having a

21     party and making it a party, not a prom.  And that was

22     to hold down the disruption, was the whole content of

23     the rule.

24     Q     Did it have anything to do with lesbian or

1    gay issues of any kind?

2         A    Never.

3              MS. FLOYD:  No further questions, Your

4    Honor.

5              THE COURT:  Okay.  Does the Plaintiff wish

6    to ask any further questions relative to her last

7    question about how long this rule has been in effect?

8              MS. SUN:  No, Your Honor.

9              THE COURT:  Very well.  You're excused.  You

10   may call your next witness.

11             MR. GRIFFITH:  The Defendant calls the final

12   witness Mr. Jim Keith.

13             THE COURT:  Okay.

14             MS. SUN:  Your Honor, we maintain the

15   objection to the testimony.  I think we've heard from

16   the folks who are directly involved with school

17   administration.  It's not clear to me at all.

18             THE COURT:  Let's swear him in and put him

19   on the witness stand.

20                   JIM KEITH,

21   having first been duly sworn, was examined and testified

22   as follows:

23             THE CLERK:  Take a seat in the witness stand

24   and state your name and address for the record.

1          THE WITNESS:  I'm Jim Keith.  I'm an

2    attorney.  I actually practice law in Jackson,

3    Mississippi, and my home address is 289 Trey Crossing,

4    Ridgeland, Mississippi.

5                    DIRECT EXAMINATION

6    BY MR. GRIFFITH:

7          Q     Mr. Keith, would you give the Court the

8    benefit of your background, training, education and

9    experience as they relate to school boards in the state

10   of Mississippi including this board of education?

11         A     Okay.  First of all I have an undergraduate

12   degree in electrical engineering from Mississippi State.

13   I practiced in that field for about eight years in

14   Miami, Chicago -- or excuse me -- Atlanta and New York.

15   Went back to law school in 1979 and got a degree from

16   the University of Mississippi School of Law.  Started

17   practicing in 1982, and the very first year I started

18   practicing in our school law area, education and

19   employment law.

20              And I've been practicing in the educational

21   arena since 19 -- well, 1982.  In fact, 98 percent of my

22   practice is in the field of educational law, advising

23   school boards, working with school boards.  Actually a

24   school board attorney for ten school districts, the

1    Mississippi School Board Association, the Mississippi

2    High School Activity Association.  And then I consult

3    with over a hundred school districts on any given day.

4    This year being one of the more active years.

5        Q    Mr. Keith, what occasion have you had to

6    interact with and even provide training for the members

7    of the board of education at Itawamba County?

8        A    Well, as legal counsel for the School Board

9    Association for at least the last ten years, I've been

10   part of the state mandated legal training for all school

11   board members in the state of Mississippi.  Every school

12   board member elected or appointed must go through

13   mandated training, mandated by the legislature including

14   the Mississippi School Board Association.  And my

15   component of that is about a three-hour component of

16   advising the school board members on how to make legally

17   founded decisions, governance, implementation of policy,

18   things of that nature.  In other words how do they

19   function as a school board member.

20            These are lay members who are not paid a lot

21   of money to provide a substantial amount of their time

22   to deal with some very, very controversial issues.  And

23   so that training is something that school board members

24   have to go through before they can ever start

1    functioning fully as a school board member.  In fact,

2    there's a statute that says if they do not go through

3    that training, they are removed from office.

4         Q    What expertise do you have, Mr. Keith, in

5    the areas of school policies, governance and decision

6    making by a school board such as the Itawamba County

7    Board of Education?

8         A    Well, 27, almost 28 years now I've been

9    advising school board members on how they govern through

10   policy.  Talking with them about policy, policy

11   development procedures.  How to govern when you don't

12   have a clear policy.  How to govern when you have gray

13   areas or difficult areas or controversial areas.

14   There's just no easy decision by school board members

15   anymore.  It's a very difficult position for them to

16   have to cover the range of issues any one of which can

17   require -- or to result in litigation.  Other issues as

18   well.

19              Obviously, in today's world student

20   performance, accountability, all of those issues are

21   things that they have to concentrate on in order to

22   carry out their mandated statutory requirements under

23   the Mississippi Legislative Law, Mississippi statute.

24   It's a very difficult job for them to do that and so

1    I've been spending about 27 years trying to help school

2    board members to effectively carry out their duties.

3         Q    In preparation for your testimony today,

4    what information have you gathered and what type of data

5    have you accumulated that would be of the type that is

6    usually and regularly relied upon by experts in your

7    field?

8                   THE COURT:  Just a moment.  Have you

9    finished with his qualifications?

10                   MR. GRIFFITH:  Yes, Your Honor.

11                   THE COURT:  Ms. Sun, do you wish to voir

12   dire him on his qualifications?  Do you want to ask him

13   any questions?  If not -- and I don't know what a lawyer

14   can testify to other than the law.

15                   MR. GRIFFITH:  That's always the question,

16   Your Honor.  He's only testifying as to governance and

17   decision-making process and the entire area of school

18   policy, not on the questions of law.  On the regularity

19   of the decision-making process in this particular

20   case.

21                   THE COURT:  Ms. Sun, do you wish to do any

22   voir dire to his qualifications?

23                   MS. SUN:  Your Honor, I don't have any

24   objection to his qualifications as an attorney.  I

1    object to his testimony as a whole because the things

2    that he's testifying about are not at issue in this

3    case.  We have no concern about the regularity of how

4    this decision was made.  We contest its

5    constitutionality, and to the extent that he's going to

6    offer his opinion as a school board attorney about the

7    constitutionality of their actions, we think that's

8    completely inappropriate.

9              THE COURT:  Let me ask you this, Mr. Keith.

10   Have you ever testified before as an expert witness?

11             THE WITNESS:  No, sir

12             THE COURT:  Well, this Court will not permit

13   him to testify as to questions of law.

14             MR. GRIFFITH:  Yes, sir.

15             THE COURT:  And I don't know what else a

16   lawyer -- I don't know what else he can testify to

17   except his opinion relative to the law.

18             MR. GRIFFITH:  If I can proceed, I believe I

19   can establish that.

20             THE COURT:  Very well.

21   BY MR. GRIFFITH:

22        Q    Very specifically, Mr. Keith.  I will not be

23   asking you nor will you give legal opinions, okay.

24        A    Correct.

1      Q      And that was our understanding at the very

2   beginning?

3      A      Absolutely.  I was never asked to do that.

4      Q      What were you asked to do?

5      A      I was asked to look at the decision-making

6   process that this board went through to try to make a

7   decision in the best interest of the school system.  As

8   you know or as I've just stated, boards typically govern

9   by policy.  Unfortunately, you can't have a policy for

10  every single issue that comes before a school board.

11          So the training that is provided to school

12  board members and this is sound, not only in just pure

13  governance but legality and everything else is to ask

14  yourself this real simple question.  Is the decision

15  that I'm about to make how is it going to impact student

16  performance because in today's no child left behind,

17  student's performance, accountability, budget issues,

18  these are all decisions that school board members have

19  to address every time they meet.

20          Bottom line is our decision, how is it going

21  to impact on student performance.  And that's what we

22  ask school boards to do in terms of their responsibility

23  under the statute.  I think it's consistent with the law

24  as well, I mean, in making decisions based on that

1    preface.

2         Q    And what was the decision-making process in

3    this case?

4         A    I talked to every single board member.  I

5    talked to the superintendent.  I talked to the principal

6    and assistant principal and it appears to me I was

7    informed that the deliberative process was the process

8    by which they debated this issue, talked about this

9    issue and made a decision that in their estimation

10   because of the distractions they felt like that their

11   decision to withdraw sponsorship of the prom was what

12   was necessary to get to that basic issue of student

13   performance.

14        Q    In your affidavit that you submitted in

15   conjunction with the response of the Defendants, can you

16   state whether or not you have set forth with specificity

17   those distractions and disruptions?

18        A    Yes.  Well, I was told that there were a lot

19   of distractions, a lot of distractions in the classroom.

20   One of the things that we deal with every day is that we

21   have a very limited amount of time to work with students

22   in a classroom environment.  Our board members know

23   that.  And what we encourage board members to do is to

24   make sure that their decisions don't impact on that

1    learning environment.  Make sure that whatever decision

2    they make enhances that learning environment.

3              And with all of these distractions, with the

4    telephone calls, the e-mails, the discussions in the

5    classroom, the board had the opinion -- reflected the

6    decision, decided that they needed to simply turn down

7    the rhetoric to be able to get back to the business of

8    educating children.  And they felt like that in their

9    estimation withdrawal of sponsorship of the prom would

10   enable them to get back to the business of educating

11   kids and get away from some of these issues that were

12   upsetting this process.

13        Q    Two questions.  First is the data that

14   you've relied upon to reach that conclusion the type of

15   data that is usually relied upon by experts in the field

16   of school policies and school decision making and

17   governance?

18        A    Well, it has to be.  I mean, obviously, the

19   information that we get as an advisor to boards is

20   information that they hear.  You know, they're community

21   members.  They do hear from the community.  Some board

22   members are elected, some are appointed.  Regardless of

23   how they get to that position, they receive a tremendous

24   amount of information from all sides of every issue.

1    And they get controversial decisions that come before

2    them that are thrown in their lap all the time.

3              And as advisor to boards, again that's my

4    advice for them every time.  You weigh all of the

5    information you have.  You weigh the input.  And then if

6    you don't have something that says this is the A, B, C

7    way to decide something, what is the impact my decision

8    is going to have on student learning, what is it going

9    to have on those kids and their ability to be educated

10   in our school system.  If every school board member

11   concentrates on that, we would certainly get away from a

12   lot of these things that do distract us today.

13        Q    How did this decision meet those objectives?

14        A    And this decision met those objections,

15   particular parameters.

16        Q    My final question to you, Mr. Keith is, can

17   you state whether or not the March 10, 2010, decision of

18   the Itawamba County Board of Education was consistent or

19   inconsistent with the core educational mission of

20   education in Itawamba County?

21        A    Well, based on the input that I've had from

22   the board members and the administration, I think it was

23   they simply have to make a decision.  It may not be a

24   popular decision.  But their decision reflecting what

1    their primary mission is and that's education of the

2    students.  That's what school board members ought to be

3    about all of the time.  Sometimes they're not, but,

4    obviously, I think in this case they were.

5         Q    Mr. Keith, based on your knowledge, your

6    experience and your expertise in this field of school

7    policy and decision making, what alternatives were open

8    to the Itawamba County Board of Education?

9         A    Well, I think in this case once it reached a

10   point where they had to make a decision, if they wanted

11   to get back to educating students and that primary focus

12   of how is my decision going to impact learning, I don't

13   think they had much of a choice but to do what they

14   did.

15             MR. GRIFFITH:  Your Honor, may I confer with

16   Counsel briefly?  No further questions, Your Honor.

17             THE COURT:  Do you want to ask any

18   questions, Ms. Sun?

19             MS. SUN:  Your Honor, I'm struggling a

20   little bit because I believe that this testimony is

21   exactly what defense Counsel said it wasn't going to be.

22             MR. GRIFFITH:  Objection, Your Honor.

23   Unless Counsel is going to make a speech to the Court,

24   we object extremely to that type of situation --

1          THE COURT:  Well, here's the situation.  The

2    man was never tendered as an expert.  I never accepted

3    his testimony as an expert.  The Court -- of course,

4    this is a non-jury matter and I can weigh this

5    testimony.

6          MR. GRIFFITH:  Yes, sir.

7          THE COURT:  But it appears to the Court that

8    the appropriate witness to testify in areas of education

9    would be an experienced school superintendent or a dean

10   of a school of education.  Not a lawyer.  You can give

11   me the law in your argument and briefs.  That's the way

12   I look to the law, but he's made some assumptions.  I'm

13   going to let you cross examine for what it's worth.

14         MR. GRIFFITH:  Thank you, Your Honor.

15         THE COURT:  Again, I say in a non-jury

16   setting.

17              CROSS EXAMINATION

18   BY MS. SUN:

19     Q    As a school board attorney, do you also

20   instruct school board members that they must uphold the

21   constitutional rights of their students?

22     A    Sure.

23     Q    That includes their free speech rights?

24     A    Sure.

1      Q      Their right to equal protection?

2      A      Sure.  All of the constitutional

3  protections.

4      Q      Right.  And that's part of what a school

5  board must do as part of its duties is to uphold the

6  constitutional rights?

7      A      Absolutely.  They -- sure, sure, they ought

8  to be able to do that or should do it.

9      Q      You mentioned in your declaration that you

10  have been involved in some controversial cases where

11  there was a lot of emotion in the community?

12      A      Absolutely.

13      Q      One of the examples I think you gave was --

14      A      Bishop Knox versus Jackson County School

15  District involving prayer over the intercom.

16      Q      Right.  And that was a case involving a

17  school district terminating a principal who had allowed

18  school prayer?

19      A      That's correct.  I represented the school

20  district in that case.  He was terminated initially.  It

21  was later changed to a suspension.

22      Q      You supported the school district's decision

23  however if you terminated or suspend their principal?

24      A      Well, I was their lawyer.

1    Q    Right.  So you supported that decision?

2    A    That's correct.

3    Q    And I take it that that decision by the

4  school board also caused a lot of emotional response in

5  the community, a lot of controversy?

6    A    It was absolutely.  We did have quite a bit

7  of disruption in the classrooms.

8    Q    Did you advise the school board at the time

9  to reverse its decision to terminate or suspend the

10  principal?

11    A    Well, again, I was their attorney giving

12  them legal advice on what their legal options were.  I

13  did not -- I don't recall giving them advice to make a

14  decision to reverse it or whatever.  They made the final

15  decision.  I just simply told them what I thought the

16  law was.

17    Q    And you understood at that time that the

18  school board had a responsibility to uphold its

19  constitutional obligations despite the controversial and

20  the emotional nature of that decision?

21    A    That is correct.

22         MS. SUN:  I have no further questions.

23         MR. GRIFFITH:  Your Honor, for the record

24  during our direct, we tendered the witness.  Counsel

1    chose not to voir dire.  At this time I reiterate our

2    request that this witness be accepted as an expert in

3    the field of school policy, governance and the

4    decision-making process of the school board in

5    Mississippi.  Not matters of law.  Matters of

6    administrative importance that relate to the functioning

7    of the school in accordance with the core educational

8    mission.

9              MS. SUN:  Your Honor, Plaintiffs will renew

10   their objection to the relevancy of his testimony.

11             THE COURT:  The objection is sustained.

12   Court is of the opinion that in a field of education the

13   appropriate expert would be an experienced school

14   superintendent or dean of a school of education.  That's

15   the ruling of the Court.

16             MR. GRIFFITH:  Thank you, Your Honor.

17             THE COURT:  You may stand down.

18             MR. GRIFFITH:  Your Honor, we have no

19   further testimony on behalf of this witness.

20             THE COURT:  Does the Plaintiff have any

21   cross?

22             MS. BENNETT:  No, Your Honor.  No rebuttal.

23             THE COURT:  That concludes the presentation

24   of proof.  Now, I realize that time is of the essence in

1    this matter, and I think I received the Defendant's

2    brief over the weekend.  It was submitted late Friday, I

3    believe.

4            MR. GRIFFITH:  Yes, sir.

5            THE COURT:  And I don't know -- does the

6    Plaintiff wish to respond to anything in the Defendant's

7    brief?

8            MS. BENNETT:  Your Honor, I mean we could

9    respond in a closing statement to the Court.

10           THE COURT:  That's my question.  If we could

11    and if you people feel comfortable with this, I'd rather

12    hear a closing argument or closing statement from you.

13    Ordinarily in a non-jury setting, I give the parties

14    some time, three days, five days, ten days to submit

15    written responses or written submissions after the

16    presentation of proof.  But I think in this case if we

17    can have oral argument and not have written submissions

18    to prolong the matter any further than it's been because

19    time is of the essence.  Why don't we -- I was thinking

20    recess for lunch and come back at one o'clock and

21    present closing arguments.

22           MS. BENNETT:  That will be perfectly okay

23    with the Plaintiff.

24           THE COURT:  Is that satisfactory?

```
 1                    MR. GRIFFITH:  That will be fine.

 2                    THE COURT:  How much time do you want to

 3    present those closing arguments?

 4                    MS. BENNETT:  Twenty minutes, Your Honor.

 5                    MR. GRIFFITH:  Your Honor, I've always said

 6    no souls are saved after 20 minutes.  So 20 at max.

 7                    THE COURT:  That's satisfactory then we'll

 8    recess until one o'clock.  We'll reconvene at one

 9    o'clock, and I'll hear your final arguments at that

10    time.

11                    (WHEREUPON, A BRIEF RECESS WAS HELD.)

12                    THE COURT:  You may be seated.  Plaintiff

13    may present a closing statement for the Court.

14                    MS. BENNETT:  May I proceed, Your Honor?

15                    THE COURT:  Yes, ma'am, you may.

16                         OPENING STATEMENTS

17                    MS. BENNETT:  Your Honor, the Plaintiff's

18    burden and request to this Court to issue a preliminary

19    injunction in this matter consist of establishing a

20    substantial likelihood that she will prevail upon the

21    merits.  The Plaintiff has met this burden as the

22    Defendants have not offered any evidence to contradict

23    that the speech or expression that Ms. McMillen intended

24    to make by attending the prom with her same sex
```

1  girlfriend was not protected under the first amendment.

2      Rather their only argument in responding to

3  this is that the entire process, the demand letter and

4  the subsequent decision of the school board to not host

5  a prom, caused a material disruption to the learning

6  environment and the school process.  However, all of the

7  witnesses proffered by the Defendants have admitted that

8  there was no disruption to the learning process.

9      Principal Wiygul who is personally at the

10 high school admitted that the e-mails that he received,

11 which were actually after the point where the school

12 chose not to host the prom, did not disrupt the class.

13 He testified that after receiving the demand letter he

14 had a meeting with faculty and instructed them to make

15 sure that the students got back on track in the

16 classroom so that did, in fact, occur.  That the

17 teachers were able to manage the classrooms.

18      There were claims about the prom being a

19 distraction itself, but these were issues based on prior

20 discussions about canceling or no longer having a prom.

21 And Principal Wiygul testified that at the board meeting

22 that was called on March 10 the discussion was how to

23 respond to the demand letter sent by us on behalf of

24 McMillen.

1          Superintendent McNeese stated that she

2    received a bunch of e-mails.  That some parents called

3    in, but she could point to no evidence that the lessons

4    in the classroom did not continue and no classes were

5    missed.  And Chairman Hood, the chairman of the school

6    board, also indicated that he wasn't aware of any

7    classes not continuing or lessons not taking place.  And

8    he also agreed that the meeting to -- the meeting that

9    was called on March 10 was to address Constance's demand

10   letter.

11         Even if you take into consideration all of

12   the disruptions and distractions that the Defendants'

13   witnesses have proffered, they have put forth no

14   evidence that Ms. McMillen herself caused any

15   disruption.  And the 11th circuit in Holloman v. Harland

16   stated that there must be some showing that the speaker

17   materially and substantially interfered with the

18   requirements of appropriate discipline in the operation

19   of a school.

20              THE COURT:  Do you have the citation?

21              MS. BENNETT:  I don't have that actual

22   citation.  I have the page and I can get you the actual

23   citation of that case, Your Honor.

24              THE COURT:  If you could get that to me.

1          MS. BENNETT:  It's in our brief.  It's in

2    our table contents and that's at 1276.

3          THE COURT:  That's sufficient.

4          MS. BENNETT:  So it's our contention that

5    there has been a showing by the Plaintiff that there's

6    substantial likelihood that she will succeed on the

7    merits.  In addition to there being no evidence of a

8    disruption, the Defendants are contending that by

9    withdrawing their sponsorship of the prom made this

10   issue mute.

11          In the case of Act Up v. Walt, which is also

12   referred to in our motion for preliminary injunction,

13   our memorandum.  There was a situation where there was a

14   group Act Up that was protesting the governor's speech.

15   This is actually a district court case, and because

16   there was a fear about the group sitting in the gallery

17   of the capital to hear the governor's address to the

18   commonwealth, the gallery was closed to all public.  It

19   wasn't closed to just the Act Up members but to all

20   public.

21          And in that case there was also an argument

22   made by the State that they closed it down because they

23   had a fear of a possible disruption, and the Court there

24   held that there was no compelling government interest at

1    stake because there was no reasonable basis for fearing

2    that the governor's speech would be disrupted.  And

3    there they found that even if a compelling interest

4    existed to restrict the speech, and that would be the

5    members of Act Up sitting in the gallery, their mere

6    presence in the gallery by itself sent a message to the

7    legislature that they were watching, they were present.

8            That even if there was an interest

9    protecting against disruption, that the government there

10   did not use the narrowest means possible in trying to

11   prevent the disruption.  And that's likewise the case

12   here.  I mean, if they're arguing that they decided to

13   withdraw sponsorship of the prom solely to quell

14   disruption, we argue that that's not the least

15   restrictive means for trying to combat any disruption

16   that may have occurred which we believe that there's no

17   evidence of any disruption.

18            The Court went on to say in the Act Up case

19   that the closing of the gallery in response to the fear

20   apparently unsubstantiated by the state that members of

21   Act Up would disrupt the governor's state of the

22   commonwealth address is a spitting image of an improper

23   prior restraint in an attempt to suppress speech prior

24   to publication or dissemination.

1           And they also quote Southeastern Promotions

2    v. Conrad, a US Supreme Court case which stated that all

3    the prior restrictions had this in common.  They gave

4    public officials the power to deny use of a forum in

5    advance of actual expression.  And it's our intention

6    that that's exactly what the school board did in this

7    case.  They closed the public forum to prevent Ms.

8    McMillen from expressing herself as a lesbian and from

9    keeping her from being able to attend the prom with her

10   girlfriend and wearing a tuxedo.

11           The witnesses for the Defendant testified

12   that their main concern at the board meeting was to

13   address the demand letter.  Well, if their response to

14   Ms. McMillen's assertions that her ability to attend the

15   prom with her girlfriend and wear a tuxedo were

16   protected by the first amendment and their response was

17   to close down that forum, then that's actually a prior

18   restraint against Ms. McMillen expressing herself as

19   protected by the first amendment.

20           And by foreclosing her from her attending

21   the prom and shutting down that forum, they have caused

22   Ms. McMillen irreparable injury.  And that's the second

23   factor in granting preliminary injunctive relief.  That

24   the plaintiff must suffer irreparable injury, and I

1    think it's pretty undisputed that the laws to first

2    amendment rights in and of itself a irreparable injury.

3    And there's a number of citations that I can give for

4    that but that seems consistently held throughout all of

5    the cases.

6            The third factor in whether or not the Court

7    should grant a preliminary injunction weighs the injury

8    that may be suffered whether the threatened injuries to

9    Plaintiff outweighs any threatened harm to the

10   Defendants.  As far as we can tell, Your Honor, the

11   Defendants have not indicated that there would be any

12   harm suffered by them if they went forward with the prom

13   and allowed Ms. McMillen to attend with her girlfriend

14   and wear a tuxedo.

15           In fact, Ms. McMillen testified she's been

16   attending school with these same students for all of her

17   life.  They all know of her preference for girls is the

18   way I think she put it.  And so the students themselves

19   wouldn't be surprised if she shows up at the prom with

20   her girlfriend.  Up until March 10, the school was

21   preparing for a prom.

22           The memo that's been introduced into

23   evidence about how you can purchase tickets for the prom

24   and setting forth the rules prohibiting dates of the

1    opposite sex was issued on February 5.  So it wasn't

2    until Ms. McMillen chose to demand her rights under the

3    first amendment that the prom was cancelled.  So putting

4    it back on at this point would not pose any harm to the

5    school and Ms. McMillen's denial of her first amendment

6    rights and the violation of her rights certainly

7    outweighs any harm that may exist on the behalf of the

8    Defendants.

9            And the fourth factor to consider in

10   determining whether or not to grant the preliminary

11   injunction is the public's interest.  And Courts have

12   consistently held that it's within the public's interest

13   to protect rights guaranteed under the constitution.

14   That was held in the Butts case and in other cases.

15           Your Honor, I'd also like to refer you to

16   the Fricke case which is a Road Island District Court

17   case.  It's 4910 SF 381 and this was cited in 1980.

18   Just if there's any question as to whether these rights

19   of Ms. McMillen to attend the prom with her girlfriend

20   and to wear a tuxedo were protected under the first

21   amendment.  The Court in the Fricke case addresses the

22   same issue.  It was a male in that case that wanted to

23   attend prom with his male -- with a male.  And the Court

24   there found that he granted preliminary injunction and

1    allowed Mr. Fricke to attend prom with his date.

2            THE COURT:  This case is a bit different in

3    that the prom had not been cancelled or sponsorship

4    withdrawn.

5            MS. BENNETT:  Right.  And that would be the

6    difference in the Fricke case, but we think that the Act

7    Up case addresses the issue of closing down a public

8    forum just to prevent a person from being able to

9    express themselves that would be protected under the

10   first amendment.  And that being the case, then Ms.

11   McMillen has met all four factors that must be

12   considered when seeking injunctive relief.

13           We also propose, Your Honor, if you feel

14   like that you cannot grant an injunction providing that

15   the prom to go on, that in the alternative we ask for a

16   declaration that in preventing Ms. McMillen from

17   attending the prom with her girlfriend in the memo that

18   was published from the school setting forth that dates

19   must be of the opposite sex was a violation of her first

20   amendment rights.  May I have a moment?

21           THE COURT:  Yes.

22           MS. BENNETT:  And, Your Honor, may I just

23   add that there was some contention I think by

24   Superintendent McNeese that the rule about same sex

1    dates being of the opposite sex was not geared toward

2    same sex couples.  But the uncontroverted evidence is

3    that Superintendent McNeese told Ms. McMillen that being

4    at the prom with her girlfriend could push people's

5    buttons or make them uncomfortable and as well the board

6    met to address how to respond to her demand letter

7    setting forth her rights.  And their response was to

8    close down the forum.  And that's all, Your Honor.

9    Thank you.

10                THE COURT:  Uh-huh (affirmative response)

11                MS. FLOYD:  May I proceed, Your Honor?

12                THE COURT:  Yes, ma'am.

13                MS. FLOYD:  Your Honor, Mr. Griffith and I

14    are going to bifurcate this closing statement.

15                THE COURT:  Very well.

16                MS. FLOYD:  I will begin.  Your Honor, it's

17    the Plaintiff's contention in this case that there's

18    been a constitutional violation of Constance McMillen's

19    rights.  The requested relief here, however, is that

20    this Court mandate the Itawamba County School District

21    to conduct a social event, to hold the prom.

22                There is no constitutional rights to have a

23    prom or to even attend a prom.  As the evidence was put

24    forth to this Court, it is estimated that 75 percent of

1   the school directs in this state do not host proms.

2   Even within our own school district, the Itawamba County

3   School District, the Mantachie High School does not host

4   its own prom.  It is a parent sponsored event.

5            However, Your Honor, the board of education

6   does have a legal obligation under state law to educate

7   its students and to do that in a controlled environment.

8   It also has the authority and the duty and authorize the

9   use of its building and have gatherings under

10  regulations prescribed by the board.  Your Honor, this

11  was a growing situation of the Itawamba County School

12  District received a demand letter by the American Civil

13  Liberties Union that was dated March the 2nd.

14           On March the 9th a reply was sent to them

15  for them to not to expect a reply to that demand letter

16  until after tonight's board meeting.  This matter kept

17  growing, kept getting concerns and calls to the

18  superintendent and the principal that disruptions were

19  occurring at the school.  That the board had no other

20  alternative but to hold a special meeting to discuss

21  this matter, and they did that on March 10.

22           At that meeting it was discussed with them

23  lengthy about all types of disruptions that had gone on

24  in the educational process at Itawamba Agricultural High

1    School.  Based upon that information given to them in

2    that meeting and the history that they had wanted to get

3    out of the prom business so to speak anyway, this board,

4    our board of education, made a content mutual decision

5    to not host the Itawamba Agricultural High School prom.

6                In opening statement Counsel opposite

7    alleged that it was this controversy that -- this

8    controversy was that distraction.  That is not the case,

9    Your Honor.  The distractions that are alluded to in the

10   notice that was sent out by the Itawamba County School

11   District are distractions to the educational process.

12   That is our paramount goal is to make sure that our

13   children are educated.

14               They also took into consideration the fact

15   that they felt very comfortable that a social event

16   would be held and that all students would be allowed to

17   go.  Ms. McMillen had already purchased a ticket to the

18   prom that was being hosted and was actually going to be

19   allowed to attend that.  There was no question about her

20   attendance to that prom.  We saw no evidence or no

21   belief to feel that she would not also be allowed to

22   attend the other prom, the other social event.

23               It was alluded to on the stand that she had

24   not received an invitation to that additional social

1    event.  But, Your Honor, no one has received

2    invitations.  It's my understanding it's still in the

3    planning process and there will not be invitations

4    anyway.  It's an open affair.  The Itawamba County

5    School District weighed all factors presented to it, and

6    its primary motive of educating the children led it to

7    the belief that it had absolutely no other alternative

8    but not to host this event.  It was in a no-win

9    situation.

10           If we continued hosting it, we were going to

11   have disruptions at school.  If we didn't host it, we

12   were going to have disruptions at school.  But by not

13   hosting it, at least we took away from ourselves the

14   potential liability that comes with hosting a prom.  And

15   in doing that it helped -- it will help protect the

16   Itawamba County School District and all of its taxpayers

17   from future ramifications of anything that could happen

18   as the result of liabilities that happen at a prom such

19   as drug abuse, alcohol abuse, accidents that happen at

20   proms.

21           Your Honor, I will now turn this over to

22   Mr. Griffith and allow him to complete the closing.

23           THE COURT:  Very well.

24           MR. GRIFFITH:  May it please the Court?

1          THE COURT:  Yes, sir.

2          MR. GRIFFITH:  Your Honor, the Court has

3     before it a very heavy issue to deal with and I'm not

4     going to belabor the point, but the Canal Authority

5     decision will control this Court's decision.  In Canal

6     Authority, as the Court is aware, there were the four

7     factors that have -- this Court has dealt with.  Every

8     Article 3 Judge who has been on the bench for any period

9     of time has dealt with.

10          In this case we submit that those four

11    factors must be carried by the Plaintiff by a clear

12    showing and that clear showing requires the burden of

13    persuasion.  And the burden of persuasion has not been

14    carried in this case.  Here's why.  The Plaintiff has to

15    prove that she is likely to prevail on the merits.  Her

16    claim is that her constitutional rights has been

17    violated by the actions of the school board in deciding

18    no longer to host the school prom.

19          Just look at that in its isolated form.

20    That is asking this Court to find that there is an

21    irreparable harm in the violation of a fundamental

22    constitutional right to have a prom.  Your Honor, that

23    is not an established constitutional right in this case.

24    We submit that there is no first amendment liberty, a no

1    first amendment associational right, no first amendment

2    right whatsoever associated with the decision by the

3    school board to withdraw its sponsorship of the prom.

4              Now, I've looked in vain, but I have found

5    what I believe is probably the best guidance for the

6    Court.  And I'm trying to help the Court as an officer

7    of the Court.  I have looked at the whole area of the

8    burden of establishing when a content mutual

9    ordinance -- here I'm looking at the March 10, 2010,

10   decision to withdraw sponsorship of the prom -- when you

11   have a content mutual ordinance what level of scrutiny

12   and what is the constitutional scrutiny that you should

13   give that.

14             The best case that I've found -- I got this

15   for the Court and I will have Counsel a cite to it as

16   well.  It's United States versus O'Brien decision, 391

17   US 367.  This O'Brien standard --

18             THE COURT:  391.

19             MR. GRIFFITH: 391 US 367.

20             THE COURT:  Very well.

21             MR. GRIFFITH:  It's a 1968 decision.  It

22   says good law has been cited repeatedly by the Supreme

23   Court in this Court and by the Fifth Circuit.  A content

24   mutual ordinance will withstand constitutional scrutiny.

1   And that's what this Court is called up to do with the

2   March 10 decision of the school board if these four

3   factors are shown.  That the ordinance is within the

4   constitutional power of the Court -- of the government.

5   In this case the government is the elected board of

6   education of Itawamba County.

7            Their action was to take a step that they

8   considered to be necessary by reason of a disruption of

9   the core educational process in the county.  They've

10  made that decision.  It is faithfully valid.  The Court

11  has heard from the very best sources which are the

12  superintendent, school board members, their own

13  reactions before and after the decision.  There was

14  clearly a detriment in an undermining of the educational

15  process.

16           Secondly, that it furthers an important and

17  substantial governmental interest.  What could be a

18  purer and a clearer showing of a governmental interest

19  that is substantial that one that seeks to uphold the

20  core education program in the county.  You've heard from

21  the superintendent.  Ms. McNeese made it so clear that

22  this was a case in which the decision had to be made.

23  Other members of the school board, other teachers,

24  principals are making it clear that there was no other

1    alternative at this stage in their judgement.

2           The third factor under O'Brien, the

3    government interest is unrelated to the suppression of

4    free speech.  This came straight from the witness stand.

5    Every witness that was asked about the March 10 decision

6    made it clear that our decision was rounded upon an

7    understanding and the fact finding of disruption,

8    disruption of the educational process.  That evidence

9    has not been contradicted, Your Honor.

10          The fourth factor in the O'Brien is the

11   incidental restriction on expressive conduct if there is

12   any.  It's no greater than necessary to further the

13   governmental interest.  We submit that there's not even

14   an incidental restriction on the -- any of the

15   expression of speech or any expressive conduct or action

16   by the Plaintiff in this case.

17          If the Court will allow me, I will hand this

18   to the Courtroom Deputy.  Turning Your Honor to the

19   factor in the Canal Authority decision that the

20   Plaintiff has to show by clear evidence that she's

21   likely to prevail on the merits.  We do not believe that

22   there is a constitutional right to hold a school prom.

23   And this decision by the school board is not going to

24   have constitutional ramifications.

1          There is a place and a time for an Article 3

2    Court to exercise its equitable power and this Court has

3    done so judicially over the years.  I've seen those

4    cases and I've actually had to rely on many of those

5    decisions.  This is not that kind of case, Your Honor.

6    The second Canal Authority factor is that the Plaintiff

7    will not suffer irreparable harm.

8          I recall and ask the Court to recall as well

9    the testimony of the Plaintiff herself.  Of course, she

10   bought a ticket to the prom.  The question was, in the

11   purchasing of ticket, did she after that make inquiry

12   about attending the alternate prom or social event that

13   was to be held.  That is still in the works and to be

14   sponsored by parents.  Has she made any inquiry.  Her

15   testimony was I wasn't invited.  Your Honor, no one has

16   been invited.

17         There are not invitations being sent.  This

18   is put on by parents as an alternative on a non-school,

19   non-governmental context to have the party, the banquet,

20   the dance that will be held, and there's been no showing

21   that the Plaintiff is excluded, singled out or otherwise

22   stigmatized and prevented from attending that.  She

23   simply has not inquired and asked about attending.

24   There has been no showing of that.

```
 1              The other factor under Canal Authority I
 2   think is one that a lot of times gets a little bogged
 3   down in analysis.  This Court's own Canal Authority
 4   decisions I think have been the clearest to me.  The
 5   Plaintiff's claim of injury has to be shown to outweigh
 6   the governmental interest of the school board in
 7   deciding that they did.  Well, there's not been a
 8   showing of that effect.
 9              The Plaintiff still has the opportunity to
10   attend this social event, and that's what it is.  It's a
11   social event.  It's important in a sense, but it doesn't
12   have constitutional ramifications to it.  It is not a
13   social event with constitutional contours.  It is a
14   social event, period, but it is attended by in this case
15   severe and growing and escalating factors of disruption
16   and dishevelment and actually undermining of the
17   educational process as by found the very people that
18   know best as this Court knows the educators themselves.
19              The fourth factor in the Canal Authority
20   analysis is the public interest must outweigh any
21   potential harm to the Defendant.  Well, this is very,
22   very serious, Your Honor.  What we have is the
23   Defendant, the board of education, has withdrawn its
24   sponsorship of a prom.  It has done that pursuit to the
```

1    statutory authorization that it has under Mississippi

2    law.   There's no question about it acting pursuant to

3    state law and state authority to do so.

4            Other schools have already done so out of

5    concerns mainly over liability exposure.  We cited in

6    our brief to the Court, in our response, in our

7    memorandum of authority two or three need this city

8    court plan's act decision dealing with lawsuits against

9    schools and schools board attended upon or related to

10   social functions.  It does happen.  It is a legitimate

11   factor to take into account in this case.

12           We go further than that, though, in it's a

13   case where the Plaintiff doesn't just have to carry a

14   burden of proof.  She has to carry a burden of

15   persuasion on every one of these four elements.  We

16   respectfully submit that she has not done so.  This is a

17   case in which Canal Authority required that showing.

18   It's a case in which not two or three have to be shown

19   and the fourth one can slide by.  There has not been

20   that adequate showing.

21           Now, I go all the way back to the Palmer

22   versus Thompson case.  This was one that was cited in

23   our brief.  Palmer versus Thompson, citation is 403 US

24   217, 403 US 217 fully cited is page 235.  Your Honor,

1    this is where the City of Jackson had found to have

2    violated the constitutional rights of African Americans

3    by having a segregated public swimming pool system.

4    Several for whites but one for African Americans.  That

5    was declared unconstitutional.

6              The Jackson government, the government of

7    the city of Jackson, simply closed all of the swimming

8    pools.  I can't tell you I would agree with that type of

9    decision, but I can tell you what the Supreme Court of

10   the United States said.  They said it is difficult or

11   impossible for any Court to determine the sole or

12   dominant motivation behind the choices of a group of

13   legislators.  They were talking about the city board,

14   the Jackson mayor and the board of aldermen.

15             There is an element of futility and this

16   addresses this Article 3 Court's power.  There's an

17   element of futility in a judicial attempt to invalidate

18   a law because of the bad motives of its supporters.

19   Many people castigated the Palmer versus Thompson

20   decision that was handed down.  Many of us because this

21   was in 1971 on the cuffs of a bunch of us going into

22   constitutional law in law school, but it is the law of

23   the land.

24             It is a case that our own Supreme Court has

1    said we cannot go behind motives of legislators and say,

2    well, you did this for the wrong reason or we think your

3    stated reason is not so.  And we're going to make you do

4    it over again or have some other rule in its place.  I

5    think the Palmer versus Thompson case although dealing

6    with the 14th amendment issue dealing with

7    constitutional rights that are of a very board and very

8    distinct admission still is dealing with constitutional

9    rights.

10              It is analogist in the sense that it does

11   provide some guidance to this Court in the area of what

12   a governmental body can or should be forced to do,

13   forced to do.  In this case we're dealing with that very

14   sensitive area of federalism with the power of the

15   federal Court represented by Article 3 Court is being

16   invited by the Plaintiffs to be operated upon and act

17   toward a local government body, a board of education.

18              I respectfully submit, Your Honor, this is

19   not the type of invitation this Court should accept.

20   The Plaintiffs are asking this Court to step in and

21   become involved in a minutia of how to conduct a school

22   prom, where it's going to be, where the decorations

23   might be, when it's going to be held, under what

24   circumstances it will be held, whether there will be

1    cheerleaders, whether there will be music, how loud it

2    will be.

3              Now, Your Honor, I do admit that if it was

4    going to be held in New Orleans they may need some

5    judicial oversight.  And several of us agreed with that

6    earlier.  But seriously this is a case that I do not

7    believe the Court should accept the Plaintiff's

8    invitation to become involved in the morass of issues

9    that are purely local in nature, purely resolvable by

10   the government local body in its wisdom.  And for better

11   or for worse that wisdom is not a wisdom that's been

12   exercised with any animus, with any intent or any effect

13   of violating the first amendment associational rights of

14   this Plaintiff.

15             Let me close by pointing out that in the

16   Tinker case, Tinker versus Des Moines, an Independent

17   Community School District case.  This is our famous

18   decision back in the 1970s where the students at the Des

19   Moines Independent Community School District wore

20   swastikas.  They were protesting against the Vietnam

21   war, and it was a really hot decision at the time.  It

22   was a hot summer when that case came down.  I still

23   remember it.  But that is a case -- and its cite is 393

24   US at page 514 where I'm quoting from, 393 US at 514.

1          THE COURT:  The Justice Fortas wrote it?

2          MR. GRIFFITH:  Yes, sir.  This is back when

3   the senate judiciary committee was letting selections of

4   justices go through and not being held up.  We say that

5   the Plaintiff's first amendment rights have not been

6   violated by the board of education's March 10 decision.

7   And that decision stands as a non-constitutional

8   dimension in the local government decision.

9          But the school board may regulate speech

10  where school officials can -- and I'm quoting from the

11  case -- reasonably forecast substantial disruption of or

12  material interference with school activities.  That's

13  the Tinker decision.  We all know -- and I've cited it

14  in every first amendment case I've had, you don't leave

15  constitutional rights at the school house door.  Of

16  course, you don't.

17         In this case the constitutional rights of

18  the public has not been abridged, they have not been

19  limited, they have not been violated by the action of

20  the board of education in making its decision on good

21  evidence, on evidence that it felt was a reasonable

22  forecast of disruption to the core educational program,

23  the core educational service, the core educational

24  meaning of what they do in the school.  And that is to

1    provide education to the students in the best possible

2    atmosphere available.

3             When this Court made the decision that it

4    did, it did so not in violation of any constitutional

5    rights but as an exercise soundly and reasonably and

6    based on facts of its best collective judgment as a

7    licensed school board.  We respectfully submit in all

8    fairness to this Plaintiff this is not a case that

9    should be one involving adjudication of violation of

10   constitutional rights.  The simple reason is the

11   Plaintiff has failed to carry her burden of persuasion

12   by clear evidence, a clear showing that every one of the

13   Canal Authority factors, the ones I've just gone over,

14   every one have been established and shown as they have

15   not been.

16            We respectfully ask the Court at this stage

17   not to grant the motion for preliminary injunction on

18   that ground.  I think the Court is on solid footing in

19   doing so and that this matter be dismissed at the

20   preliminary injunction stage.  Thank you, Your Honor.

21            THE COURT:  Okay.  The Plaintiff may

22   respond.

23            MS. BENNETT:  May I proceed, Your Honor?

24            THE COURT:  Yes, ma'am.

1            MS. BENNETT:  Your Honor, obviously, you

2    heard the testimony.  I think it's pretty clear that the

3    Defendants have not shown that the classes were

4    disrupted, that any lessons were cancelled as the result

5    of Ms. McMillen sending a demand letter asking that her

6    rights under the constitution be respected.

7            In Butts v Dallas Independent School

8    District, the Fifth Circuit took up whether or not --

9    what was the constitutional right, and they said that we

10   believe that the Supreme Court declared a constitutional

11   right which school authorities must nurture and protect,

12   not extinguish unless they found the circumstances

13   allowed them no practical alternative.

14            And that's essentially what the school

15   district is arguing here.  That they had no practical

16   alternative in what they did by withdrawing their

17   sponsorship of the prom.  But the Butts case goes on to

18   state, there must be some inquiry and establishment of

19   substantial fact to buttress the determination.  And

20   that's what the Defendants have failed to do here.

21            And they've made a lot of allegations about

22   e-mails coming in and phone calls, but there's been no

23   testimony from any teachers or any students that they

24   weren't able to get their lessons and that the classroom

1   was interrupted.  In fact, they testified to the

2   contrary.  As a school administrator, Mr. Wiygul was

3   able to handle the situation by talking to the teachers

4   and asking them to insure that their classes continued.

5              All of the Defendants' witnesses testified

6   that the contact they received from outside sources be

7   it e-mail, phone calls, whatever it may be,

8   substantially increased after they issued their press

9   statement that they were withdrawing their sponsorship

10  of the prom.

11             Your Honor, I think you have to consider in

12  this case what the Defendants are arguing.  They're

13  arguing that in order to avoid Ms. McMillen's

14  constitutional right to take her girlfriend to prom,

15  they could withdraw their sponsorship.  And that's

16  essentially saying that any time a government violates

17  someone's rights before the event that if they just

18  cancel the event then those constitutional violations

19  don't have to be addressed.

20             The school district clearly issued a

21  memorandum to all students advising them of the prom and

22  setting forth the rules which the chairman of the board

23  said they were going to uphold and enforce.  So there's

24  an acknowledgement here that there were rights at stake.

1           And if they can get out of violating Ms.

2     McMillen's rights by denying her the opportunity to

3     attend prom with her girlfriend simply by canceling it.

4     I mean, governments all over the country could start

5     canceling things when students or regular citizens raise

6     rights under the constitution when the event itself

7     hasn't actually taken place.

8           It is as if Ms. McMillen is being penalized

9     because she went through the proper channels, she raised

10    these issues before the event for them to argue that the

11    cancellation of the prom or the withdrawing of

12    sponsorship is a content neutral.

13          I mean, it's clearly belied by the fact that

14    they met strictly -- they met solely to address Ms.

15    McMillen's demand letter and their response to her was

16    rather than let you attend with your girlfriend and wear

17    a tuxedo, we're not going to have a prom.  And I think

18    that's what the Defendant fails to acknowledge that, you

19    know, by pulling out the public forum that was available

20    to Ms. McMillen, they denied her the opportunity for

21    expressing herself as a lesbian and attending prom in

22    genderial clothing of her choice.

23          And going back to the Act Up case, I mean,

24    that's exactly what the Court there find.  There

1    supposedly because -- they argue there it was content

2    neutral because the gallery that was closed to the Act

3    Up members was closed to all public.  Therefore, it

4    didn't affect just those who were seeking to make an

5    expression by being present but rather all public who

6    would have come to the gallery to watch the governor's

7    address were denied access.

8              But the Court there still found that that

9    acted as a prior restraint on those members' ability to

10   express themselves, and that's exactly what the school

11   district has done here.  So if they say that it is not

12   within the Court's purview to order them to put on a

13   social event, then we contend that what they did was

14   violate Ms. McMillen's rights not only through their

15   policy of requiring dates be of the opposite sex and

16   that dress at the prom had to be gender specific but

17   also in restraining her speech through a prior

18   restriction by canceling the prom.

19             You know, it's also important to note that

20   they cited distractions and Ms. Floyd talked about

21   distractions, but they still haven't shown who caused

22   the distractions.  And as I stated earlier in the Boyd

23   case -- in the Holloman case there is indication that

24   you have to show it is the speaker that caused the

1    disruption or the distractions not outside forces, not

2    community.

3            I mean, if you let the community dictate

4    what you do and your government, I mean, that is given

5    way to a Heckler's veto which both the Court, the

6    Supreme Court in Tinker and Terminello addressed saying

7    that, you know, they cannot condone a Heckler's veto in

8    our society.  Because if views are unpopular, obviously,

9    there might be a reaction to that.

10           But that's the whole point of the first

11   amendment.  It's supposed to be to allow people to

12   express themselves without being worried about how other

13   people are going to perceive it.  We're not saying

14   there's any fundamental right to have a prom.  Rather

15   what we're saying is that they shouldn't be able to

16   censor Ms. McMillen's speech by simply canceling the

17   prom.

18           And while the Counsel opposite went through

19   saying that the board said that -- the board made a

20   reasonable decision based on the fact that they found a

21   disruption.  I mean, just because they say there was a

22   disruption doesn't mean that there was a disruption.  I

23   mean, that's a finding that Your Honor must make whether

24   there was, in fact, an inquiry made and whether there

1    was the establishment of substantial facts to buttress

2    that determination that there was a disruption.

3            And the witnesses that have testified here

4    today have not indicated that there was any disruption

5    to the actual classroom and learning environment.  And

6    the other thing that the Defendants focused on is this

7    private prom.  There was testimony by Superintendent

8    McNeese that they encouraged parents to put on this

9    private prom and the private prom is open to everybody.

10           But there's been no real testimony about how

11   students are going to be made aware of the private prom.

12   I mean, is the school district now saying that they're

13   going to insure that Ms. McMillen is invited to this

14   private prom and that she be allowed to bring her

15   girlfriend and wear a tuxedo.  I mean, I don't think

16   that they're going to step out that far.

17           So really whether or not there's a private

18   prom shouldn't factor into whether this forum has been

19   denied to Ms. McMillen.  And according to Ms. McMillen

20   herself all she knows is what she's heard through the

21   case that it will be at the Tupelo Furniture Market.

22   She doesn't know when it is, you know, what day, what

23   time.  She hasn't heard anything about it, and she

24   doesn't expect to.

1          And finally we don't think there's any

2     question in this case about what the motive was behind

3     the school district's decision to withdraw its

4     sponsorship of the prom.  I mean, they've testified they

5     met to address the issues raised in Ms. McMillen's

6     demand letter, and their response to Ms. McMillen's

7     assertions that she had a constitutional right to bring

8     her girlfriend as a date and to wear a tuxedo was to

9     remove the forum all together.

10          And that's a viewpoint based censorship and

11     a prior restriction on Ms. McMillen's speech.  And,

12     therefore, we believe that we've met the burden for

13     proving the likelihood of success on the merits as well

14     as the other factors required in granting a preliminary

15     injunction.  But, again, in the alternative, I believe

16     Ms. McMillen would be satisfied with the declaration

17     that her rights were violated by the school removing the

18     forum and denying her the right to attend the prom with

19     her girlfriend and to wear a tuxedo.

20          THE COURT:  Let me ask you, when you make

21     this alternative prayer --

22          MS. BENNETT:  Your Honor, we would not be

23     opposed to consolidating this as a bench trial and you

24     making a finding on the merits.  I believe the Defense

1    argued some of the issues on the merits.  And so we

2    would not be opposed to that at this point in time.

3              THE COURT:  What do you say to that?

4              MR. GRIFFITH:  Your Honor, I think at this

5    stage this is a preliminary injunction hearing, and I

6    responded properly to the Canal Authority factors --

7              THE COURT:  Yes, sir.

8              MR. GRIFFITH:  -- which necessarily require

9    me to address everything that I did.  So I'm not really

10   following her logic, and I certainly don't believe

11   that's what the law says.  If it will help the Court, we

12   will do whatever you direct.

13             THE COURT:  Well, I just -- it appears to

14   the Court that it's late -- at a late stage that this is

15   raised for the first time.

16             MR. GRIFFITH:  It's a little bit like a

17   kabuki deal, what do we do now.  And it's a change in

18   belief that is a reflection of what Counsel thinks about

19   the merits of the case.  That's what's going on.  I

20   don't believe that this is a time to get in the middle

21   of the stream and change boats, and I believe that's

22   what's occurred.

23             MS. BENNETT:  We're not in any way, Your

24   Honor, trying to change.  We fully believe we're

1   entitled to injunctive relief.  Most of the issues,

2   testimony has been offered by the Defendants and,

3   therefore, it was something we proposed.  But,

4   obviously, Your Honor, if you feel it's inappropriate at

5   this time, I certainly will --

6              THE COURT:  Well, ordinarily, when you

7   combine a preliminary injunction, it's done

8   beforehand --

9              MR. GRIFFITH:  Yes, Your Honor.

10             MS. BENNETT:  Yes, Your Honor.

11             THE COURT:  Anything further?

12             MS. BENNETT  No, Your Honor.  Thank you.

13             THE COURT:  I will review the authoritative

14  citings, the submissions to the Court and the evidence

15  that's been been presented here today and issue a

16  written opinion just as promptly as I possibly can.

17             MR. GRIFFITH:  Thank you, Your Honor.

18             MS. BENNETT:  Thank you, Your Honor.

19             THE COURT:  And when we're all doing our

20  work electronically, it will be done quickly.

21             MR. GRIFFITH:  Yes, sir.

22             THE COURT:  Okay.  Very well.  Court is

23  adjourned.

24

**A**

**ability** 17:5 89:9 101:14 124:9
**able** 7:11 15:1 30:12 33:19 38:11,11,23 67:1,2,5 88:7 92:8 97:17 101:9 104:8 121:24 122:3 125:15
**above-captioned** 1:15
**ABOVE-MENTION...** 28:19 44:21 47:11 49:3 62:19
**abridged** 119:18
**absolutely** 5:8 18:13 43:1 55:3 86:3 92:7 92:12 93:6 108:7
**abuse** 108:19,19
**abusive** 54:20 55:2
**accept** 54:23 117:19 118:7
**acceptable** 32:12
**accepted** 91:2 94:2
**access** 124:7
**accidents** 108:19
**accompanied** 34:2
**accordance** 94:7
**according** 72:3,5,11 75:18 78:16 126:19
**account** 115:11
**accountability** 83:20 86:17
**accumulated** 84:5
**acknowledge** 123:18
**acknowledgement** 122:24
**ACLU** 2:10 22:8 25:10 26:21 45:21 46:24
**act** 99:11,14,19 100:5 100:18,21 104:6 115:8 117:16 123:23 124:2
**acted** 124:9
**acting** 15:23 115:2
**action** 7:20 14:11 62:9 111:7 112:15 119:19
**actions** 37:21 62:5,8 85:7 109:17
**active** 82:4
**activities** 55:17 56:12 119:12
**Activity** 82:2
**actual** 15:3 65:24 66:3 98:21,22 101:5 126:5
**actually** 10:1 14:8 16:4 16:16 17:13,22 23:17 27:8 28:9 41:4 52:4 60:20,21 62:3,11 66:7 68:2 71:2 74:1,9 78:7 79:19 81:2,23 97:11 99:15 101:17 107:18 113:4 114:16

123:7
**Adams** 1:22 3:5
**add** 104:23
**addition** 99:7
**additional** 57:7 107:24
**address** 11:16 19:8,12 35:20,23 39:24 58:7 58:11 67:2 69:12 75:10,11,12 80:24 81:3 86:19 98:9 99:17 100:22 101:13 105:6 123:14 124:7 127:5 128:9
**addressed** 122:19 125:6
**addresses** 103:21 104:7 116:16
**addressing** 7:18 9:23
**adequate** 115:20
**adhere** 15:22
**adjourned** 129:23
**adjudication** 120:9
**administration** 16:14 80:17 89:22
**administrative** 94:6
**administrator** 36:14 67:4 122:2
**administrators** 54:12 59:21
**admissible** 9:8
**admission** 15:14 117:8
**admit** 118:3
**admitted** 8:17 44:20 47:8 48:24 97:7,10
**adopted** 34:5
**advance** 101:5
**advice** 40:5 89:4 93:12 93:13
**advise** 93:8
**advising** 81:22 82:16 83:9 122:21
**advisor** 36:22 88:19 89:3
**affair** 108:4
**affect** 124:4
**affected** 75:7
**affidavit** 87:14
**affiliation** 40:5
**affirmative** 19:23 22:17 24:14 29:7 32:4 33:18,24 49:11 105:10
**afraid** 76:4,7
**African** 116:2,4
**after** 15:3 18:17 22:6 22:24 25:8,17 27:4 29:2 34:13 37:6 50:4 50:6,23 52:21 55:7 57:7 60:19 61:23 62:6,13 65:6 66:10 95:15 96:6 97:11,13

106:16 111:13 113:11 122:8
**afternoon** 46:11 66:16
**again** 53:5 89:3 91:15 93:11 117:4 127:15
**against** 12:24 15:5 100:9 101:18 115:8 118:20
**ago** 71:19 72:12 79:16
**agree** 11:17 12:4 116:8
**agreed** 78:3,23,24 98:8 118:5
**Agricultural** 13:4 18:15 34:9,16 58:10 58:19 59:5 79:14 106:24 107:5
**al** 1:11 10:20
**alcohol** 108:19
**aldermen** 116:14
**Alex** 29:23
**allegation** 8:9
**allegations** 121:21
**alleged** 14:7 50:9 52:5 55:16 107:7
**allow** 13:18 14:14 18:7 51:14 66:20 78:12 108:22 112:17 125:11
**allowed** 8:21 13:8,21 18:2 21:20,22 40:7 92:17 102:13 104:1 107:16,19,21 121:13 126:14
**allowing** 64:8 78:1,7
**AllState** 70:6 75:11,13
**alluded** 107:9,23
**almost** 39:17 60:8 83:8
**along** 13:15 56:5
**ALPHA** 1:20 3:3
**already** 17:20 107:17 115:4
**also** 6:23 7:6 11:6 13:18,19 17:14,24 72:24 78:18 91:19 93:4 98:6,8 99:11,21 101:1 103:15 104:13 106:8 107:14,21 124:17,19
**alternate** 113:12
**alternative** 104:15 106:20 108:7 112:1 113:18 121:13,16 127:15,21
**alternatives** 39:9,16 90:7
**although** 117:5
**altogether** 39:14
**always** 9:7 84:15 96:5
**Alysson** 2:13 11:4
**am** 30:22 31:3,18 46:22 54:15

**amendment** 13:2 14:17 97:1 101:16,19 102:2 103:3,5,21 104:10,20 109:24 110:1,1 117:6 118:13 119:5,14 125:11
**American** 16:23 106:12
**Americans** 116:2,4
**amount** 82:21 87:21 88:24
**analogist** 117:10
**analysis** 114:3,20
**animus** 118:12
**announced** 55:12
**announcement** 44:6 50:24 52:12
**annual** 59:12
**another** 29:11 47:16
**anybody** 20:16 22:22
**anymore** 74:22 83:15
**anyone** 34:17 70:14
**anything** 6:3,23 10:7 10:14 20:13,16,21 22:6 25:12,20 26:1,6 31:11 79:24 95:6 108:17 126:23 129:11
**anyway** 21:17 107:3 108:4
**apologize** 34:17
**apparently** 68:13 100:20
**appear** 28:6,10
**appearing** 11:2
**appears** 87:6 91:7 128:13
**appointed** 82:12 88:22
**appreciate** 45:16
**approach** 63:2
**approached** 13:6
**appropriate** 8:19 43:19 91:8 94:13 98:18
**Approximately** 63:18
**April** 42:15 65:3
**area** 42:18 59:18 81:18 84:17 110:7 117:11 117:14
**areas** 83:5,13,13,13 91:8
**arena** 81:21
**aren't** 51:14
**argue** 100:14 123:10 124:1
**argued** 128:1
**arguing** 100:12 121:15 122:12,13
**argument** 91:11 95:12 95:17 97:2 99:21
**arguments** 95:21 96:3 96:9

**arising** 16:6
**around** 19:3 21:24 25:24 38:9 73:18
**article** 72:4,11 109:8 113:1 116:16 117:15
**ask** 8:20 12:10 15:3 18:21 26:7 31:18 32:7 47:4 50:1 53:6 54:11 63:21 68:8 80:6 84:12 85:9 86:13,22 90:17 104:15 113:8 120:16 127:20
**asked** 13:12 20:21 25:4 25:12 26:1 32:11,17 32:18,22 40:20 79:11 86:3,4,5 112:5 113:23
**asking** 13:7,16,18 31:1 37:2 38:2 74:11 85:23 109:20 117:20 121:5 122:4
**assertions** 101:14 127:7
**assistant** 6:17 59:1,6 87:6
**associated** 110:2
**Association** 6:20 82:1,2 82:9,14
**associational** 110:1 118:13
**assumptions** 91:12
**athletic** 59:7
**Atlanta** 81:14
**atmosphere** 120:2
**attached** 28:22 44:24 46:5 47:14 49:6 62:22
**attempt** 100:23 116:17
**attend** 13:24 14:14 29:2 43:4 74:9 101:9 101:14 102:13 103:19,23 104:1 105:23 107:19,22 114:10 123:3,16 127:18
**attendance** 58:23 59:3 107:20
**attended** 13:2 20:6 26:6 114:14 115:9
**attending** 13:13,17 21:2 32:15 60:9 96:24 101:20 102:16 104:17 113:12,22,23 123:21
**attorney** 10:4 14:16 23:17,19 61:16 81:2 81:24 84:24 85:6 91:19 93:11
**attorneys** 75:18
**attorney's** 23:22

author 55:1
authoritative 129:13
authorities 121:11
authority 11:17 15:9
  18:11,18 106:8 109:4
  109:6 112:19 113:6
  114:1,3,19 115:3,7
  115:17 120:13 128:6
authorization 115:1
authorize 106:8
available 41:9 75:2
  120:2 123:19
Avenue 1:22 3:5
avoid 122:13
aware 13:5 29:11 65:1
  66:14 98:6 109:6
  126:11
away 17:21 67:10,11
  67:12 88:11 89:11
  108:13

**B**

B 4:18 89:6
bachelor's 36:11 58:19
back 24:5,15,18 61:4
  65:8 66:23 81:15
  88:7,10 90:11 95:20
  97:15 103:4 115:21
  118:18 119:2 123:23
background 36:6 58:16
  60:11 70:7 81:8
bad 116:18
balance 16:17
ball 39:20
banquet 113:19
based 7:11 86:24 89:21
  90:5 97:19 107:1
  120:6 125:20 127:10
basic 87:12
basically 23:4 32:23
  41:8 66:18
basis 9:1,21 56:6 100:1
because 7:19,23 12:8
  13:19 18:13 20:2
  21:9,14,15 22:2 23:1
  23:7 25:2,5 27:9,11
  27:22 30:8,11,13
  31:11,13 32:19 44:2
  53:16 59:22 64:4
  73:8 75:9 77:17 85:1
  86:16 87:10 90:20
  95:18 99:15,22 100:1
  116:18,20 123:9
  124:1,2 125:8,21
become 117:21 118:8
becoming 37:13,13
before 1:16 7:18 10:21
  15:8 16:11 26:3,8
  38:3 50:4,5 55:7
  58:23 59:4,14 60:17
  60:20,21 61:3,18

71:5 82:24 85:10
  86:10 89:1 109:3
  111:13 122:17
  123:10
beforehand 129:8
begin 105:16
beginning 86:2
behalf 2:4,17 15:12
  27:15 28:7 45:21
  94:19 97:23 103:7
behind 79:18 86:16
  116:12 117:1 127:2
being 10:3 15:18,20
  17:12 18:4 20:16
  29:11 30:12 37:16,17
  38:5 41:11 51:20
  60:7 62:2 66:14,15
  70:13 71:7 82:4
  97:18 99:7 101:9
  104:8,10 105:1,3
  107:18 113:17
  117:15 119:4 123:8
  124:5 125:12
belabor 109:4
belied 123:13
belief 107:21 108:7
  128:18
believe 6:18,22 9:15
  11:6 15:10,11 16:24
  30:19 33:16 43:18
  48:13,18 85:18 90:20
  95:3 100:16 110:5
  112:21 118:7 121:10
  127:12,15,24 128:10
  128:20,21,24
bell 38:6,7,8,8 39:1,1
below 42:20 43:7
bench 109:8 127:23
benefit 36:6 58:16 81:8
Benjamin 2:19 11:12
besides 52:7
best 18:5,14 34:12
  37:18 44:5 55:22
  56:1 86:7 110:5,14
  111:11 114:18 120:1
  120:6
better 118:10
between 52:11,15
  77:14
bifurcate 105:14
big 25:21
bigot 61:14
bigotry 17:2
Bishop 92:14
bit 90:20 93:6 104:2
  128:16
boards 7:14,15 81:9,23
  81:23 86:8,22 88:19
  89:3
board's 8:12 50:17,23
  70:11 78:14

boats 128:21
body 117:12,17 118:10
bogged 114:2
bombarded 61:8 73:4,5
both 125:5
Bottom 86:20
bought 113:10
boy 22:1,1 31:21,21
Boyd 124:22
boys 22:11 79:20
break 29:9,10 57:14
brief 10:17 12:10 95:2
  95:7 96:11 99:1
  115:6,23
briefly 12:13 16:19
  36:5 41:13 56:17
  58:16 90:16
briefs 91:11
bring 13:8,10 14:3 22:1
  22:1 43:6 64:8 78:1,7
  78:19 126:14 127:7
bringing 13:6 21:18
  26:16 60:10
brought 12:24 60:7
budget 86:17
building 106:9
bunch 79:19,20 98:2
  116:21
burden 59:17,20 96:18
  96:21 109:12,13
  110:8 115:14,14
  120:11 127:12
business 71:17,19
  73:17 88:7,10 107:3
buttons 32:22 105:5
buttress 121:19 126:1
Butts 103:14 121:7,17
buy 33:12

**C**

C 2:1 5:1 89:6
cafeteria 42:18
call 5:17,21 18:22 22:8
  26:21 35:13 37:24
  57:21 69:5 80:10
called 23:14 24:6,15
  25:9 46:15 61:13,14
  75:13 97:22 98:2,9
  111:1
calling 6:10 70:24
calls 10:19 19:1 50:4
  54:3,5,19 57:23
  80:11 88:4 106:17
  121:22 122:7
came 1:15 15:2,2 112:4
  118:22
can 5:17 8:17 9:18
  10:10 12:14 19:15
  23:6,7 31:9 33:23
  34:4 40:10 56:12
  57:20 61:5 63:6

69:19 70:18 82:24
  83:16 84:14 85:16,18
  85:19 87:15 89:16
  91:4,10 95:17 98:22
  102:3,10,23 115:19
  116:9 117:12 119:10
  123:1 129:16
Canal 15:9 18:18 109:4
  109:5 112:19 113:6
  114:1,3,19 115:17
  120:13 128:6
cancel 14:9,22 16:2
  33:17 122:18
canceling 14:14 15:5
  34:19 64:4 97:20
  123:3,5 124:18
  125:16
cancellation 15:3 39:14
  50:8,11 52:18,22
  123:11
cancelled 18:9 26:3,24
  27:5,12 29:3 34:21
  52:14 73:8 74:19
  103:3 104:3 121:4
cannot 78:19 104:14
  117:1 125:7
can't 6:3 21:15 48:7
  86:9 116:8
capital 99:17
career 58:22
carried 109:11,14
carry 76:6 83:22 84:2
  115:13,14 120:11
cases 27:21 92:10
  102:5 103:14 113:4
castigated 116:19
cause 1:15 10:19
caused 14:24 27:12
  34:7 62:5,8,9 67:10
  93:4 97:5 98:14
  101:21 124:21,24
causes 34:17
causing 38:5 71:20
ceased 55:16 62:6
cell 38:2
censor 125:16
censorship 7:3 127:10
Center 58:23 59:4
ceremonies 72:7
certainly 51:17 89:11
  103:6 128:10 129:5
chairman 70:1,3 98:5,5
  122:22
challenging 7:22 8:12
  14:17
change 21:12 27:22
  128:17,21,24
changed 92:21
channels 123:9
characterize 61:11
  73:20

cheerleaders 118:1
Chicago 81:14
child 86:16
children 38:2,4 71:18
  71:22 88:8 107:13
  108:6
choice 90:13 123:22
choices 116:12
chose 13:19 40:22
  73:15,16 94:1 97:12
  103:2
Christine 2:6 11:3
  13:15
circuit 98:15 110:23
  121:8
circumstances 117:24
  121:12
citation 98:20,22,23
  115:23
citations 102:3
cite 110:15 118:23
cited 14:9 103:17
  110:22 115:5,22,24
  119:13 124:20
cites 34:5
citings 129:14
citizens 34:10 40:8
  49:12,16,20 54:13
  76:24 123:5
city 115:7 116:1,7,13
Civil 10:23 16:23
  106:12
claim 50:19 109:16
  114:5
claims 97:18
clarifying 13:7
class 37:11 51:3,8,15
  51:20 54:3 66:23
  67:6,11,11,13,17
  97:12
classes 17:12 26:5
  52:18,22 53:14 66:14
  66:16 98:4,7 121:3
  122:4
classroom 15:18 17:14
  17:22 53:16,19 60:1
  60:6 65:24 66:4,6
  72:20 87:19,22 88:5
  97:16 98:4 121:24
  126:5
classrooms 38:4 66:20
  93:7 97:17
clear 9:20 54:2 80:17
  83:12 109:11,12
  111:21,24 112:6,20
  120:12,12 121:2
clearer 111:18
clearest 114:4
clearly 7:4 111:14
  122:20 123:13
CLERK 19:7,12 28:23

35:19 47:9 48:7,9
49:2 58:6 69:11
80:23
**Cleveland** 2:21 11:12
**close** 60:8 101:17 105:8
118:15
**closed** 57:15 99:18,19
99:22 101:7 116:7
124:2,3
**closing** 95:9,12,12,21
96:3,13 100:19 104:7
105:14 108:22
**clothing** 123:22
**coach** 22:21 23:1 36:13
59:1
**Coalition** 13:16
**collecting** 43:3 65:2
**collection** 61:19
**collective** 61:22 120:6
**College** 36:10
**combat** 100:15
**combine** 129:7
**come** 6:4 16:18 19:3
31:20,21 37:10 39:22
58:1 67:22 73:18
89:1 95:20 124:6
**comes** 10:21 86:10
108:14
**comfortable** 12:21
31:10 95:11 107:15
**coming** 53:14,18
121:22
**committee** 119:3
**common** 67:3 101:3
**commons** 42:15,17
44:9 53:23
**commonwealth** 99:18
100:22
**communications** 63:16
73:1 76:20
**community** 36:9 61:1
74:3 88:20,21 92:11
93:5 118:17,19 125:2
125:3
**compelling** 99:24 100:3
**complaining** 64:2
**complains** 33:1
**complete** 16:19 108:22
**completely** 15:18 85:8
**component** 82:15,15
**concentrate** 83:21
**concentrates** 89:11
**concern** 70:19,23 71:16
85:3 101:12
**concerned** 54:13 60:11
76:2
**concerns** 16:5,7,8
17:15,20,23 53:1,5,8
71:14 106:17 115:5
**concludes** 94:23
**conclusion** 7:1 8:12

88:14
**conclusions** 7:17
**condone** 125:7
**conducive** 38:14
**conduct** 105:21 112:11
112:15 117:21
**confer** 41:12 64:14
90:15
**conference** 5:2
**confidential** 5:10
**confining** 7:13
**conjunction** 87:15
**Conrad** 101:2
**consider** 78:1,6 103:9
122:11
**consideration** 34:13
78:11 98:11 107:14
**considered** 104:12
111:8
**considering** 17:18
**consist** 96:19
**consistent** 86:23 89:18
**consistently** 102:4
103:12
**consisting** 61:22
**consolidating** 127:23
**Constance** 1:5 3:12
5:16 10:19 12:24
13:11,18 14:14,24
15:4 19:1,4,10,19
30:7,19 48:20 54:16
55:1,3 62:3 64:8 73:8
78:1,7 105:18
**Constance's** 5:4 13:24
14:8 98:9
**constituted** 37:21
**constitution** 103:13
121:6 123:6
**constitutional** 17:1
91:21 92:2,6 93:19
105:18,22 109:16,22
109:23 110:12,24
111:4 112:22,24
114:12,13 116:2,22
117:7,8 119:15,17
120:4,10 121:9,10
122:14,18 127:7
**constitutionality** 85:5,7
**consult** 82:2
**contact** 41:4 54:14
60:15 122:6
**contacted** 13:12 27:2
38:1 50:3 72:18
**contacting** 50:20 54:15
**contemplated** 17:20
**contend** 124:13
**contending** 99:8
**content** 79:22 107:4
110:8,11,23 123:12
124:1
**contention** 18:16 99:4

104:23 105:17
**contents** 99:2
**contest** 85:4
**context** 113:19
**continuation** 16:9
59:11
**continue** 26:2 53:2
63:15 70:21 98:4
**continued** 39:18
108:10 122:4
**continuing** 55:20 56:4
56:5 98:7
**contours** 114:13
**contradict** 96:22
**contradicted** 112:9
**contrary** 122:2
**control** 39:21 44:4
109:5
**controlled** 106:7
**controversial** 82:22
83:13 89:1 92:10
93:19
**controversy** 14:7 93:5
107:7,8
**conversation** 22:9 52:2
**conversations** 51:24
55:5
**convey** 24:20
**conveyed** 66:15
**coordinator** 65:17,18
**copy** 27:24 66:11
**core** 8:5 15:14,23 38:16
38:21 89:19 94:7
111:9,20 119:22,23
119:23
**corner** 38:9
**corporate** 75:14
**CORPORATION** 1:20
3:3
**correct** 11:4 43:9 46:14
46:22 49:19 50:20
57:2 65:10 73:10
77:9 85:24 92:19
93:2,21
**could** 13:10,12 17:13
21:8,11,24 23:2,2
24:24 25:10,12 27:18
31:20,21 33:1 37:20
39:10,24 78:15 95:8
95:10 98:3,24 105:4
108:17 111:17
122:15 123:4
**counsel** 6:19 11:11
13:12 41:13 48:22
57:20 61:20,24 64:14
75:3 82:8 90:16,21
90:23 93:24 107:6
110:15 125:18
128:18
**country** 123:4
**county** 1:10 10:20 13:1

13:3 14:6,13 17:4,11
18:6,11 34:7,12,15
36:16,21 38:17 40:11
41:18,21 43:10,13,15
56:3 58:24 59:18
69:20 71:3 72:14
82:7 83:6 89:18,20
90:8 92:14 105:20
106:2,11 107:10
108:4,16 111:6,9,20
**couple** 37:9 72:12
76:16 77:16
**coupled** 17:17
**couples** 13:17 105:2
**course** 11:11 36:23
39:19 63:24 74:19
91:3 113:9 119:16
**courses** 70:9
**courtroom** 8:22 10:3,5
10:11 11:7 112:18
**Courts** 103:11
**Court's** 109:5 114:3
116:16 124:12
**cover** 83:16
**crescendo** 15:21
**criteria** 43:8
**critical** 53:19
**cross** 3:15,21 4:4,9,16
33:8 42:1,2 64:19,23
76:10,12 91:13,17
94:21
**crossed** 54:24
**Crossing** 81:3
**cuffs** 116:21
**Cumming** 35:23
**current** 14:12 36:7
64:2 70:5
**curriculum** 65:17
**curse** 61:15

_____

**D**

**D** 3:9 5:1
**Daily** 72:11
**Dallas** 121:7
**dance** 16:10 32:23
40:14 41:9 113:20
**dances** 16:6
**dancing** 32:18,21
**data** 9:1 84:4 88:13,15
**date** 13:11 22:1 24:10
25:4 26:16 41:2
43:23 46:15 60:13
62:11 104:1 127:8
**dated** 62:11 68:10
106:13
**dates** 21:6 32:15 42:21
43:8,11 60:10,11
78:19 79:12 102:24
104:18 105:1 124:15
**dating** 51:11
**Davidson** 1:16 37:20

**day** 1:16 14:5,11 18:17
24:6 25:1,23 26:8
27:9 29:4,5 37:17,18
46:1 52:2,3,57 54,8
63:17 66:8,9 70:23
82:3 87:20 126:22
**days** 14:5 29:2 52:22
57:7 60:4 95:14,14
95:14
**day-to-day** 54:9
**deal** 25:21 82:22 87:20
109:3 128:17
**dealing** 115:8 117:5,6,8
117:13
**dealt** 109:7,9
**dean** 91:9 94:14
**debated** 87:8
**decide** 78:16 89:7
**decided** 22:8 34:8
39:11 46:2 88:6
100:12
**deciding** 109:17 114:7
**decisions** 38:3 39:16
55:24 77:1 82:17
86:18,24 87:24 89:1
113:5 114:4
**decision-making** 7:15
9:23 84:17,19 86:5
87:2 94:4
**declaration** 8:14 92:9
104:16 127:16
**declared** 116:5 121:10
**decorate** 17:22 37:12
53:14 67:16,17
**decorating** 60:3 67:10
67:13,14
**decorations** 67:22
117:22
**Defendant** 2:17 11:12
12:2 35:11,13 57:21
57:22 80:11 101:11
114:21,23 123:18
**Defendants** 1:12 11:14
15:12 61:21 87:15
96:22 97:7 98:12
99:8 102:10,11 103:8
121:3,20 122:5,12
126:6 129:2
**Defendant's** 14:16 46:6
62:20 95:1,6
**defense** 48:22 90:21
127:24
**degree** 36:11,12 58:19
81:12,15
**delete** 64:6
**deliberative** 87:7
**Deloach** 1:21 3:4
**demand** 13:14 14:8
25:15,17 27:15,20,24
28:3,14 66:10,12
68:3 97:3,13,23 98:9

101:13 103:2 105:6
106:12,15 121:5
123:15 127:6
**denial** 103:5
**denied** 12:1 18:21
123:20 124:7 126:19
**deny** 101:4
**denying** 123:2 127:18
**Deputy** 112:18
**Des** 14:20 118:16,18
**describe** 25:18
**described** 38:22 63:12
**DESCRIPTION** 4:19
**despite** 55:19 93:19
**detail** 40:16
**determination** 121:19
126:2
**determine** 45:17
116:11
**determining** 103:10
**detriment** 111:14
**developed** 9:16
**development** 83:11
**dictate** 125:3
**didn't** 21:17 22:2,6
23:1,11 25:22 27:13
27:17 29:4 31:11
32:19 50:8 71:5
108:11 124:4
**difference** 104:6
**different** 21:10 41:19
65:18 75:12 104:2
**difficult** 17:8 18:6
65:23 83:13,15,24
116:10
**dimension** 119:8
**dinner** 40:13
**dinners** 72:6
**dire** 84:12,22 94:1
**direct** 3:13,19 4:2,7,14
19:17 36:3 58:13
60:15 69:17 81:5
93:24 128:12
**directed** 15:11 24:2
41:1
**direction** 40:16
**directions** 40:18
**directives** 40:16
**directly** 48:2 77:11
80:16
**director** 59:7 75:19
**directs** 106:1
**dirty** 27:10
**discipline** 98:18
**discuss** 46:19 106:20
**discussed** 71:2,5,8,10
106:22
**discussing** 37:9,14
**discussion** 16:4 97:22
**discussions** 59:9,16
67:9 71:12 88:4

97:20
**dishevelment** 114:16
**dismissed** 120:19
**disposition** 37:3
**disrupt** 97:12 100:21
**disrupted** 100:2 121:4
**disruption** 7:2 8:16
14:21,24 15:2,13
37:22 38:21 50:9,19
52:5 56:11 62:5,8,9
62:14 71:21 75:24
76:2 79:22 93:7 97:5
97:8 98:15 99:8,23
100:9,11,14,15,17
111:8 112:7,8 114:15
119:11,22 125:1,21
125:22,22 126:2,4
**disruptions** 49:24 50:1
54:2 72:19 76:5
87:17 98:12 106:18
106:23 108:11,12
**disruptive** 8:4 17:12
51:3,20 55:16 56:11
**dissemination** 100:24
**distinct** 117:8
**distract** 89:12
**distracted** 15:18
**distraction** 14:9 15:13
34:6 37:13,22 67:9
97:19 107:8
**distractions** 38:21
47:21 62:14 87:10,17
87:19,19 88:3 98:12
107:9,11 124:20,21
124:22 125:1
**districts** 40:6 81:24
82:3
**district's** 92:22 127:3
**disturb** 12:3
**DIVISION** 1:3
**document** 28:20 42:8
44:22 46:7 47:12,16
47:17,19,23 49:4,9
62:20
**documents** 63:7
**Doe** 5:14,21
**does** 28:6,10 80:5 94:20
95:5 106:3,6 115:10
117:10
**doesn't** 31:14 40:11
62:4 114:11 115:13
125:22 126:22,24
**doing** 18:14 70:22 73:5
108:15 120:19
129:19
**dominant** 116:12
**done** 25:13 38:5 113:3
114:24 115:4,16
124:11 129:7,20
**don't** 5:15 6:2,22 9:13
10:14 19:16 20:15

30:10,24 31:15,15
39:12 40:14 41:10
52:4 60:10 67:16
72:7 83:11 84:13,23
85:15,16 87:24 89:6
90:12 93:13 95:5,19
98:21 119:14,16
122:19 126:15 127:1
128:10,20
**door** 119:15
**Dorsey** 58:23 59:3,14
**down** 20:3 35:7 39:20
54:16 57:19 75:15
79:22 88:6 94:17
99:22 101:17,21
104:7 105:8 114:3
116:20 118:22
**dress** 31:14 124:16
**dresses** 22:12 24:23
25:2
**dressing** 17:15
**drinking** 16:7 17:23
53:11 59:22
**Drive** 58:11
**driving** 16:8
**drug** 17:23 53:12
108:19
**drugs** 59:23
**due** 14:7 17:2 34:6
42:22
**duly** 19:5 35:17 58:4
69:9 80:21
**during** 15:18 39:4 43:4
59:10 77:18 93:24
**duties** 17:14 84:2 92:5
**duty** 17:5 18:13 38:12
106:8
**D-1** 4:24 63:6

**E**
**E** 2:1,1,19 3:9 4:18 5:1
5:1 11:12
**earlier** 20:24 33:16
62:12 118:6 124:22
**easy** 59:16 83:14
**Eddie** 4:6 69:5,8,13
**educate** 8:6 17:5 106:6
**educated** 89:9 107:13
**educating** 71:18 77:11
88:8,10 90:11 108:6
**education** 6:17 7:13
16:12,16 17:10,18
34:2,13 35:14 36:12
36:13,18,21 37:5
38:17,18 39:4,10,21
40:1 56:23 58:21
60:14,16 70:23 71:22
81:8,10,18 82:7 83:7
89:18,20 90:1,8 91:8
91:10 94:12,14 106:5
107:4 111:6,20

114:23 117:17
119:20 120:1
**educational** 8:5 15:14
15:14,24 18:14 34:6
36:6 37:22 51:4
58:16 62:14 65:12,14
70:7 81:20,22 89:19
94:7 106:24 107:11
111:9,14 112:8
114:17 119:22,23,23
**education's** 17:4 119:6
**educators** 114:18
**effect** 38:20 44:2 80:7
114:8 118:12
**effectively** 17:5 84:2
**eight** 81:13
**either** 39:18 72:16
**elected** 36:17 82:12
88:22 111:5
**electrical** 81:12
**electronically** 129:20
**element** 116:15,17
**elements** 115:15
**else** 9:12 10:7,14 22:22
30:12 85:15,16 86:13
**emotion** 92:11
**emotional** 93:4,20
**employment** 70:5 75:8
81:19
**enable** 88:10
**encourage** 49:15 87:23
**encouraged** 126:8
**encouraging** 49:20
**end** 18:17
**enforce** 122:23
**engineering** 81:12
**enhances** 88:2
**enjoy** 30:12
**entered** 28:14 44:12,14
**entire** 13:3 15:19 19:12
19:21 20:7 57:12
84:17 97:3
**entitled** 129:1
**environment** 14:10,21
17:6 38:13 51:4
70:20 87:22 88:1,2
97:6 106:7 126:5
**equal** 31:5,6 92:1
**equitable** 113:2
**escalating** 17:10
114:15
**essence** 94:24 95:19
**essential** 7:19,24
**essentially** 121:14
122:16
**establish** 5:13 6:1,13
7:24 9:5 11:19 85:19
**established** 19:19
109:23 120:14
**establishing** 96:19
110:8

**establishment** 121:18
126:1
**estimate** 61:10
**estimated** 105:24
**estimation** 87:9 88:9
**et** 1:11 10:20
**even** 9:1 25:22 82:6
98:11 100:3,8 105:23
106:2 112:13
**event** 18:13 34:10
49:13 105:21 106:4
107:15,22 108:1,8
113:12 114:10,11,13
114:14 122:17,18
123:6,10 124:13
**events** 34:7 37:15
67:12
**ever** 20:13,20 82:24
85:10
**every** 37:17,17 38:19
52:3 61:13 63:17
65:15,19,20 66:8,9
70:23 82:11 86:10,19
87:4,20 88:24 89:4
89:10 109:7 112:5
115:15 119:14
120:12,14
**everybody** 126:9
**everyone** 31:5 54:9
**everything** 86:13 128:9
**evidence** 11:20 15:11
44:12,15 45:8 48:12
48:15,23 68:11 96:22
98:3,14 99:7 100:17
102:23 105:2,23
107:20 112:8,20
119:21,21 120:12
129:14
**evidenced** 17:12
**exactly** 53:5,8 90:21
101:6 123:24 124:10
**examination** 3:13,15
3:19,21,23 4:2,4,7,9
4:11,14,16 19:17
33:8 36:3 42:1,2
56:20 58:13 64:23
69:17 76:12 79:9
81:5 91:17
**examine** 64:20 76:11
91:13
**examined** 19:5 35:17
58:4 69:9 80:21
**example** 40:10
**examples** 92:13
**except** 14:1 52:15
85:17
**exception** 9:9
**excluded** 113:21
**excuse** 6:9 20:18 81:14
**excused** 80:9
**exemplary** 61:22

exercise 113:2 120:5
exercised 118:12
Exhibit 4:20,21,22,23
  4:24 28:14,18,21
  34:1 44:23 45:3,3,6
  47:3,9,13 48:6 49:5
  61:21,22 62:21 63:6
exist 103:7
existed 100:4
expect 106:15 126:24
expected 6:7
experience 7:12 81:9
  90:6
experienced 91:9 94:13
expert 6:18,24 7:7,11
  8:21,24 9:11 85:10
  91:2,3 94:2,13
expertise 83:4 90:6
experts 9:2 84:6 88:15
expert's 9:20
explaining 23:5
exposure 115:5
express 104:9 124:10
  125:12
expressing 7:16 30:20
  101:8,18 123:21
expression 96:23 101:5
  112:15 124:5
expressive 112:11,15
extent 17:13 85:5
extinguish 121:12
extremely 90:24
e-mail 42:7 44:11,14
  54:14 60:15 75:10,11
  75:12,23 76:24 77:6
  122:7
e-mails 54:5,6,11,18
  55:2,6,7,12,19 60:24
  61:6,8,12,19,22 62:2
  63:10 64:1 65:10,12
  65:16 66:5 73:4,17
  73:19 75:9 76:5,19
  88:4 97:10 98:2
  121:22

                 F
faced 17:8
fact 8:4 14:18 17:3,17
  17:19,24 18:7 33:12
  37:14 48:2 50:22
  54:16 55:11 67:8
  77:5 81:21 83:1
  97:16 102:15 107:14
  112:7 121:19 122:1
  123:13 125:20,24
factor 101:23 102:6
  103:9 112:2,10,19
  113:6 114:1,19
  115:11 126:18
factors 15:10 18:18,19
  104:11 108:5 109:7

109:11 111:3 114:15
  120:13 127:14 128:6
facts 17:7,12,17,19
  18:5 120:6 126:1
faculty 51:24 66:17
  97:14
failed 120:11 121:20
fails 123:18
fair 51:7 55:6
fairness 120:8
Fairview 36:16
faithfully 111:10
fall 31:11 36:17
family 19:22
famous 118:17
far 10:3 52:2,19 53:6
  54:4 64:10 74:2
  79:15 102:10 126:16
favor 15:4
fear 99:16,23 100:19
fearing 100:1
February 42:7 43:1
  68:10 103:1
federal 10:23 65:17
  117:15
federalism 117:14
feel 21:12,13 23:5 30:8
  30:10,10 34:11 55:22
  56:1 95:11 104:13
  107:21 129:4
felt 21:14 27:11 31:10
  37:18 38:14,23 87:10
  88:8 107:15 119:21
female 78:15
feminine 31:14
few 31:18 40:20 42:6
fiduciaries 15:23
field 9:3 81:13,22 84:7
  88:15 90:6 94:3,12
Fifth 110:23 121:8
filed 14:11,12
final 41:16 80:11 89:16
  93:14 96:9
finally 127:1
find 8:4 15:4 26:23
  65:15,20 109:20
  123:24
finding 112:7 125:23
  127:24
fine 12:22 96:1
finished 84:9
FIRM 3:1
first 13:2 14:17 18:23
  19:5 23:17 34:4
  35:17 39:4 58:4 59:6
  64:6 69:9,22 71:2
  74:18 75:10 77:6
  80:21 81:11,17 88:13
  97:1 101:16,19 102:1
  103:3,5,20 104:10,19
  109:24 110:1,1

118:13 119:5,14
  125:10 128:15
Fishman 2:14
five 71:9 95:14
Floyd 2:23 4:8,12
  11:13 16:22 23:20,23
  24:7 69:15,18 75:3,6
  76:3,8 79:7,10 80:3
  105:11,13,16 124:20
flyer 44:15
focus 14:18 90:11
focused 126:6
fold 66:23
folks 80:16
follow 71:6 78:3
followed 8:10
following 1:17 14:5,11
  34:5 57:11 128:10
follows 19:6 35:18 58:5
  69:10 80:22
follow-up 32:8
footing 120:18
forced 117:12,13
forces 125:1
forecast 119:11,22
foreclosing 101:20
form 50:10 64:5,5
  109:19
formal 22:10
Fortas 119:1
forth 14:20 15:24
  37:12 87:16 98:13
  102:24 104:18 105:7
  105:24 122:22
forum 101:4,7,17,21
  104:8 105:8 123:19
  126:18 127:9,18
forward 17:7 102:12
found 27:5 100:3
  103:24 110:4,14
  114:17 116:1 121:12
  124:8 125:20
foundation 17:1
founded 82:1
four 12:4 16:5 18:19
  58:22 59:4,5,13 60:1
  60:2 71:9 104:11
  109:6,10 111:2
  115:15
fourth 103:9 112:10
  114:19 115:19
free 91:23 112:4
Fricke 103:16,21 104:1
  104:6
Friday 29:6 42:15
  57:10,12 95:2
friends 26:14
front 16:1
full 29:5 34:4 39:1
fully 9:16 44:8 53:22
  83:1 115:24 128:24

Fulton 2:24 19:11,14
  19:20 35:23 69:14
function 82:19
functioning 83:1 94:6
functions 115:10
fundamental 109:21
  125:14
furniture 29:16 41:6
  74:6 126:21
further 35:2 41:23
  56:14 57:17 64:17
  68:9 76:8 79:4 80:3,6
  90:16 93:22 94:19
  95:18 112:12 115:12
  129:11
furthers 111:16
futility 116:15,17
future 108:17

                 G
G 5:1
gallery 99:16,18 100:5
  100:6,19 124:2,6
gathered 84:4
gatherings 106:19
gave 13:22 61:16 92:13
  101:3
gay 30:11,14 80:1
geared 105:1
gender 31:16 124:16
genderial 123:22
general 6:19 53:1
get 10:2 22:1 24:5,18
  25:10 27:12 33:1,19
  33:22 52:14 53:7
  65:16 66:23 71:22
  73:16 74:16 87:12
  88:7,10,11,19,23
  89:1,11 90:11 98:22
  98:24 107:2 121:24
  123:1 128:20
gets 32:24 114:2
getting 21:15 60:4 61:8
  76:5 79:20 106:17
girl 22:11 31:14
girlfriend 5:5,18 13:6,8
  13:10,13,20 14:1,15
  21:2,16,19 30:21
  31:5,21 64:8 78:1,7
  97:1 101:10,15
  102:13,20 103:19
  104:17 105:4 122:14
  123:3,16 126:15
  127:8,19
girls 20:11,14,21 22:11
  24:22,23 25:2 79:20
  102:17
give 20:2 36:5 40:10,17
  58:15 81:7 85:23
  91:10 95:13 102:3
  110:13

given 18:17 82:3 107:1
  125:4
giving 45:22 93:11,13
GLEN 1:16
go 20:9 21:15,17 22:2
  23:2,2,6 27:4 29:5
  30:8,11,12,20 32:19
  52:14 61:3 62:4
  65:15,19 71:22 82:12
  82:24 83:2 104:15
  107:17 115:12,21
  117:1 119:4
goal 107:12
goes 121:17
going 6:4 14:9 16:11
  22:2 26:19,21 39:19
  41:5 47:16 61:20
  65:22 70:15,20 85:5
  86:15,20 89:8,8
  90:12,21,23 91:13
  105:14 107:18
  108:10,12 109:4
  112:23 116:21 117:3
  117:22,23 118:4
  122:23 123:17,23
  125:13 126:11,13,16
  128:19
gone 18:18 106:23
  120:13
good 5:13 33:10,11
  42:4,5 49:18 53:15
  76:14,15 110:22
  119:20
got 25:11,23 30:20
  32:16 34:23 53:18
  58:19 65:19,19 71:18
  74:20 75:10,15 81:15
  97:15 110:14
govern 83:9,11,12 86:8
governance 7:14 9:22
  82:17 83:5 84:16
  86:13 88:17 94:3
governed 15:9
government 99:24
  100:9 111:4,5 112:3
  116:6,6 117:17
  118:10 119:8 122:16
  125:4
governmental 111:17
  111:18 112:13 114:6
  117:12
governments 123:4
governor's 99:14,17
  100:2,21 124:6
grade 21:24 30:10 40:14
graduate 36:8,9,12
  38:11 58:18 70:8
Granddaughter 74:12
  74:13
grant 102:7 103:10
  104:14 120:17

granted 11:23 12:2
  103:24
granting 12:3 101:23
  127:14
gray 19:13 83:12
greater 112:12
Griffin 68:10
ground 5:14 6:6 120:18
grounds 77:15
group 40:17 99:14,16
  116:12
growing 17:9,15 52:24
  106:11,17 114:15
guaranteed 103:13
guidance 110:5 117:11
guiding 40:24

**H**

H 4:18
half 26:3 29:4 59:8
  70:4
hand 54:18 61:20,24
  112:17
handed 116:20
handing 63:5
handle 122:3
handled 37:4 41:19
happen 26:19 27:14
  108:17,18,19 115:10
happened 20:24 52:6
  57:11 65:5
hard 5:20 38:7 66:22
Harland 98:15
harm 11:23 12:1 102:9
  102:12 103:4,7
  109:21 113:7 114:21
hasn't 55:16 123:7
  126:23
haven't 55:11 124:21
having 15:19 19:5
  23:21 31:19 35:17
  38:7,8 41:9 46:11
  47:22 52:1 53:15,19
  58:4 66:23 69:9
  79:20 80:21 97:20
  116:3
Haygood 2:14
he 7:10,15,17 8:8,14,14
  9:12 10:4,4 23:1,1,2
  23:3,5 52:1 85:16
  92:20 97:10,13,13
  98:6,8 103:24
head 23:6
hear 8:22 12:18 22:22
  88:20,21 95:12 96:9
  99:17
heard 1:15 31:20 80:15
  111:11,20 121:2
  126:20,23
hearing 10:21 28:14
  31:19 45:3 47:3

128:5
hearsay 6:23 8:16 9:1
Heather 1:21 3:4
heavy 109:3
Heckler's 125:5,7
held 10:17 42:14 46:13
  57:7 66:14,16 96:11
  99:24 102:4 103:12
  103:14 107:16
  113:13,20 117:23,24
  118:4 119:4
help 13:12 70:10 84:1
  108:15 110:6 128:11
helped 108:15
helping 40:22 60:5
here 9:13 12:23 67:24
  68:9 100:12 105:19
  110:9 121:15,20
  122:24 124:11 126:3
  129:15
HERETO 28:22 44:24
  47:14 49:6 62:22
here's 91:1 109:14
herself 98:14 101:8,18
  113:9 123:21 126:20
He'll 7:13
he's 6:19,22,23 7:4
  9:21,23,24 10:4
  84:16 85:2,5 91:12
high 13:4 18:15 34:9,16
  36:9 37:7,8 38:10
  42:11,14,18 43:11,16
  44:8 56:2 57:24
  58:10,19,22 59:5
  66:7 71:4 72:13
  77:12 79:12,14 82:2
  97:10 106:3,24 107:5
hill 39:20
him 10:3 23:5,11 72:19
  80:18,18 84:12,12
  85:13 108:22
himself 7:13
his 7:4,5,12,13 8:13 9:2
  22:20 51:24 75:22
  84:9,12,22,24 85:1,6
  85:17 91:3 94:10
  103:23 104:1
history 79:18 107:2
hold 44:9 69:23 79:22
  105:21 106:20
  112:22
holding 16:6,9 40:2
Holloman 98:15
  124:23
home 81:3
homophobia 17:2
homophobic 61:14
honestly 7:23
Honorable 1:16
Hood 4:6 69:5,7,8,13
  69:19 70:10 73:24

75:7,22 76:14 79:11
  98:5
hope 34:10 49:10,12,17
  58:11
hoping 21:8
Horn 2:23 11:13
host 18:7,13 34:8,15
  40:9,13 41:22,22
  49:20 53:2 55:15
  56:23 65:7 70:21
  72:2,5,10,16 73:15
  73:16 97:4,12 106:1
  106:3 107:5 108:8,11
  109:18
hosted 40:6 73:12
  107:18
hostile 27:8
hosting 34:22 37:11,15
  53:22 55:8,13 65:11
  70:11 71:3,15 108:10
  108:13,14
hot 118:21,22
hounded 37:17,17
hounding 37:21
hour 54:17 65:19
house 119:15
how 8:2 19:20 21:11,13
  23:5,12 25:18,19
  26:23 27:4,7 29:2
  37:3 40:3,18 52:21
  59:16 63:18 64:9
  65:12,14,24 68:4
  70:2 71:7 73:21
  74:16 79:13 80:7
  82:16,18 83:9,11,12
  85:3 86:15,20 88:23
  89:13 90:12 96:2
  97:22 102:23 105:6
  117:21 118:1 125:12
  126:10
however 34:11 92:23
  97:6 105:19 106:5
HR 75:18
hundred 82:3

**I**

IAHS 42:15,17 44:9
  53:23
idea 15:20
identification 62:17,24
  63:6 64:13
identify 8:15 63:6
identity 6:2
IHS 70:8 78:21
image 100:22
imagine 6:3
impact 65:12 66:5
  86:15,21 87:24 89:7
  90:12
impacted 65:14,24 66:3
implement 36:24

implementation 82:17
importance 94:6
important 111:16
  114:11 124:19
impossible 116:11
improper 100:22
inappropriate 6:24 7:6
  54:13 76:24 77:2,4
  85:8 129:4
incidental 112:11,14
incidents 16:13
includes 91:23
including 81:10 82:13
inconsistent 89:19
inconvenience 34:17
increased 122:8
incumbent 11:18
Independent 118:16,19
  121:7
indicated 98:6 102:11
  126:4
indicating 14:2
indication 124:23
individuals 60:16 61:1
inform 9:20
information 34:23 52:7
  84:4 88:19,20,24
  89:5 107:1
informed 21:21 87:7
initially 92:20
initiated 68:13
injunction 10:22 11:23
  12:1,2,3 14:12 15:5
  18:21 96:19 99:12
  102:7 103:11,24
  104:14 120:17,20
  127:15 128:5 129:7
injunctive 101:23
  104:12 129:1
injuries 102:8
injury 11:24 101:22,24
  102:2,7 114:5
input 89:5,21
inquired 113:23
inquiry 113:11,14
  121:18 125:24
instant 14:11
instruct 38:24 91:20
instructed 5:16 97:14
instruction 38:7,8 39:1
  53:19
instructors 39:2
insurance 70:6,9
insure 122:4 126:13
intended 96:23
intending 44:8 53:22
intent 49:15 118:12
intention 101:5
interact 82:6
intercom 92:15
interest 12:4 18:14

34:12 50:23 73:1
  86:7 99:24 100:3,8
  103:11,12 111:17,18
  112:3,13 114:6,20
interested 40:21
interfere 70:22
interfered 98:17
interference 119:12
internal 8:12
interrupted 122:1
into 34:13 44:12,15
  45:8 48:15 71:20
  76:6 98:11 102:22
  107:14 115:11
  116:21 126:18
introduce 47:2
introduced 102:22
introduction 62:2
invalidate 116:17
invitation 29:17 30:2
  41:10 74:23 75:1
  107:24 117:19 118:8
invitations 41:8 108:2
  108:3 113:17
invited 113:15,16
  117:16 126:13
involved 10:1 54:9
  80:16 92:10 117:21
  118:8
involving 17:4 46:19
  92:15,16 120:9
irreparable 11:23
  101:22,24 102:2
  109:21 113:7
Island 103:16
isn't 50:20 51:7
isolated 109:19
issue 7:18,20 8:10 14:3
  14:18 15:4 37:2
  53:11,13 59:24 60:6
  67:24 68:1 75:22
  85:2 86:10 87:8,9,12
  88:24 96:18 99:10
  103:22 104:7 109:3
  117:6 129:15
issued 14:6 65:10 103:1
  122:8,20
issues 6:3 17:15 37:10
  51:8 53:12,13 59:15
  59:23 60:17 67:6,22
  80:1 82:22 83:16,17
  83:20 86:17 88:11
  97:19 118:8 123:10
  127:5 128:1 129:1
its 7:21 15:23 16:15,24
  17:5 40:15 50:17
  52:12 55:13 57:23
  65:10 85:4 92:5 93:9
  93:18 106:4,7,9
  108:6,16 109:19
  110:3 113:2 114:23

116:18 117:4 118:10
118:23 119:20 120:6
127:3
**itself** 97:19 100:6 102:2
123:6
**I'd** 61:3,20 95:11
103:15
**I'll** 12:18 23:7 28:9
96:9
**I'm** 23:21 25:23 29:24
30:11,14 31:4,5,6,9
33:19,22 36:8 37:2
45:6,11 46:12 47:16
48:14,21 49:8 52:3
52:14 53:7 54:15
56:8,11 58:9,18 61:8
61:19 63:5 70:1
74:11 78:24 81:1,1
86:15 90:19 91:12
109:3 110:6,9 118:24
119:10 128:9
**I've** 5:16 8:13 9:9,10
20:11 36:12 37:24
59:7,13 61:13,14,15
63:24 69:21 75:10
79:15 81:20 82:9
83:8 84:1 86:8 89:21
96:5 110:4,14 113:3
113:4 119:13,14
120:13

**J**

**Jackson** 2:11 81:2
92:14 116:1,6,7,14
**Jane** 5:14,21
**January** 36:19
**jeopardizing** 17:10
**Jim** 4:13 6:18 80:12,20
81:1
**job** 36:22 58:23 60:3
65:21,23 83:24
**Journal** 72:4,12
**Judge** 1:17 37:20 109:8
**judgement** 112:1
**judgment** 120:6
**judgments** 8:2
**judicial** 116:17 118:5
**judicially** 113:3
**judiciary** 119:3
**junior** 34:15 42:14
60:2 68:16
**juniors** 34:11 49:13,21
**Justice** 119:1
**justices** 119:4
**justified** 16:15
**justify** 7:2

**K**

**kabuki** 128:17
**keep** 79:19
**keeping** 101:9

**Keith** 4:13 6:18 8:21
80:12,20 81:1,7 82:5
83:4 85:9,22 89:16
90:5
**Keith's** 6:22
**kept** 106:16,17
**kicked** 33:1
**kids** 20:6,9 26:18 88:11
89:9
**kin** 29:23
**kind** 64:6 80:1 113:5
**knew** 21:3 25:9,24
26:20 39:18,22,23
59:17
**knowing** 22:4 73:18,21
**knowledge** 7:5,12 43:3
44:5 52:5 53:22
71:12 73:14 78:9
90:5
**known** 61:13
**knows** 8:24 114:18
126:20
**Knox** 92:14
**Kristy** 2:9 11:3
**K-H** 59:14

**L**

**L** 1:21 3:4
**land** 116:23
**lap** 89:2
**last** 21:4 41:4 45:15
49:8 59:5,7,10,13
71:9 80:6 82:9
**late** 95:2 128:14,14
**later** 9:14 14:5 25:1
92:21
**latest** 43:1
**law** 9:8,11 81:2,15,16
81:18,19,22 83:23
84:14,18 85:13,17
86:23 91:11,12 93:16
94:5 106:6 110:22
115:2,3 116:18,22,22
116:22 128:11
**lawful** 8:11
**laws** 31:16 102:1
**lawsuit** 16:24 17:3
**lawsuits** 115:8
**lawyer** 84:13 85:16
91:10 92:24
**lawyers** 9:9
**lay** 8:23 9:17 82:20
**leadership** 58:21
**learning** 14:10,21 17:6
38:14 66:24 88:1,2
89:8 90:12 97:5,8
126:5
**least** 82:9 100:14
108:13
**leave** 119:14
**leaving** 27:8

**led** 108:6
**Lee** 40:11 59:18
**left** 86:16
**legal** 7:1,16,17 8:8,11
9:21 45:17 82:8,10
85:23 93:12,12 106:6
**legality** 86:13
**legally** 82:16
**Legislative** 83:23
**legislators** 116:13
117:1
**legislature** 82:13 100:7
**legitimate** 115:10
**Leigh** 2:13 11:4
**lengthy** 106:23
**lesbian** 31:4 73:9 79:24
101:8 123:21
**lesson** 15:20
**lessons** 66:1,4,15 98:3
98:7 121:4,24
**let** 22:2 23:8 26:19
31:18 42:6 45:2,14
46:5 54:11 62:23
63:21 68:8 70:22
71:22 73:17 85:9
91:13 118:15 123:16
125:3 127:20
**letter** 13:14 14:2,8
25:15,17 27:15,20,24
28:3,6,10,10,14
45:12,21,23 46:16,24
52:9,11 64:5 66:10
66:12,18 68:3 97:3
97:13,23 98:10
101:13 105:6 106:12
106:15 121:5 123:15
127:6
**letting** 119:3
**let's** 48:5 51:24 62:16
64:12 80:18
**level** 33:23 110:11
**Levy** 69:14
**liabilities** 108:18
**liability** 16:6 17:21
37:10,14 53:10,13
108:14 115:5
**Liberties** 16:23 106:13
**liberty** 109:24
**licensed** 120:7
**life** 13:3 19:21 20:7
102:17
**light** 8:3 40:24
**like** 5:21 16:18 20:20
20:21 21:14 23:5
25:3,20,21,23 26:8
27:10,11,11,13,17,20
30:8,10,10,12,24
31:9,11 32:20,23
37:18 38:14,23 53:17
55:22 59:23 61:20
64:5,5 67:15 71:6

73:3,6 87:10 88:8
103:15 104:14
128:16
**liked** 20:11
**likelihood** 11:20 96:20
99:6 127:13
**likely** 109:15 112:21
**likewise** 100:11
**liking** 20:14
**limine** 9:13
**limit** 12:14
**limited** 87:21 119:19
**limits** 5:9
**line** 54:23 86:20
**litigation** 46:20,23,23
66:19 83:17
**little** 19:16 60:9 90:20
114:2 128:16
**live** 19:11,19
**lived** 19:20
**local** 72:3 75:15,15
117:17 118:9,10
119:8
**logic** 128:10
**long** 19:20 48:6 77:19
79:13 80:7
**longer** 34:19 37:15
39:23 40:6 41:22
60:14,22 72:1 97:20
109:18
**look** 61:4 86:5 91:12
109:19
**looked** 110:4,7
**looking** 110:9
**looks** 27:10 64:5
**losing** 38:15 39:21
**lot** 25:22 27:12 64:4,7,9
82:20 87:18,19 89:12
92:11 93:4,5 114:2
121:21
**loud** 118:1
**Louisiana** 2:15
**lower** 19:15
**lunch** 95:20

**M**

**made** 7:23 8:3 18:6
21:12 23:5 37:5 38:3
39:4 42:24 44:6
56:23 60:20,21 64:10
65:6 70:13 85:4 87:9
91:12 93:14 99:9,22
107:4 111:10,21,22
112:6 113:14 120:3
121:21 125:19,24
126:11
**main** 68:1 101:12
**mainly** 115:5
**maintain** 80:14
**major** 15:13 59:24 60:6
**majority** 64:7 72:9

**make** 5:6,24 12:10
21:13 36:23 39:22
54:1 55:22,24 56:1
70:20 82:16 86:6,15
87:24 88:1,2 89:23
90:10,23 93:13 96:24
97:14 105:5 107:12
113:11 117:3 124:4
125:23 127:20
**makes** 65:23 77:1
**making** 39:3,9 79:21
83:6 86:24 88:16
90:7 111:24 119:20
127:24
**male** 103:22,23,23
**man** 61:13 91:2
**manage** 97:17
**mandate** 105:20
**mandated** 15:22 18:20
82:10,13,13 83:22
**manner** 16:10
**Mantachie** 41:17 58:11
59:19 106:3
**many** 9:24 18:1 27:9,9
29:2 63:18 70:2 71:7
113:4 116:19,20
**marginalized** 15:20
**mark** 62:16 64:12
**marked** 28:20 44:22
45:2 47:12 49:4
61:21 62:20,24 63:5
**market** 29:16 41:6 74:6
126:21
**master's** 36:12 58:20
**material** 7:2 14:20 97:5
119:12
**materially** 98:17
**matter** 7:19 9:18 11:17
12:24 30:6 37:9 91:4
95:1,18 96:19 106:16
106:21 120:19
**matters** 7:5 8:4 9:13,22
16:13 36:22 46:19
94:5,5
**max** 96:6
**maybe** 21:9,11,12
27:16,17,18,19,21
29:24 74:20
**mayor** 116:14
**ma'am** 19:3 22:14 28:4
30:17 42:9,16 43:6
44:10 45:5,19,24
57:20 65:4 66:2
67:21 68:5 69:16
75:5 76:18 78:3
79:3 96:15 105:12
120:24
**McMillen** 1:5 3:12
10:19 12:24 13:2
19:1,2,4,10 33:10,22
35:6 96:23 97:24

98:14 101:8,18,22
102:13,15 103:2,19
104:11,16 105:3
107:17 121:5 123:8
123:20 126:13,19,19
127:16
**McMillen's** 62:4,9
101:14 103:5 105:18
122:13 123:2,15
124:14 125:16 127:5
127:6,11
**McNeese** 3:18 24:12,13
35:13,16,22 36:5,20
41:16 42:4 48:19
56:22 98:1 104:24
105:3 111:21 126:8
**mean** 7:4 20:11,16,19
21:3,14 22:6 23:4,6
23:10 25:5,20,21,23
25:24 26:7,8,13,13
26:14 30:10,23 31:2
31:3,4,5,9,14 32:14
32:17,19,23 54:8
86:24 88:18 95:8
100:12 123:4,13,23
125:3,4,21,22,23
126:12,15 127:4
**meaning** 119:24
**means** 100:10,15
**media** 37:16 38:1 47:24
48:3 50:3,19,23
52:12 55:12 72:3
73:1 74:17,18
**meet** 86:19 89:13
**meeting** 14:4 39:5
46:11,19 66:17 68:2
97:14,21 98:8,8
101:12 106:16,20,22
107:2
**member** 69:21,23
76:21 77:8,10,13
82:12,19 83:1 87:4
89:10
**members** 6:15 8:3,15
9:17,24 10:8 54:7
82:6,11,16,20,23
83:9,14 84:2 86:12
86:18 87:22,23 88:21
88:22 89:22 90:2
91:20 99:19 100:5,20
111:12,23 124:3,9
**memo** 68:10 102:22
104:17
**memorandum** 99:13
115:7 122:21
**Memphis** 1:23 3:6
**mentioned** 5:5,7 49:23
50:2 51:2 52:24 54:2
67:8 76:19 92:9
**mere** 100:5
**merits** 11:21 96:21

99:7 109:15 112:21
127:13,24 128:1,19
**message** 100:6
**met** 66:17 89:14 96:21
104:11 105:6 123:14
123:14 127:5,12
**Miami** 81:14
**mic** 19:15
**Michele** 2:23 11:13
**Michelle** 16:21 23:20
23:23 24:7
**middle** 31:12 128:20
**might** 5:13 71:3 117:23
125:9
**Miller** 29:24
**Mills** 2:13 11:4
**minor** 5:6
**minutes** 12:14 96:4,6
**minutia** 117:21
**misconception** 18:9
**miss** 36:11 58:21 67:17
**missed** 98:5
**mission** 8:5 15:23
38:17,21 89:19 90:1
94:8
**Mississippi** 1:2 2:10,11
2:21,24 6:19 11:13
13:15 19:14 35:24
36:10,15,15 58:11,20
69:14 72:10 81:3,4
81:10,12,16 82:1,1
82:11,14 83:23,23
94:5 115:1
**Mitchell** 22:21 23:1
**Moines** 14:20 118:16
118:19
**mom** 25:9
**moment** 30:15 68:6,22
69:6 75:20 79:2 84:8
104:20
**Monday** 57:12
**money** 43:4 82:21
**Mooreville** 36:15 58:22
**morass** 118:8
**more** 9:16 14:3 40:12
50:22 53:19 55:11
65:23 72:15 82:4
**morning** 15:11 33:10
33:11 42:4,5 46:11
76:14,15
**most** 26:18 27:11 64:3
72:7 73:17,19 129:1
**motion** 10:22 14:12,16
99:12 120:17
**motivation** 116:12
**motive** 108:6 127:2
**motives** 116:18 117:1
**motto** 38:6
**move** 12:20 71:21
**moving** 59:4
**much** 27:13 60:12

90:13 96:2
**multiple** 16:8
**music** 118:1
**must** 8:2 13:11 42:24
43:11,23 82:12 91:20
92:5 98:16 101:24
104:11,19 109:11
114:20 121:11,18
125:23
**mute** 99:10
**mutual** 107:4 110:8,11
110:24
**my** 18:16 19:10,21
21:16 22:1 23:6 25:9
26:14 31:21 35:22,23
36:22 38:12 40:4
41:4 58:9,10,19,21
65:14 66:21 71:16
74:6 75:15 78:9 81:3
81:21 82:14 89:3,7
89:16 90:12 95:10
108:2

## N

**N** 2:1 3:9 5:1
**name** 5:7,17,24 6:4
19:8,10 22:20 23:22
24:11 35:20,22 58:7
58:9 61:13 69:12
80:24
**names** 61:14 74:11
**narrowest** 100:10
**nature** 82:18 93:20
118:9
**nearby** 40:2
**necessarily** 128:8
**necessary** 87:12 111:8
112:12
**need** 6:6,13 115:7
118:4
**needed** 5:2 14:3 88:6
**needing** 38:24
**negative** 61:9,11,14
70:14
**negatively** 16:9
**nervous** 20:4
**neutral** 123:12 124:2
**never** 26:20,20 80:2
86:3 91:2,2
**new** 2:7,7,15 17:17
81:14 118:4
**news** 38:1
**next** 14:3,10 26:2 57:21
57:23 69:5 80:10
**night** 31:12 32:20
62:12
**Nikita** 11:7
**non-constitutional**
119:7
**non-governmental**
113:19

**non-jury** 91:4,15 95:13
**non-school** 113:18
**nor** 85:23
**normal** 56:6
**normality** 8:1
**normally** 55:20 77:21
77:22
**NORTHERN** 1:2
**NORTHWESTERN**
1:3
**note** 124:19
**nothing** 44:3 51:17
56:14
**notice** 46:10 107:10
**now** 9:8,12 12:9 22:13
31:21 52:2 63:24
64:1 68:14 71:20
72:8 75:12 83:8
94:24 108:21 110:4
115:21 118:3 126:12
128:17
**no-win** 39:17 108:8
**number** 10:19 48:6
53:10 61:6 102:3
**nurture** 121:11

## O

**O** 5:1
**object** 50:10 52:1 62:1
75:21 85:1 90:24
**objection** 6:21 7:3
28:15,16 44:17,18,19
47:5,6 49:1 76:1
80:15 84:24 90:22
94:10,11
**objections** 47:7 89:14
**objectives** 89:13
**obligation** 106:6
**obligations** 93:19
**observed** 16:14 37:23
**obvious** 15:17
**obviously** 5:5 38:12
39:17 83:19 88:18
90:4 121:1 125:8
129:4
**occasion** 82:5
**occur** 8:16 50:4,6,12
52:15 97:16
**occurred** 49:24 50:19
62:6 100:16 128:22
**occurrences** 15:17
**occurring** 50:9 106:19
**off** 5:9 10:16 59:20
61:15
**offer** 14:23 48:15 85:6
**offered** 96:22 129:2
**offering** 6:23,23 7:6 8:8
**office** 36:18 75:14 83:3
**officer** 10:4 110:6
**offices** 69:24 75:15
**official** 54:22 76:24

**officials** 13:7,9 21:1
101:4 119:10
**Oh** 19:13 48:9,21
**okay** 5:2,12,19,22 9:4
20:17 21:7 30:15
31:7,17 32:18 43:14
48:14 64:12,19 69:6
69:13 77:24 80:5,13
81:11 85:23 95:22
120:21 129:22
**old** 75:10
**Ole** 36:11 58:20
**once** 9:16 21:21 32:15
90:9
**one** 6:18 11:20 17:2
20:18,19,20 25:20,24
25:24 26:1 31:19
41:16,18,20 49:8
53:10 64:6 65:15,20
65:20,21 68:8 82:4
83:16 87:20 92:13
95:20 96:8,8 108:1
111:19 113:15 114:2
115:15,19,22 116:4
120:9,12,14
**ones** 56:1 72:7 120:13
**ongoing** 53:8
**only** 8:1 9:8,18,22 26:9
84:16 86:12 97:2
124:14
**open** 39:10,16 41:6
54:15 90:7 108:4
126:9
**opening** 12:10 16:17
96:16 107:6
**operate** 55:20 56:5
**operated** 117:16
**operating** 77:21,22
**operation** 54:9 98:18
**opining** 9:21
**opinion** 9:20 73:7 85:6
85:17 88:5 94:12
129:16
**opinions** 6:24 7:6,16,17
8:8,9 9:8,22 85:23
**opportunity** 114:9
123:2,20
**opposed** 127:23 128:2
**opposing** 61:20
**opposite** 13:11 32:15
43:12,24 78:19 79:13
103:1 104:19 105:1
107:6 124:15 125:18
**opposition** 14:16 46:6
**options** 45:18 93:12
**oral** 95:17
**order** 15:1 18:20,20
83:21 122:13 124:12
**orderly** 38:13
**ordinance** 110:9,11,24
111:3

ordinarily 95:13 129:6
ordinary 26:6
organize 34:10 49:13
　49:16
organizing 53:9
orientation 20:10
Orleans 2:15 118:4
other 6:5 9:10 16:8
　17:24 39:15 40:2,5,6
　54:6,12 56:10,11
　60:24 67:12 72:1,13
　74:20 76:20 82:18
　83:17 84:14 103:14
　106:19 107:22,22
　108:7 111:23,23,24
　114:1 115:4 117:4
　125:12 126:6 127:14
others 54:19
otherwise 62:4 113:21
ought 5:13 90:2 92:7
ourselves 108:13
out 16:5 21:1 23:12
　26:6,23 27:5 31:11
　33:1 37:11 41:7,11
　53:14 60:1,5 65:15
　65:20 67:5 71:18
　78:4 83:22 84:2
　107:3,10 113:21
　115:4 118:15 123:1
　123:19 126:16
outside 63:11 122:6
　125:1
outweigh 114:5,20
outweighs 12:1 102:9
　103:7
over 16:5,7 17:20,23
　23:6 59:2,11 60:9
　63:20 71:9 76:6 82:3
　92:15 95:2 108:21
　113:3 115:5 117:4
　120:13 123:4
overall 67:10
oversight 118:5
own 106:2,4 111:12
　114:3 116:24
O'Brien 110:16,17
　112:2,10
o'clock 95:20 96:8,9

**P**

P 2:1,1,6 5:1 11:3
page 3:11 4:19 45:14
　98:22 115:24 118:24
paid 82:20
Palmer 115:21,23
　116:19 117:5
pants 24:24
papers 46:6
paragraph 34:4 49:9
paragraphs 42:21
paralegals 11:7

parameters 89:15
paramount 107:12
Pardon 44:13
parent 41:1 106:4
parents 18:3,8 37:24
　40:8,17,17,21 41:22
　49:17 54:14 59:17,20
　70:24 98:2 113:14,18
　126:8
part 82:10 92:4,5
participate 70:10
participated 59:10
　71:11
particular 40:14 43:16
　84:19 89:15
Particularly 8:3
parties 95:13
party 10:9 79:21,21
　113:19
Pasadena 36:14
pass 38:10 59:16
passed 59:19
past 29:8 57:12
patent 9:9,10
payments 42:21,24
penalized 123:8
people 20:21 25:22
　27:9,10,11,13 31:6
　54:15 63:11 64:1
　68:15 73:1,7,20
　95:11 114:17 116:19
　125:11,13
people's 105:4
pep 67:15,16,18
per 12:15 40:14 41:10
perceive 125:13
percent 61:9,9 72:5
　81:21 105:24
perceptions 15:16
perfectly 95:22
perform 17:13
performance 83:20
　86:16,17,21 87:13
perhaps 9:12
period 37:6 77:19
　109:8 114:14
periodically 77:18
permit 85:12
permitted 8:24 9:9,11
　10:5
perquisites 12:5
person 30:13 32:20
　104:8
personal 7:5 52:5
　71:12
personally 8:18 97:9
persons 61:1
perspective 46:19,23
　60:8
persuasion 109:13,13
　115:15 120:11

phone 3:7 38:2 50:3
　54:5,18 121:22 122:7
picked 75:13
place 15:17 21:10
　37:21 59:10 75:8
　79:17,17 98:7 113:1
　117:4 123:7
plaintiff 1:6 2:4 11:3
　11:10,19,21,22,24
　12:19 18:22,24 35:8
　35:10 45:21 48:21
　52:9 64:19 80:5
　94:20 95:6,23 96:12
　96:21 99:5 101:24
　102:9 109:11,14
　112:16,20 113:6,9,21
　114:9 115:13 118:14
　120:8,11,21
Plaintiffs 7:19 10:24
　18:19 94:9 117:16,20
Plaintiff's 10:22 28:18
　28:20 44:22 47:9,12
　49:4 51:18 96:17
　105:17 114:5 118:7
　119:5
plan 15:20
planned 29:12 65:2
planning 108:3
plans 41:3
plan's 115:8
please 12:23 19:3,7
　22:13 35:19 57:20
　58:2,6,15 62:10
　69:19 75:4 108:24
pleases 16:22
podium 12:20 16:19
point 16:18 24:21 25:6
　26:20 27:7 31:19
　35:9 39:23 61:7 78:6
　90:10 97:11 98:3
　103:4 109:4 125:10
　128:2
pointing 118:15
policies 8:13 37:1 83:5
　88:16
policy 7:14 8:2 13:5,17
　21:3,5,6,10 25:5
　43:10,13,15,18,23
　78:18,20,21,22,24
　82:17 83:10,10,10,12
　84:18 86:9,9 90:7
　94:3 124:15
polite 54:19
pool 116:3
pools 116:8
popular 55:24 89:24
pose 103:4
position 12:20 36:7
　83:15 88:23
positive 29:24 61:9
　73:23

possible 99:23 100:10
　120:1
possibly 129:16
post 6:6
potential 66:19 108:14
　114:21
power 101:4 111:4
　113:2 116:16 117:14
practical 121:13,15
practice 81:2,22
practiced 81:13
practicing 81:17,18,20
prayer 92:15,18 127:21
precedent 40:1
predicate 8:23 9:6
preface 87:1
preference 102:17
preliminary 10:22 12:3
　14:12 96:18 99:12
　101:23 102:7 103:10
　103:24 120:17,20
　127:14 128:5 129:7
preparation 84:3
preparations 53:17
prepare 17:22
preparing 102:21
preponderance 11:19
prescribed 106:10
presence 100:6
present 11:7 16:17
　39:4 95:21 96:3,13
　100:7 124:5
presentation 94:23
　95:16
presented 17:11,15
　18:4 108:5 129:15
presiding 1:17
press 14:7 37:16 122:8
Prestage 68:14
presumably 55:20
presume 77:5
pretend 32:20
pretty 54:20 61:16
　102:1 121:2
prevail 11:21 96:20
　109:15 112:21
prevent 100:11 101:7
　104:8
prevented 51:18
　113:22
preventing 104:16
primarily 16:5
primary 90:1,11 108:6
principal 6:17,18 22:15
　22:16,24 23:3,3
　26:14,15 36:15 37:8
　51:23 57:23 58:10
　59:1,3,3,6,7 87:5,6
　92:17,23 93:10 97:9
　97:21 106:18
principals 111:24

printed 61:15
prior 70:13 72:22
　97:19 100:23,23
　101:3,17 124:9,17
　127:11
private 34:10 40:7
　49:12,15,16,20 126:7
　126:9,9,11,14,17
probably 9:18 40:11
　53:18 70:4 72:4
　110:5
Procedure 10:23
procedures 8:9,13
　83:11
proceed 10:24 33:6
　36:1 56:18 64:21
　69:15 79:7 85:18
　96:14 105:11 120:23
proceedings 1:18 9:19
proceeds 6:5,2
process 7:15 8:5 9:23
　9:24 15:14 18:15
　34:7 37:22 39:21
　62:15 65:13,14 70:23
　84:17,19 86:6 87:2,7
　87:7 88:12 94:4 97:3
　97:6,8 106:24 107:11
　108:3 111:9,15 112:8
　114:17
processed 6:16
professional 54:19
proffered 97:7 98:13
program 65:17 111:20
　119:22
prohibiting 13:5,17
　102:24
prolong 95:18
Promotions 101:1
prompt 68:9
prompted 21:1
promptly 129:16
proms 18:1,2 37:11
　40:3 41:19 106:1
　108:20
proof 15:10 94:24
　95:16 115:14
proper 8:23 123:9
properly 128:6
property 16:7
propose 104:13
proposed 129:3
propriety 8:1
protect 103:13 108:15
　121:11
protected 97:1 101:16
　101:19 103:20 104:9
protecting 100:9
protection 92:1
protections 92:3
protective 14:18
protest 17:16

protesting 99:14
  118:20
prove 18:19 109:15
provide 9:20 17:6
  38:13,18 82:6,21
  117:11 120:1
provided 47:23 86:11
providing 104:14
proving 127:13
public 8:5 12:4 54:22
  76:23 99:18,20 101:4
  101:7 104:7 114:20
  116:3 119:18 123:19
  124:3,5
publication 100:24
publicized 48:2
public's 103:11,12
published 104:18
pulling 123:19
punishing 51:19
purchase 102:23
purchased 107:17
purchasing 113:11
pure 86:12
purely 8:8,11 118:9,9
purer 111:18
purportedly 49:24
purports 8:15
purpose 10:20
pursuant 10:22 11:17
  115:2
pursue 45:17
pursued 30:6
pursuit 114:24
purview 14:19 124:12
push 32:22 105:4
put 15:24 28:23 31:15
  33:16 80:18 98:13
  102:18 105:23
  113:18 124:12 126:8
putting 29:22 103:3
P-1 4:20 28:17 45:6,9
  68:12,13
P-2 4:21 44:20 48:8,10
  48:11
P-3 4:22 47:10
P-4 4:23 48:24 49:2

**Q**

qualifications 84:9,12
  84:22,24
qualified 7:10
quality 38:18 53:15
quell 100:13
question 32:8 39:13
  41:16 49:8 50:11
  53:6 68:8,9 80:7
  84:15 86:14 89:16
  95:10 103:18 107:19
  113:10 115:2 127:2
questions 5:10 9:11

15:19 35:2 41:23
  42:6 50:1 57:17
  64:18 76:8,16 79:5
  80:3,6 84:13,18
  85:13 88:13 90:16,18
  93:22
quickly 129:20
quite 93:6
quote 55:2 101:1
quoting 118:24 119:10

_____

**R**

R 2:1 5:1
raise 123:5
raised 14:7 123:9 127:5
  128:15
rallies 67:15,16,18
ramifications 108:17
  112:24 114:12
range 83:16
rather 14:18 15:2
  95:11 97:2 123:16
  124:5 125:14
reach 10:2 23:12 88:14
reached 15:21 90:9
reaction 125:9
reactions 111:13
read 8:13 33:23 34:4
  64:4,6
ready 10:24 11:14 60:4
real 9:20 86:14 126:10
realize 27:20,21 94:24
really 9:15 15:9 25:20
  25:22,24,24 26:9
  118:21 126:17 128:9
reason 21:10 73:11
  111:8 117:2,3 120:10
reasonable 100:1
  119:21 125:20
reasonably 9:2 119:11
  120:5
rebuttal 94:22
recall 45:11 52:8 56:12
  61:3 93:13 113:8,8
receive 13:23 60:15,24
  63:15 66:11 75:9
  88:23
received 14:1 29:17
  30:1 48:17 61:6
  63:10,19 68:3 70:14
  70:16 72:24 74:23
  75:22 76:19 77:6
  95:1 97:10 98:2
  106:12 107:24 108:1
  122:6
receiving 45:11 52:8
  65:9 97:13
recent 34:7
recess 10:17 95:20 96:8
  96:11
recognition 72:6

recognize 42:7 45:3,7
  46:6 47:17
recommendation 36:24
recommendations
  36:23
reconvene 96:8
record 6:14 7:24 9:16
  10:16 19:9 35:21
  48:5 58:8 69:12
  80:24 93:23
redirect 35:4,5 56:16
  69:3,4
refer 5:14,17 62:13
  103:15
reference 34:18
referred 33:15 99:12
referring 44:1
refers 50:11
reflected 16:8 88:5
reflecting 89:24
reflection 128:18
reflects 8:2
refunded 65:8
regard 38:17
regarding 13:1 37:5
  40:2 60:17 61:1
Regardless 88:22
regular 123:5
regularity 84:18 85:3
regularly 84:6
regulate 119:9
regulations 42:11
  106:10
reiterate 73:14 94:1
relate 9:22 16:13 81:9
  94:6
related 51:8 65:16
  115:9
relates 37:2
relating 7:14 60:16
relation 23:9 32:8
relationship 36:20
  69:20
relative 74:8 80:6
  85:17
relevancy 94:10
relevant 9:14 62:2,7
  65:21,21 75:23
relied 9:2 84:6 88:14
  88:15
relief 101:23 104:12
  105:19 129:1
relieve 59:20
rely 113:4
remain 5:10 10:5,10
  11:11
remember 20:15,15
  51:4 53:3 118:23
REMEMBERED 1:14
remove 127:9
removed 83:3

removing 127:17
renew 94:9
repeatedly 110:22
rephrase 50:14,15
reply 106:14,15
reporter 20:3 27:1,2
  34:24
REPORTING 1:20 3:1
  3:3
represented 92:19
  117:15
reprimand 51:15
reprimanding 51:19
request 13:23,24 26:12
  51:18 78:10 94:2
  96:18
requested 105:19
require 83:17 128:8
required 15:1 38:10
  115:17 127:14
requirements 83:22
  98:18
requires 109:12
requiring 124:15
resolvable 118:9
respect 8:7
respected 121:6
respectful 55:4
respectfully 115:16
  117:18 120:7,16
respond 7:8 8:7 13:23
  15:19 45:22 68:4
  95:6,9 97:23 105:6
  120:22
responded 128:6
responding 97:2
response 13:24 19:23
  20:2 22:18 24:14
  29:7 32:5 33:18,24
  34:2 45:16 46:15
  47:21 49:11 87:15
  93:4 100:19 101:13
  101:16 105:7,10
  115:6 123:15 127:6
responses 73:21 95:15
responsibility 86:22
  93:18
responsibly 15:22
rest 35:8,10
restraining 124:17
restraint 100:23
  101:18 124:9
restrict 100:4
restriction 112:11,14
  124:18 127:11
restrictions 101:3
restrictive 100:15
result 15:2 83:17
  108:18 121:4
resulted 25:14
return 35:7 57:20

reverse 93:9,14
review 62:23 129:13
revise 13:16
Re-Direct 3:23 4:11
  56:20 79:9
rhetoric 88:7
Ridgeland 81:4
ridiculous 26:18
right 6:5 24:16 25:16
  27:3,22 29:10 30:8
  35:1 38:9 45:8 52:4
  66:8 76:22 77:3 92:1
  92:4,16 93:1 104:5
  109:22,23 110:1,2
  112:22 121:9,11
  122:14 125:14 127:7
  127:18
rights 13:2 14:22 17:1
  91:21,23 92:6 102:2
  103:2,6,6,13,18
  104:20 105:7,19,22
  109:16 116:2 117:7,9
  118:13 119:5,15,17
  120:5,10 121:6
  122:17,24 123:2,6
  124:14 127:17
risk 15:15
Road 69:14 103:16
role 77:11
rolling 39:20
rough 61:10,17
rounded 112:6
rule 5:14 8:24 9:13
  10:23 44:2 78:21,24
  79:11,13,23 80:7
  104:24 117:4
ruled 9:7
rules 6:6 10:23 37:1
  43:16,20 44:1 51:14
  78:3,5,9,17 100:24
  122:22
ruling 94:15
run 71:19

_____

**S**

S 2:1 4:18 5:1
Sabine 68:14
safe 13:15 17:6 38:13
  70:20
safety 34:14
said 12:9 20:13,19,20
  24:4 25:2,4,20 26:9
  26:17 31:19 32:17
  38:1 41:5 53:17
  66:19 73:6 74:18
  90:21 96:5 116:10,10
  117:1 121:9 122:23
  125:19
same 13:17 20:6 21:6
  23:4 24:9 25:4 26:16
  30:9 44:3 46:1,15

96:24 102:16 103:22
104:24 105:2
**sampling** 61:19
**Sandy** 68:14
**Sarah** 25:10
**sat** 54:16
**satisfactory** 95:24 96:7
**satisfied** 127:16
**saved** 96:6
**saw** 107:20
**say** 19:24 30:1 31:20
32:21 41:8 51:7 55:6
73:18 77:2 91:15
100:18 117:1 119:4
124:11 125:21 128:3
**saying** 20:16 122:16
125:6,13,15,19
126:12
**says** 23:7 42:13,24
46:18 83:2 89:6
110:22 128:11
**schools** 13:3,16 17:24
18:1 37:1,11 38:13
40:2,12 41:18,20
59:18,18 65:18 72:1
72:5,10,13 115:4,9,9
**school's** 42:11 59:11
**scrutiny** 110:11,12,24
**se** 40:14 41:11
**seat** 19:7 35:19 58:6
69:7,11 80:23
**seated** 10:18 96:12
**second** 20:18 45:14
49:9 101:22 113:6
**secondhand** 52:7
**Secondly** 111:16
**see** 27:24 33:23 34:1
42:13,20 43:7 45:14
46:18 47:23 48:5,7,9
49:9 61:4 62:23
71:20
**seek** 21:1
**seeking** 14:13 104:12
124:4
**seeks** 111:19
**seem** 14:17 37:10
**seems** 102:4
**seen** 63:24 113:3
**segregated** 116:3
**selections** 119:3
**senate** 119:3
**Senatobia** 36:14
**sending** 41:7 121:5
**senior** 34:15 42:14 60:2
68:16
**seniors** 34:11 49:13,21
**sense** 53:7 114:11
117:10
**sensitive** 117:14
**sent** 13:14 25:17 27:15
27:20 28:7,11 41:11

66:10,18 97:23 100:6
106:14 107:10
113:17
**sentence** 45:15 49:10
**serious** 114:22
**seriously** 118:6
**served** 6:16 36:13 59:1
59:3,6
**service** 119:23
**set** 14:19 78:3 87:16
**setting** 76:6 91:16
95:13 102:24 104:18
105:7 122:22
**several** 40:8 51:23 52:2
59:11,15,17 61:15
65:16 66:21 70:8,16
71:19 75:14 116:4
118:5
**severe** 114:15
**sex** 13:11,17 21:6 24:10
25:4 26:16 32:15
43:12,24 44:3 78:19
79:13 96:24 103:1
104:19,24 105:1,2
124:15
**sexual** 20:10
**SF** 103:17
**sham** 7:22
**share** 21:15
**she's** 5:6 102:15 112:20
126:20
**shorten** 9:19
**should** 30:10 31:15,15
53:2 66:5 71:6,18,23
92:8 102:7 110:12
117:12,19 118:7
120:9
**shouldn't** 125:15
126:18
**show** 11:2 15:12 28:2,9
33:15 42:7 45:2,14
46:5 47:16 62:4
112:20 124:24
**showed** 44:15
**showing** 98:16 99:5
109:12,12 111:18
113:20,24 114:8
115:17,20 120:12
**shown** 48:18 111:3
114:5 115:18 120:14
121:3 124:21
**shows** 14:23 102:19
**shutting** 101:21
**side** 12:15
**sides** 88:24
**significant** 61:6
**simple** 86:14 120:10
**simply** 17:3 18:10,11
34:19 39:15 59:22
88:6 89:23 93:15
113:23 116:7 123:3

125:16
**since** 13:4 20:11 55:12
65:10 70:9 72:24
81:21
**sincerely** 34:16
**single** 65:20 86:10 87:4
**singled** 113:21
**sir** 7:9 10:6 33:7 36:2,8
37:6,24 39:6,8 40:20
41:14,20 48:9 56:19
57:1,3,6 58:2,18
60:23 61:8 63:3,7,8
63:14,23 64:16 68:20
85:11,14 91:6 95:4
109:1 119:2 128:7
129:21
**sit** 8:21
**site** 75:11
**sitting** 99:16 100:5
**situation** 17:9 24:9
39:18 44:4 54:17
65:22 70:15 71:20
73:5,19,21 90:24
91:1 99:13 106:11
108:9 122:3
**sit-down** 40:13
**slide** 115:19
**slow** 32:23
**snow** 39:20
**social** 18:12 105:21
107:15,22,24 113:12
114:10,11,13,14
115:10 124:13
**society** 125:8
**sole** 116:11
**solely** 100:13 123:14
**solid** 120:18
**some** 8:15 40:12 42:20
43:7 49:24 50:1,2
51:2 54:3,18,23
60:11 61:15 62:13
65:9 72:6,6,12 77:18
82:22 88:11,21,22
91:12 92:10 95:14
98:2,16 104:23 117:4
117:11 118:4 121:18
128:1
**somebody** 31:22
**someone** 25:9 29:23
30:9,12 32:24,24
41:4 66:11
**someone's** 122:17
**something** 5:14 6:1
9:12 27:19 39:23
82:23 89:6,7 129:3
**sometimes** 55:23 67:19
90:3
**sorry** 45:6,11 46:12
48:14,21 49:8 52:14
53:7 56:8,11 78:24
**sorts** 51:11

**souls** 96:6
**sound** 86:12
**soundly** 120:5
**sources** 111:11 122:6
**South** 35:23
**Southeastern** 101:1
**speak** 75:3 107:3
**speaker** 98:16 124:24
**special** 21:16 30:13
46:10 106:20
**specialized** 7:12
**specific** 40:18 124:16
**specifically** 7:1 37:20
40:10 43:23 85:22
**specificity** 87:16
**speech** 14:18 90:23
91:23 96:23 99:14
100:2,4,23 112:4,15
119:9 124:17 125:16
127:11
**spending** 84:1
**spent** 58:22 60:1
**spitting** 100:22
**spoke** 72:19 75:19
**spoken** 8:14 40:4 55:4
**sponsor** 18:8 60:14,22
62:6
**sponsored** 40:3 74:22
79:16 106:4 113:14
**sponsoring** 16:3 17:19
18:1,2 34:20 49:18
**sponsors** 60:2,2 68:17
**sponsorship** 7:21 18:10
18:12 37:19 39:15
40:15,23 46:3 50:18
52:13 59:12,19 63:22
87:11 88:9 99:9
100:13 104:3 110:3
110:10 114:24
121:17 122:9,15
123:12 127:4
**sports** 51:11
**spring** 29:8,10 57:14
**staff** 75:16
**stage** 112:1 120:16,20
128:5,14
**stake** 100:1 122:24
**stand** 19:8 35:6,20
57:19 58:7 69:12
80:19,23 94:17
107:23 112:4
**standard** 14:19 110:17
**standpoint** 5:11 10:13
**stands** 119:7
**start** 66:22 82:24 123:4
**started** 58:21 81:16,17
**starting** 49:10
**state** 19:8 35:20 38:9
53:18 58:7,20 61:5
69:12,19 80:24 81:9
81:12 82:10,11 87:16

89:17 99:22 100:20
100:21 106:1,6 115:3
115:3 121:18
**stated** 86:8 98:1,16
101:2 117:3 124:22
**statement** 12:11 14:6
16:17 31:3 34:5
47:20 65:11 95:9,12
96:13 105:14 107:6
122:9
**statements** 38:2 70:14
70:16,19 96:16
**states** 1:1 8:14 45:15
110:16 116:10
**status** 41:2 64:2
**statute** 83:2,23 86:23
**statutory** 83:22 115:1
**stay** 51:24
**step** 111:7 117:20
126:16
**stick** 78:4
**stigmatized** 113:22
**still** 55:24 108:2 113:13
114:9 117:8 118:22
124:8,21
**stop** 14:13 16:3 50:8,18
50:21 70:11 71:3
**stopped** 18:1,2
**story** 50:3
**straight** 17:7 30:9 31:6
112:4
**stream** 128:21
**Street** 19:13 35:23
**strictly** 75:1 78:4,9
123:14
**struggling** 90:19
**student** 38:19 83:19
86:15,21 87:12 89:8
**student's** 86:17
**stuff** 27:11
**stupid** 64:10
**submissions** 11:18 12:9
95:15,17 129:14
**submit** 95:14 109:10,24
112:13 115:16
117:18 120:7
**submitted** 87:14 95:2
**subsequent** 97:4
**subsequently** 14:10
25:14
**substantial** 11:20,22
82:21 96:20 99:6
111:17,19 119:11
121:19 126:1
**substantially** 98:17
122:8
**succeed** 99:6
**success** 127:13
**such** 14:21 37:13,14
83:6 108:18
**suffer** 11:22 101:24

113:7
suffered 102:8,12
sufficient 7:2 99:3
summarized 63:12
summer 118:22
Sun 2:6 3:22 4:10,17
6:2,21 8:7 11:3,5
13:15 42:3 44:11,14
45:1,10 47:2,15
48:16,18,21 49:7
50:14,16 56:14 76:13
79:2,4 80:8,14 84:11
84:21,23 90:18,19
91:18 93:22 94:9
Sundra 68:14
superintendent 6:17
10:9 16:12 23:8,17
23:18 24:3,5,6,11
32:11 35:14 36:18
38:12 87:5 91:9
94:14 98:1 104:24
105:3 106:18 111:12
111:21 126:7
superintendents 40:5
support 64:7
supported 92:22 93:1
supporters 116:18
supposed 27:18 29:15
125:11
supposedly 124:1
suppress 100:23
suppression 112:3
Supreme 102:1 110:22
116:9,24 121:10
125:6
sure 5:6,23,24 23:2
25:23 53:21 54:1,21
56:4 70:12,16 72:21
73:2 77:7 87:24 88:1
91:22,24 92:2,7,7
97:15 107:12
surmise 70:18
surprised 26:11 102:19
surrounding 59:18
suspend 92:23 93:9
suspension 92:21
sustained 76:1 94:11
swastikas 118:20
swear 80:18
swimming 116:3,7
sworn 19:3,5 35:17
58:2,4 69:9 80:21
system 8:6 15:24 86:7
89:10 116:3

**T**

T 4:18
table 11:11 28:23 35:7
57:20 99:2
take 12:8 19:7 35:19
58:6 67:12 69:7,11

80:23 93:3 98:11
111:7 115:11 122:14
taken 37:11 59:9 123:7
taking 7:19 15:17
17:21 20:3 34:13
58:23 60:3 67:10
98:7
talk 19:16 21:9,11
23:15 24:2,4,8,16
51:7,11 64:3 66:19
66:21
talked 22:7 23:17 25:3
41:4 54:17 65:9 68:3
79:15 87:4,5,5,8
124:20
talking 21:5 24:24
26:14,15 38:4 51:3
51:15 54:3 59:22
67:5,24 70:24 74:21
83:10 116:13 122:3
talks 64:9
taxpayers 108:16
teach 71:23
teacher 26:7 36:13
59:1
teachers 15:19 17:13
17:21 37:12 38:5
51:15,18 60:3 66:17
66:21 67:1,5,10,12
67:16 68:18 71:23
79:16 97:17 111:23
121:23 122:3
teaching 58:21
telephone 54:3,14 88:4
tell 23:15 24:7 31:22
32:12 37:20 102:10
116:8,9
temporary 18:21
ten 81:24 82:9 95:14
tender 31:17 33:3 69:1
tendered 91:2 93:24
Tennessee 1:23 3:6
tenure 71:1
Teresa 3:18 24:13
35:13,16,22
terminate 93:9
terminated 92:20,23
terminating 92:17
Terminello 125:6
terms 39:14 77:11
86:22
test 38:9 53:18
testified 19:5 35:17
58:4 69:9 80:21
85:10 97:13,21
101:11 102:15 122:1
122:5 126:3 127:4
testifies 9:12
testify 6:8 7:11 8:17 9:1
9:10,17 84:14 85:13
85:16 91:8

testifying 7:4 84:16
85:2
testimony 6:22 7:4,13
8:22,23 9:11 14:23
16:12 18:17 28:21
44:23 47:13 49:5,23
51:5 53:3 54:2,12
62:21 76:17,23 80:15
84:3 85:1 90:20 91:3
91:5 94:10,19 113:9
113:15 121:2,23
126:7,10 129:2
Texas 36:14
than 9:10 40:12 53:20
62:12 84:14 95:18
112:12 115:12
123:16
Thank 12:22 15:5
28:23 34:18 51:22
52:8 56:10 63:1 79:5
91:14 94:16 105:9
120:20 129:12,17,18
themselves 102:18
104:9 114:18 124:10
125:12
then 9:12 13:11 14:5
21:16 23:7,18 25:1
27:22 29:8 32:18,19
36:10,11,17,23,24
53:13 70:9 74:19
75:14 79:17 82:2
89:5 96:7 101:17
104:10 122:18
124:13
therefore 124:3 127:12
129:3
there's 18:8 42:20 43:7
44:19 47:7 51:17
54:23 74:14 83:2,14
99:5 100:16 102:3
103:18 105:17
112:13 113:20 114:7
115:2 116:16 121:22
122:23 125:14
126:10,17 127:1
these 17:17 18:4 61:21
62:2,7,11,12 64:1,1
65:9 66:5 67:22
68:14 82:20 86:18
88:3,11 89:12 97:19
102:16 103:18 111:2
115:15 123:10
they're 41:7 42:21 60:5
60:10 68:18 88:20
90:3 100:12 122:12
126:12,16
they've 65:24 66:3
111:9 121:21 127:4
thing 23:4 25:4 26:9
27:22 37:18 67:3
126:6

things 6:24 38:4 49:18
51:12 71:23 82:18
83:21 85:1 87:20
89:12 123:5
think 5:13 6:2 8:10
10:10 27:14 29:23,23
31:13,15,15 40:12
41:8,10 48:8 54:23
60:1 63:20 71:7 73:8
74:20 77:17 80:15
85:7 86:23 89:22
90:4,9,13 92:13 95:1
95:16 102:1,18 104:6
104:23 114:2,4 117:2
117:5 120:18 121:2
122:11 123:17
126:15 127:1 128:4
thinking 95:19
thinks 128:18
third 102:6 112:2
Thomas 11:8
Thompson 115:22,23
116:19 117:5
though 115:12
thought 18:5 21:9 23:2
26:18 27:16,16,18,19
27:21,23 31:20 48:17
93:15
threat 11:22
threatened 12:1 46:23
102:8,9
threatening 11:24
threats 75:14,15,17,22
three 11:24 60:4 95:14
115:7,18
three-hour 82:15
through 18:18 40:4,7
50:19 57:12,12 65:15
65:19 71:6 73:1
74:20 82:12,24 83:2
83:9 86:6 119:4
123:9 124:14,17
125:18 126:20
throughout 102:4
thrown 89:2
Thursday 29:4 57:9
ticket 33:12 107:17
113:10,11
tickets 65:6 75:2
102:23
time 6:6 14:3 17:21
34:11 35:9 37:6,11
38:7,16 43:5 51:8
52:11 53:16,16,19,20
59:24 66:22 72:19
77:19,24 78:11 82:21
86:19 87:21 89:2,4
90:3 93:8,17 94:1,24
95:14,19 96:2,10
109:9 113:1 118:21
122:16 126:23 128:2

128:15,20 129:5
times 52:2 67:13 77:16
77:18 114:2
Tinker 14:20 118:16,16
119:13 125:6
Title 65:17
today 10:21 63:19 68:1
84:3 89:12 126:4
129:15
today's 83:19 86:16
together 32:23 79:20
127:9
told 5:23 13:9,20 21:18
21:24 22:10,13 23:1
23:1,3,11 24:16,22
24:23 25:1 26:13,15
26:17,20 31:20,24
32:2 40:21,23 66:17
66:21 87:18 93:15
105:3
tonight's 106:16
took 36:18 37:21 59:2
107:14 108:13 121:8
total 63:18
totally 41:1
touch 25:10,11
toward 105:1 117:17
track 97:15
tractate 9:19
Trae 4:1 37:7 57:23
58:3,9 72:18
training 7:12 10:1 36:7
58:17 81:8 82:6,10
82:13,23 83:3 86:11
tremendous 88:23
Trey 81:3
trial 127:23
trouble 23:21 31:19
true 18:10
try 50:14,15 86:6
trying 33:22 56:7 77:17
79:19 84:1 100:10,15
110:6 128:24
Tupelo 41:5 72:4,11
74:6 126:21
turn 88:6 108:21
Turning 112:18
tux 22:6,7,9,11 23:9
24:9 26:16
tuxedo 13:19,21 14:1
14:15 31:7,10 78:10
78:12 101:10,15
102:14 103:20
123:17 126:15 127:8
127:19
tuxedos 22:11,23 78:15
Twenty 96:4
two 11:21 14:5 25:23
59:2,6 60:3 72:15
88:13 115:7,18
two-page 28:9

**type** 9:2 39:15 75:17
76:4,5 84:4,5 88:14
90:24 116:8 117:19
**types** 76:20 106:23
**typically** 86:8

---

**U**

**uh-huh** 19:23 22:17
24:14 29:7 32:4
33:18,24 42:23,23
44:7 49:11 105:10
**ultimate** 7:1,18
**unable** 18:19
**uncomfortable** 32:24
33:1 105:5
**unconstitutional** 116:5
**uncontroverted** 105:2
**under** 8:24 14:19 16:4
83:22 86:23 97:1
103:2,13,20 104:9
106:6,9 112:2 114:1
115:1 117:23 121:6
123:6
**underage** 53:11
**undergraduate** 81:11
**undermining** 111:14
114:16
**understand** 5:8 21:11
30:24 39:12 72:8
**understanding** 23:22
45:20 46:22 72:9
74:7,13 86:1 108:2
112:7
**understood** 5:7 93:17
**underway** 41:3
**undisputed** 102:1
**unfortunately** 53:12
86:9
**Union** 16:23 106:13
**United** 1:1 110:16
116:10
**University** 36:10 58:20
81:16
**unless** 62:3 90:23
121:12
**unpopular** 125:8
**unquote** 55:2
**unrelated** 112:3
**unsubstantiated**
100:20
**until** 13:22 44:5 45:22
53:21 57:8 96:8
102:20 103:2 106:16
**up** 6:4 14:3 19:16 27:8
33:22 44:5 53:18,21
57:8 58:1 67:23
75:13 99:11,14,19
100:5,18,21 102:19
102:20 104:7 111:1
119:4 121:8 123:23
124:3

**upcoming** 60:18
**uphold** 91:20 92:5
93:18 111:19 122:23
**upon** 9:2 11:18 18:4
38:20 84:6 88:14,15
96:20 107:1 112:6
115:9 117:16
**upset** 21:14,23 22:3
25:7,11 26:21
**upsetting** 88:12
**us** 5:10 7:24 16:15
25:14 37:18 40:10
58:15 59:20 60:11
89:12 97:23 101:2
110:17,19 115:23,24
116:20,21 118:5,24
118:24
**use** 5:24 17:23 53:12
100:10 101:4 106:9
**using** 53:16
**usually** 49:18 84:6
88:15

---

**V**

**v** 14:20 98:15 99:11
101:2 121:7
**vain** 110:4
**valid** 9:10 111:10
**verbal** 20:2
**verify** 28:3
**versus** 10:19 92:14
110:16 115:22,23
116:19 117:5 118:16
**veto** 125:5,7
**via** 38:2
**vice** 22:15,16
**vice-principal** 32:1,2
**Vietnam** 118:20
**viewpoint** 127:10
**views** 125:8
**violate** 124:14
**violated** 109:17 116:2
119:6,19 127:17
**violates** 122:16
**violating** 118:13 123:1
**violation** 13:1 17:1
103:6 104:19 105:18
109:21 120:4,9
**violations** 122:18
**visit** 77:17,19
**visited** 77:15
**voir** 84:11,22 94:1
**vote** 36:24
**voted** 47:21
**VS** 1:8

---

**W**

**walked** 27:10
**Walker** 69:13
**Walt** 99:11
**want** 5:6 6:1 9:13

21:17 23:6,11 31:11
32:19 33:15 40:24
48:14 50:1 53:7 54:1
71:16,21,21 84:12
90:17 96:2
**wanted** 23:15 24:8 41:1
68:4 90:10 103:22
107:2
**war** 118:21
**wasn't** 14:24 21:15,22
22:10 25:21,21 32:20
50:22 90:21 98:6
99:19 103:1 113:15
**watch** 124:6
**watching** 100:7
**way** 39:18 41:19 60:15
72:8 75:7 89:7 91:11
102:18 115:21 125:5
128:23
**ways** 21:24
**wear** 13:18,21 14:1,15
22:11,11,12 24:22,24
25:2 31:9 78:10,12
78:15 101:15 102:14
103:20 123:16
126:15 127:8,19
**wearing** 23:9 26:16
31:7,10 101:10
**web** 75:11
**Wednesday** 57:4
**week** 14:11 26:2 29:8
57:4,11,12
**weekend** 95:2
**weekends** 52:16
**weeks** 72:12
**weigh** 89:4,5 91:4
**weighed** 108:5
**weighs** 102:7
**wellbeing** 34:14
**went** 21:4,8 22:24 23:3
23:10 25:19 29:4
81:15 86:6 100:18
102:12 123:9 125:18
**weren't** 8:10 26:19
27:17 50:22 121:24
**West** 19:13
**we'll** 8:22 9:5 10:2 96:7
96:8
**we're** 8:12 41:8 56:7
59:22 66:20 67:24
76:1 117:3,13 123:17
125:13,15 128:23,24
129:19
**we've** 18:18 19:19
53:17 80:15 127:12
**whatever** 26:8 31:10
88:1 93:14 122:7
128:12
**whatsoever** 110:2
**what's** 22:20 24:11
45:2 48:5 63:5

128:19,22
**when** 1:17 10:2 22:7,7
24:24 25:19 26:20
27:10,14 29:20 32:11
40:19 44:6 65:18
83:11,12 104:12
110:8,10 117:23
118:22 119:2 120:3
123:5,6 126:22
127:20 129:6,19
**whenever** 27:19
**where** 1:17 34:1,4
39:23 40:19 41:17
42:13,17,20 45:15
46:18 71:20 74:5
90:10 92:10 97:11
99:13 115:13 116:1
117:22,22 118:18,24
119:10
**WHEREUPON** 10:17
28:19 44:21 47:11
49:3 62:19 96:11
**whether** 7:1 8:10 13:8
32:12 41:17 45:17
53:1 61:5 62:7,8
75:22,23 87:16 89:17
102:6,8 103:10,18
117:24 118:1 121:8
125:23,24 126:17,18
**which** 8:6 9:5 14:4,24
15:23 23:19 37:6
38:6 41:19 57:9
58:24 59:10,14 60:1
62:12 65:20,21 68:11
74:19 75:12 83:16
87:8 97:11 99:11
100:16 101:2 103:16
111:11,22 115:17,18
121:11 122:22 125:5
128:8
**while** 125:18
**whispering** 27:10
**whites** 116:4
**who** 6:16 16:12,16
21:16 22:13 29:22
30:22 31:2,3,24 40:8
40:13,21 50:2 51:19
53:14,15 65:1 68:14
74:8 80:16 82:20
92:17 97:9 109:8
124:4,5,21
**whole** 56:3 73:18,21
79:22 85:1 110:7
125:10
**whom** 9:24
**who's** 30:9 60:7
**why** 30:6 37:5 54:16
73:5,14 95:19 109:14
**wide** 53:18
**wisdom** 118:10,11,11
**wish** 12:10 80:5 84:11

84:21 95:6
**wit** 1:18
**withdraw** 18:12 37:19
40:23 46:2 55:8
87:11 100:13 110:3
110:10 122:15 127:3
**withdrawal** 39:15
50:17 52:13 88:9
**withdrawing** 7:21
40:15 55:13 99:9
121:16 122:9 123:11
**withdrawn** 63:22 104:4
114:23
**withdrew** 18:10
**within** 7:5 14:19,22
37:1 41:18 103:12
106:2 111:3 124:12
**without** 125:12
**withstand** 110:24
**witnesses** 6:7,11 8:17
9:17 35:11 97:7
98:13 101:11 122:5
126:3
**Wiygul** 4:1 25:1 37:7,7
57:23 58:1,3,9,15
59:9 64:1,20 65:1
68:10 69:7 72:18,19
73:6 97:9,21 122:2
**wonder** 5:12
**word** 74:3,16,20
**words** 46:2 50:18 61:15
82:18
**wore** 118:19
**work** 60:4 67:5 75:23
87:21 129:20
**worked** 75:13
**working** 81:23
**works** 113:13
**world** 73:18 83:19
**worried** 125:12
**worry** 31:12
**worse** 118:11
**worth** 91:13
**wouldn't** 5:7 21:20
102:19
**wound** 27:8
**writing** 25:14
**written** 95:15,15,17
129:16
**wrong** 74:19 117:2
**wrote** 119:1

---

**X**

**X** 3:9 4:18

---

**Y**

**Yeah** 6:13 32:17 60:20
67:15
**year** 20:24 21:4 34:9
37:4 59:8 69:22 71:2
81:17 82:4

**years** 16:5 17:19 37:9
  44:2 58:22 59:2,4,5,6
  59:11,14 70:2 71:7,9
  71:19 79:15,16,17
  81:13 82:4,9 83:8
  84:1 113:3
**York** 2:7,7 81:14
**young** 16:7 25:10
**yourself** 56:5 86:14
**you'll** 15:4 19:3 58:1
**you're** 12:21 30:24
  31:13 44:1 53:15,16
  56:4 66:7 77:10 80:9
**you've** 38:22 59:10
  65:19,19 71:11 76:19
  77:6 88:14 111:20
**y'all** 6:10 29:8 68:2

———————— **Z** ————————
**zoom** 33:20

———————— **1** ————————
**1** 28:14,18,21 61:21
  62:21 65:17
**1:10CV61** 10:19
**1:10CV61-D-D** 1:8
**10** 13:22 39:7 44:6
  45:16,22 46:1,13
  50:4,6,23 52:12,15
  52:21 53:21 55:7
  56:23 60:13,19,22
  61:9,23 67:20 77:14
  89:17 97:22 98:9
  102:20 106:21 110:9
  111:2 112:5 119:6
**10th** 26:8 57:8 72:22
  72:24
**100** 58:11
**11** 61:5
**11th** 57:9 98:15
**12th** 57:9
**125** 65:19
**1276** 99:2
**14th** 117:6
**15** 12:14 57:12
**18th** 69:22
**19** 3:14 57:13 81:21
**1968** 110:21
**1969** 70:8
**1970s** 118:18
**1971** 116:21
**1977** 36:8
**1979** 36:9 81:15
**1980** 103:17
**1981** 36:10
**1982** 81:17,21
**1984** 36:11
**1991** 58:18
**1996** 58:20

———————— **2** ————————

**2** 13:14 25:18 42:15
  44:23 46:16,24 52:9
  52:11,15 65:3 66:11
  77:14
**2nd** 106:13
**20** 44:2 96:6,6
**200** 60:9,10
**2000** 58:24
**2002** 59:2
**2007** 36:17
**2008** 36:19
**2010** 1:16 13:14 42:13
  45:16 46:13 56:23
  68:11 89:17 110:9
**204** 19:13
**2115** 69:13
**217** 115:24,24
**22** 14:4
**22nd** 1:15
**235** 115:24
**236** 1:22 3:5
**27** 83:8 84:1
**28** 4:20 83:8
**289** 81:3

———————— **3** ————————

**3** 47:9,13 109:8 113:1
  116:16 117:15
**33** 3:16
**35** 3:20
**367** 110:17,19
**381** 103:17
**38103** 1:23 3:6
**38855** 58:12
**391** 110:16,18,19
**393** 118:23,24

———————— **4** ————————

**4** 49:5
**4,000** 63:20 65:9
**403** 115:23,24
**41** 3:22
**45** 4:21
**47** 4:22
**49** 4:23
**4910** 103:17

———————— **5** ————————

**5** 42:7 43:1,1 103:1
**5th** 68:11
**514** 118:24,24
**523-8974** 1:24 3:7
**56** 3:24
**57** 4:3

———————— **6** ————————

**605** 35:23
**62** 4:24
**64** 4:5
**65** 10:23
**68** 4:8

———————— **7** ————————

**702** 8:24
**703** 8:24
**75** 4:10 72:5 105:24
**78** 4:12

———————— **8** ————————

**8th** 20:12
**80** 4:15

———————— **9** ————————

**9** 14:2
**9th** 13:4 106:14
**90** 4:17 61:9
**901** 1:24 3:7
**98** 81:21